## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

IVY STRYKER; BURTON WAY
INVESTMENTS LLC; MICHAEL BUSH;
CAMERON CARDIN; DANIEL
CHANDLER; LARRY COLE; JOSEPH
CURB; TAMARA DARBY; LABRAUN
CRAYTON; DAWN GIBBS-ALLEN;
JENNA FORSTER; CHRISTIAN KEATING;
WALTER KWAK; MICHELLE
LASKOWSKI; NARCISO MALDONADO;
JEREMY MORA; ANDREW MORILL;
KATRINA O'CONNOR; CARL PATELLI;
MARK PFEIFER; GARRETT PFEIFER;
EMMA PIRE; PAUL SOBERANO;
ANTHONY SPANGLER; CICELY
TEGELER; EMMANUEL TURCOTTE;
WANYA WARREN; ARIC WHITE; LESLIE
WILCZEWSKI; ARON WOZNIAK; DOUG
YARRINGTON; CHARLES
ZIMMERSCHIED individually and on behalf
of others similarly situated,

Case No. 2:24-cv-11538-LVP-KGA

Hon. Linda V. Parker

Magistrate Judge Kimberly G. Altman

**DEMAND FOR JURY TRIAL**

**CLASS ACTION**

               Plaintiffs,

      v.

FCA US LLC, a Delaware limited liability
company; and STELLANTIS NV, a public
limited liability company in the Netherlands,

               Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT

I.      NATURE OF THE ACTION ............................................................ 13

II.     JURISDICTION AND VENUE ...................................................... 17

III.    PARTIES ........................................................................................ 19

        A.      Arizona Plaintiff ................................................................ 19

                1.      Cicely Tegeler ........................................................ 19

        B.      California Plaintiffs .......................................................... 21

                1.      Burton Way Investments LLC ............................... 21

                2.      Jeremy Mora ........................................................... 23

                3.      Paul Soberano ......................................................... 26

        C.      Delaware Plaintiff ............................................................. 29

                1.      Wanya Warren ......................................................... 29

        D.      Colorado Plaintiff ............................................................. 31

                1.      Mark Pfeifer ............................................................ 31

        E.      Florida Plaintiff ................................................................ 33

                1.      Aron Wozniak .......................................................... 33

                2.      Emmanuel Turcotte ................................................. 35

        F.      Georgia Plaintiff ............................................................... 37

                1.      Emma Pire ............................................................... 37

        G.      Illinois Plaintiffs .............................................................. 39

                1.      Joseph Curb ............................................................. 39

                2.      Dawn Gibbs-Allen ................................................... 41

                3.      Christian Keating ..................................................... 43

                4.      Michelle Laskowski ................................................ 46

                5.      Katrina O'Connor .................................................... 49

|   |   | 6. | Aric White ................................................................ | 52 |
|   |   | 7. | Narciso Maldonado ..................................................... | 56 |
| **H.** | **Indiana Plaintiffs** ................................................................ | | | **59** |
|   |   | 1. | Anthony Spangler ....................................................... | 59 |
|   |   | 2. | Walter Kwak ............................................................. | 61 |
| **I.** | **Maryland Plaintiff** ............................................................... | | | **62** |
|   |   | 1. | Garrett Pfeifer .......................................................... | 62 |
| **J.** | **Michigan Plaintiffs** .............................................................. | | | **64** |
|   |   | 1. | Michael Bush ............................................................ | 64 |
|   |   | 2. | Daniel Chandler ......................................................... | 66 |
|   |   | 3. | Labraun Crayton ......................................................... | 69 |
|   |   | 4. | Tamara Darby ............................................................ | 72 |
|   |   | 5. | Ivy Stryker .............................................................. | 74 |
|   |   | 6. | Leslie Wilczewski ....................................................... | 77 |
| **K.** | **Missouri Plaintiff** ............................................................... | | | **79** |
|   |   | 1. | Doug Yarrington ......................................................... | 79 |
| **L.** | **Nevada Plaintiff** ................................................................. | | | **82** |
|   |   | 1. | Larry Cole .............................................................. | 82 |
| **M.** | **New Jersey Plaintiff** ............................................................ | | | **85** |
|   |   | 1. | Joyce Jones ............................................................. | 85 |
|   |   | 2. | Carl Patelli ............................................................. | 86 |
| **N.** | **Oregon Plaintiff** ................................................................. | | | **89** |
|   |   | 1. | Charles Zimmerschied .................................................. | 89 |
| **O.** | **Texas Plaintiffs** ................................................................. | | | **91** |
|   |   | 1. | Cameron Cardin ......................................................... | 91 |

2.     Andrew Morill ........................................................................ 93

**P.    Wisconsin Plaintiffs** ....................................................................... **96**

1.     Jenna Forster ......................................................................... 96

**Q.    Defendants** ...................................................................................... **98**

1.     FCA ........................................................................................ 98

2.     Stellantis ................................................................................ 99

**IV.   SUBSTANTIVE ALLEGATIONS** .............................................................. **104**

**A.   Federal Legislative and Regulatory Framework Setting Forth Automotive Anti-Theft Requirements** ....................................... **104**

1.     Safety concerns relating to vehicle thefts lead to the mandate for automotive anti-theft devices intended to prevent the ability of amateur thieves to quickly steal vehicles. ................................. 104

2.     NHTSA strengthens the requirements for anti-theft devices if used to obtain part marking requirements ("PMR") exemptions. .................. 107

**B.   The Class Vehicles Were Marketed and Sold as Safe, Secure, and of the Highest Quality.** ............................................................ **109**

**C.   The Class Vehicles Suffer from the Anti-Theft Security Defect which Allows Amateur Thieves to Easily Steal the Vehicles in Under Two Minutes Without Making a Sound.** ..................................... **111**

1.     The Class Vehicles' keyless ignition and anti-theft systems can be bypassed with a cheap key programming device. .................................. 111

2.     The Anti-Theft Security Defect allows amateur thieves to steal Class Vehicles in under two minutes without making any sound. .................. 117

3.     Surveillance videos reveal how easy it is for thieves to exploit the Anti-Theft Security Defect without any resistance. ................................ 119

**D.   As News of the Anti-Theft Security Defect Started to Spread, Theft Rates of Class Vehicles Began to Surge.** ....................................... **123**

**E.   The Anti-Theft Security Defect Poses an Unreasonable Danger to Class Members and the Public.** ................................................. **130**

1.     The theft of Class Vehicles creates an unreasonable safety threat to Class Members. ....................................................................... 130

2.      Just as Congress warned in 1968, stolen Class Vehicles are a serious safety threat to the general public. ......................................................... 133

**F.      The Class Vehicles are Defective, Do Not Meet Industry Standards, and Violate Federal Law. ................................................................... 136**

1.      The Class Vehicles do not satisfy FMVSS No. 114. ............................. 136

2.      The anti-theft systems installed in Class Vehicles do not meet industry standards, which include, at minimum, a 5-minute delay when creating new keys. ................................................................ 137

3.      Defendants ignored feasible alternative designs, consistent with industry standards, that would alleviate the risk of theft created by the Anti-Theft Security Defect. ................................................................. 139

**G.      Defendants Knowingly Manufactured and Sold Millions of Class Vehicles that Contain the Anti-Theft Security Defect, Allowing Barrierless Exploitation By Thieves. ............................................................. 140**

1.      Defendants and their predecessors belonged to automotive industry associations that monitor developing technology like key programmers since 1999. ......................................................... 142

2.      Defendants should have uncovered the Defect through its FMVSS self-certification process and pre-sale testing. ......................................... 144

3.      Defendants were on notice of the Defect from their efforts to monitor Class Vehicle thefts. ................................................................. 145

4.      Defendants were aware of the specific vulnerabilities within SKIS that compromised security in Class Vehicles since its inception around 2011. ........................................................................... 146

5.      Defendants were aware that thieves target RF Hubs to create unauthorized keys used to steal Class Vehicles. .................................... 149

6.      A Class Vehicle is sensationally hacked and Defendants pledge to review electronic vulnerabilities in Class Vehicles in 2015. .................. 150

7.      Defendants offer public bounties for those who identify security vulnerabilities in Class Vehicles beginning in 2016. .............................. 151

8.      Auto thieves exploited key programming to steal Class Vehicles by hacking DealerCONNECT in 2016. ........................................................ 152

9.      Defendants installed new security modules in Class Vehicles with a design defect in 2018. ............................................................................ 152

10. Defendants grant permission to key programmers to bypass the security modules in 2020. ....................................................... 153

11. Defendants had direct notice that key programmers were fueling rampant theft of Class Vehicles since 2020. ............................................ 154

12. Defendants acknowledged that SKIS was vulnerable to key programmers in 2021. ............................................................ 156

**H.  Defendants Engaged in a Concerted Effort to Conceal the Existence and Extent of the Defect. ................................................................... 156**

1. Berj Alexanian's misleading statements in response to the hack of DealerCONNECT. .................................................................. 156

2. Stellantis' false and misleading response to theft story published by WXYZ Detroit. ..................................................................... 157

3. Stellantis and Tim Kuniskis's false and misleading press release concerning new security features. ............................................. 158

4. Defendants' false and misleading announcement of the Programming Lockdown. .................................................................. 159

5. Defendants' misleading letters to customers informing them of the Programming Lockdown TSBs. .................................................. 160

**I.  Defendants' Made Fraudulent Misrepresentations in order to Induce Class Members to Acquire Class Vehicles. ....................................... 163**

1. Defendants made false and misleading statements concerning the anti-theft systems installed in the Class Vehicles and their compliance with FMVSS No. 114. ..................................................... 163

2. Defendants knew all statements were false at the time they were made. ............................................................................. 166

3. Defendants intended to induce Plaintiffs and Class Members to acquire Class Vehicles. ........................................................... 167

4. Plaintiffs and Class Members relied on Defendants' false and misleading statements. ............................................................ 168

**J.  Fraudulent Omission/Concealment/Nondisclosure Allegations. ................. 170**

1. Who, What, Where, When, How, and Why ............................................ 170

2. Defendants had a duty to disclose based upon their superior knowledge and special relationship to Class Members. ........................ 174

3.     Defendants had a duty to disclose under statute and regulation. ............ 176

4.     Defendants had a duty to disclose safety defects to customers. ............. 176

5.     Defendants had a duty to disclose because they knew Class Members were unaware of the Anti-Theft Security Defect.................... 177

6.     Defendants had a duty to disclose based on its partial statements.......... 179

K.     **The Anti-Theft Security Defect Has Caused Plaintiffs and Class Members to Suffer Immense Damages in a Variety of Forms...................... 179**

1.     The defect causes substantial damages to Class Vehicles beyond the defective ignition and anti-theft systems. ................................. 179

2.     Class Members suffer damages beyond those to their Class Vehicles themselves.................................................................................... 181

3.     The existence of the defect in all Class Vehicles constitutes a concrete injury suffered by all Class Members...................................... 182

L.     **To This Day, Defendants Allow Millions of Class Vehicles to Remain on the Road, Suffering from the Anti-Theft Security Defect, And Posing Serious Danger to Class Members and the General Public............. 182**

1.     The theft rates of Class Vehicles continued to increase after Defendants' limited Programming Lockdown rollout........................... 182

2.     Defendants sold over 3 million Class Vehicles suffering from the Anti-Theft Security Defect after developing the Programming Lockdown. ........................................................................................... 184

3.     Defendants' Refusal to Provide Fair Notice and Full Disclosure of the Anti-Theft Security Defect is Preventing a Resolution to the Rampant Theft of Class Vehicles ............................................................ 185

4.     Defendants' Programming Lockdown was an insincere ploy designed to satisfy critics in media and law enforcement...................... 186

5.     The Programming Lockdown TSBs failed due to severely limited scope, unreasonable side-effects, and shifting costs to customers.......... 190

6.     Defendants have the ability to address the Anti-Theft Security Defect in all Class Vehicles immediately—but do not........................... 193

M.     **Joint Venture and Agency Relationship Between Defendants and their Dealers.................................................................................................. 194**

N.     **Privity Exists Between Defendants and Plaintiffs and Class Members ....... 197**

**V.**     **TOLLING OF STATUTE OF LIMITATIONS**................................................ **198**

    **A.**     **Fraudulent Concealment Tolling** ................................................ **198**

    **B.**     **Estoppel**.......................................................................................... **199**

    **C.**     **Discovery Rule**............................................................................... **200**

**VI.**    **CLASS ALLEGATIONS** ........................................................................ **201**

**VII.**   **CLAIMS FOR RELIEF** .......................................................................... **205**

    **A.**     **Nationwide Class Claims**.............................................................. **205**

        1.     Nationwide Count 1: Breach of Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. (Nationwide Class)....... 205

    **B.**     **Arizona Counts:** ............................................................................. **207**

        1.     Arizona Count 1: Breach of Implied Warranty of Merchantability (AZ Rev Stat § 47-2314) Against Defendants ......................................... 207

        2.     Arizona Count 2: Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. § 44-1521, *et seq.* ................................................... 209

        3.     Arizona Count 3:  Fraudulent Concealment .......................................... 211

        4.     Arizona Count 4: Unjust Enrichment Against All Defendants............... 214

    **C.**     **California Counts:** ......................................................................... **216**

        1.     California Count 1: Breach of Implied Warranty of Merchantability (Cal. Com. Code §§ 2314 and 10212) Against Defendants.................... 216

        2.     California Count 2: Violation of the California Song-Beverly Consumer Warranty Act for Breach of Implied Warranty, Cal. Civ. Code §§ 1791.1 and 1792 ..................................................................... 219

        3.     California Count 3: Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, et seq.) Against All Defendants ............................................................................................. 220

        4.     California Count 4: Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.) Against All Defendants. ............................................................................................ 225

        5.     California Count 5: False Advertising Under the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, et seq.) Against All Defendants ....................................................................................... 230

6.      California Count 6: Fraudulent Concealment ........................................... 234

7.      California Count 7: Unjust Enrichment Against All Defendants ........... 238

**D.      Colorado Counts** ....................................................................... **239**

1.      Colorado Count 1: Breach of Implied Warranty of Merchantability
(Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212) Against Defendants.......... 239

2.      Colorado Count 2: Violation of the Colorado Consumer Protection
Act (Colo. Rev. Stat. § 6-1-101, et seq.) Against All Defendants .......... 242

3.      Colorado Count 3: Fraud by Omission and Concealment Against All
Defendants ............................................................................. 247

4.      Colorado Count 4: Unjust Enrichment Against All Defendants............. 250

**E.      Delaware Counts** ....................................................................... **252**

1.      Delaware Count 1: Violation of the Delaware Consumer Fraud Act
(6 Del. Code § 2511, et seq.) Against All Defendants............................ 252

2.      Delaware Count 2: Violation of the Delaware Deceptive Trade
Practices Act (6 Del. Code § 2531, et seq.) Against All Defendants ..... 256

3.      Delaware Count 3: Fraud by Omission and Concealment Against
All Defendants ......................................................................... 260

4.      Delaware Count 4: Unjust Enrichment Against All Defendants ........... 263

**F.      Florida Counts:** ......................................................................... **264**

1.      Florida Count 1: Breach of Implied Warranty of Merchantability
(Fla. Stat. §§ 672.314 and 680.212) Against Defendants ...................... 264

2.      Florida Count 2: Violation of the Florida Deceptive and Unfair
Trade Practices Act, Fla. Stat. § 501.201, *et seq*. .................................. 267

3.      Florida Count 3: Fraudulent Concealment............................................... 269

4.      Florida Count 4: Unjust Enrichment...................................................... 272

**G.      Georgia Counts:** ......................................................................... **274**

1.      Georgia Count 1: Breach of Implied Warranty (Ga. Code. Ann. §§
11-2-314 and 11-2A-212) Against Defendants........................................ 274

2.      Georgia Count 2: Violation of the Georgia Uniform Deceptive
Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq*. ........................ 276

3.      Georgia Count 3: Violation of the Georgia Fair Business Practices Act (Ga. Code Ann. § § 10-1-390, et seq.) Against All Defendants ...... 278

4.      Georgia Count 4: Fraud by Omission and Concealment ....................... 281

5.      Georgia Count 5: Unjust Enrichment Against All Defendants.............. 284

H.   **Illinois Counts: ................................................................................... 286**

1.      Illinois Count 1: Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* and 720 ILCS 295/1A ........................................................................................ 286

2.      Illinois Count 2: Breach of Implied Warranty, 810 ILCS § § 5/2-314 and 5/2A-212 .......................................................................................... 288

3.      Illinois Count 3: Fraudulent Inducement ................................................ 289

4.      Illinois Count 4: Fraudulent Concealment .............................................. 290

5.      Illinois Count 5: Unjust Enrichment Against All Defendants ............... 294

I.   **Indiana Counts: ................................................................................... 296**

1.      Indiana Count 1: Breach of the Indiana Implied Warranty of Merchantability Code § § 26-1-2-314 and 26-1-2.1-212, *et seq* .............. 296

2.      Indiana Count 2: Violation of the Indiana Deceptive Consumer Sales Act (Ind. Code § 24-5-0.5-1, et seq.) Against All Defendants ...... 297

3.      Indiana Count 2: Constructive Fraud ...................................................... 302

4.      Indiana Count 4: Unjust Enrichment Against All Defendants................ 305

J.   **Maryland Counts: ............................................................................... 306**

1.      Maryland Count 1: Breach of Implied Warranty of Merchantability (Md. Code Com. Law § § 2-314 and 2A-212) Against Defendants ........ 306

2.      Maryland Count 2: Violation of the Maryland Consumer Protection Act, Md. Code, Com. Law § 13-101, *et seq.* .......................................... 310

3.      Maryland Count 3: Fraudulent Concealment........................................... 311

4.      Maryland Count 4: Unjust Enrichment Against All Defendants ............ 315

K.   **Michigan Counts: ............................................................................... 316**

1.     Michigan Count 1: Breach of Implied Warranty of Merchantability (Mich. Comp. Laws §§ 440.2314 and 440.2862) Against Defendants ............................................................................................ 316

2.     Michigan Count 2: Silent Fraud ................................................. 319

3.     Michigan Count 3: Unjust Enrichment Against All Defendants ........... 322

**L.    Missouri Counts:** ................................................................ **323**

1.     Missouri Count 1: Breach of Implied Warranty of Merchantability (Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212) Against Defendants ..... 323

2.     Missouri Count 2: Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, et seq.) Against All Defendants ...................................................................... 326

3.     Missouri Count 3: Fraud by Omission and Concealment Against All Defendants ...................................................................... 330

4.     Missouri Count 4: Unjust Enrichment Against All Defendants ............ 333

**M.    Nevada Counts:** ................................................................ **335**

1.     Nevada Count 1: Nevada Count 1: Breach of Implied Warranty of Merchantability (Nev. Rev. Stat. §§ 104.2314 and 104A.2212) ........... 335

2.     Nevada Count 2: Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. § 598.0903, et seq.) ................................. 337

3.     Nevada Count 3: Fraud by Omission and Concealment Against All Defendants ...................................................................... 340

4.     Nevada Count 4: Unjust Enrichment Against All Defendants .............. 343

**N.    New Jersey Counts:** .......................................................... **345**

1.     New Jersey Count 1: Breach of Implied Warranty of Merchantability (N.J. Stat. Ann. §§ 12A:2-314 and 12A:2-212) Against Defendants ................................................................ 345

2.     New Jersey Count 2: Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, et seq.) Against All Defendants .................... 348

3.     New Jersey Count 3: Fraudulent Concealment ....................................... 352

4.     New Jersey Count 4: Unjust Enrichment Against All Defendants ......... 355

**O.    Oregon Class** .................................................................... **357**

1.  Oregon Count 1: Breach of Implied Warranty (Or. Rev. Stat. § 72.3140 and 72A.2120) Against Defendants ........................................... 357

2.  Oregon Count 2: Violation of the Oregon Unlawful Trade Practices Act (Or. Rev. Stat. §§ 646.605, et seq.) Against All Defendants ........... 360

3.  Oregon Count 3: Fraudulent Concealment .............................................. 364

4.  Oregon Count 4: Unjust Enrichment Against All Defendants ................ 367

P.  **Texas Counts:** ................................................................................................ **369**

1.  Texas Count 1: Breach of Implied Warranty of Merchantability (Tex. Bus. & Com. Code Ann. §§ 2.314 and 2A.212) Against Defendants ................................................................................................ 369

2.  Texas Count 2: Violation of the Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann. § 17.41, et seq.) Against All Defendants .................................................................... 372

3.  Texas Count 3: Fraud by Omission and Concealment Against All Defendants ............................................................................................... 377

4.  Texas Count 4: Unjust Enrichment Against All Defendants ................. 380

Q.  **Wisconsin Counts** ......................................................................................... **382**

1.  Wisconsin Count 1: Breach of Implied Warranty of Merchantability (Wis. Stat. §§ 402.314 and 411.212) Against Defendants ...................... 382

2.  Wisconsin Count 2: Violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18, et seq.) Against All Defendants ...... 385

3.  Wisconsin Count 3: Fraud by Omission and Concealment Against All Defendants ......................................................................................... 387

4.  Wisconsin Count 4: Unjust Enrichment Against All Defendants .......... 390

VIII.  **PRAYER FOR RELIEF** ................................................................................ **391**

IX.  **JURY DEMAND** .......................................................................................... **392**

Plaintiffs Burton Way Investments LLC; Michael Bush; Cameron Cardin; Daniel Chandler; Larry Cole; Joseph Curb; Tamara Darby; Labraun Crayton; Dawn Gibbs-Allen; Jenna Forster; Christian Keating; Walter Kwak; Michelle Laskowski; Narciso Maldonado; Jeremy Mora; Andrew Morill; Katrina O'Connor; Carl Patelli; Mark Pfeifer; Garrett Pfeifer; Emma Pire; Paul Soberano; Anthony Spangler; Ivy Stryker; Cicely Tegeler; Emmanuel Turcotte; Wanya Warren; Aric White; Leslie Wilczewski; Aron Wozniak; Doug Yarrington; Charles Zimmerschied on behalf of themselves and on behalf of all others similarly situated, as described below, allege the following based upon personal knowledge as to their acts and experiences, and as to all other matters, based upon the investigation of their counsel:

## I.    NATURE OF THE ACTION

1.    For over a decade, Defendants built and sold millions of easy-to-steal Class Vehicles,[1] many of which cost well above the average vehicle on the street, making them prime targets for criminals.

2.    These cars have a serious safety defect: the anti-theft and ignition systems can easily be bypassed by novice thieves and fail to comply with Federal and industry safety standards. Specifically, amateur criminals utilize a simple and inexpensive device, known as a "key programmer," which is sold at auto-parts stores and Amazon, to instantly bypass the wholly inadequate and defective anti-theft system installed in Class Vehicles, allowing thieves to steal the vehicles in under two minutes.  Making matters worse, the Class Vehicles do not have alarm systems that can detect or prevent thieves from using key programmers to create unauthorized keys and steal the vehicles. (Collectively, the "Anti-Theft Security Defect" or the "Defect").

---

[1] The "Class Vehicles" mean all 2012-2024 model year ("MY") Alfa, Fiat, Chrysler, Jeep, Dodge, and Ram brand vehicles that are equipped with Defendants' Sentry Key Engine Immobilizer System ("SKIS") and a push-button ignition system. On information and belief, this includes the most popular vehicle models sold by Defendants such as the Dodge Challenger, Dodge Charger, Dodge Durango, and Jeep Grand Cherokee.

3.      Below is a flow chart showing how simple it is for a thief to exploit the theft Anti-Theft Security Defect to steal a Class Vehicle:



4.      The theft rate for Class Vehicles is staggering. A recent report from 2023 found that the Dodge Charger Hellcat is stolen at a rate 60 times higher than the national average for all 2020-2022 models, relative to their numbers on the road. The Dodge Charger HEMI was stolen more than 20 times the average rate, and the Dodge Challenger was stolen more than 76 times the average rate.[2] The Senior Vice President of the Highway Loss Data Institute, an insurance organization that tracks auto theft claims, gave Hellcat owners the following advice: "If you own a Hellcat, you better check your driveway…. These numbers are unbelievable."[3]

5.      This is also a serious matter of personal and national safety. Over fifty years ago, the U.S. Department of Transportation ("DOT") recognized that "stolen cars constitute a major hazard to life and limb … [and] cause unreasonable risk of accident, personal injury, and death[.]" 33 Fed. Reg. 6,471 (Apr. 27, 1968). The National Highway Traffic Safety Administration ("NHTSA") concluded that, "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety." *Id*.

6.      To address these issues, Federal Motor Vehicle Safety Standards ("FMVSS" or "Safety Standards") were promulgated under the National Traffic and Motor Vehicle Safety Act

---

[2] https://www.iihs.org/news/detail/dodge-muscle-cars-once-again-top-hldis-list-of-most-stolen-vehicles (last accessed on September 6, 2024).
[3] https://www.iihs.org/news/detail/dodge-muscle-cars-once-again-top-hldis-list-of-most-stolen-vehicles (last accessed on September 6, 2024).

(the "Safety Act"), 49 U.S.C. § 30101 *et seq*. One of the fundamental anti-theft requirements that all vehicle manufacturers must comply with is FMVSS No. 114, titled "Theft Protection and Rollaway Prevention." FMVSS No. 114 was promulgated to, among other things, address a risk identified in a survey conducted by the Department of Justice ("DOJ") which found that "[t]he number of car thieves who start cars with so-called 'master keys' and devices which bypass the lock is … large enough to produce a significant safety hazard." 33 Fed. Reg. 6,471.

7.      FMVSS No. 114 establishes minimum anti-theft requirements that manufacturers must meet to comply with Federal Motor Vehicle Safety Standards. This Safety Standard mandates that manufacturers install in their vehicles, among other things, "a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self–mobility, of the vehicle, or both." 49 C.F.R. § 571.114 S5.1.1.

8.      Nevertheless, the concerns identified by Congress half a century ago have manifested dramatically with the Class Vehicles becoming tools for criminals engaging in murder, robbery, and other violent crime nationwide. In Chicago, a stolen Dodge Charger drove the wrong way down a road at high speed, crashing into seven (7) vehicles, sending sixteen (16) people to the hospital, and killing two (2) people. In Houston, armed thieves used a stolen Dodge Charger to ram and rob other motorists, before crashing into another car during a high-speed chase resulting in the death of an innocent driver. Car thieves used a stolen Dodge Durango to flee after shooting two police officers, one fatally, when the officers tried to stop them from stealing cars at the Philadelphia International Airport. Additionally, the owner of a Dodge Charger Hellcat was shot to death by thieves when she tracked down her stolen car in Bakersfield, California.

9.      Defendants sold millions of Class Vehicles that they knew were equipped with

substandard and ineffective anti-theft and ignition systems, which are less secure than basic ignition systems used thirty years ago. The anti-theft systems in the Class Vehicles fail to adhere to automotive industry standards in the United States, Canada, and Europe. This dangerous mix predictably makes the vehicles prime targets for criminals who use them to commit serious crimes.

10.     By 2021, the reported rate of Class Vehicle thefts began to skyrocket. Instead of fixing the defect, Defendants engaged in a public relations campaign to further portray their vehicles as secure.

11.     For example, in August 2021, Defendants released a software update they called "Programming Lockdown," which was designed to prevent key programmers from adding new keys. Based on Plaintiffs' investigation to date, if Programming Lockdown functions as advertised, it could prevent thieves from using key programmers to steal Class Vehicles. However, Defendants failed to implement this technology across all Class Vehicles and, instead, installed it in only 240 out of the millions of defective vehicles. Furthermore, the software update has caused other ancillary damage to Class Members who have installed the software on their vehicles.

12.     Defendants' actions indicate a calculated decision to prioritize profits over safety and security of their customers' vehicles.

13.     As described herein, the Class Vehicles are not safe and secure as advertised by Defendants. They lack industry standard anti-theft features for immobilizer and, when combined with a simple push button ignition, this omission renders the Class Vehicles non-compliant with FMVSS No. 114. Specifically, the "normal activation of the vehicle's engine" can be initiated by a key programmer and an unauthorized blank key after the owner has removed all keys and locked the vehicle—precisely the risk the Safety Standard was designed to address.

14.     For many Americans, acquiring a motor vehicle, whether through purchase or lease,

represents a significant financial commitment. Had the Plaintiffs and other Class members been aware of the security Defect at the time of their vehicle acquisition, they would have either opted not to purchase or lease the vehicles in question or would have paid significantly less for them.

15.     Plaintiffs and members of the Class have each suffered ascertainable damages caused by their purchases of vehicles containing the Defect, including but not limited to costs incurred (or that will need to be incurred) to remedy the Defect and benefit-of-the-bargain damages.   Many class members have also suffered damages due to vehicle theft that was foreseeably and directly caused by the Defect.

16.     Accordingly, Plaintiffs bring this action seeking compensation and other appropriate relief for losses they have suffered due to Defendants' misconduct.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff, and one Defendant, FCA US LLC, are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

18.     In January 2021, Peugeot S.A. merged with and into Fiat Chrysler Automobiles N.V. The combined company was renamed Stellantis N.V. ("Stellantis"). Defendant Stellantis is a naamloze vennootschap, organized under the laws of the Netherlands and is headquartered in Hoofddorp, Netherlands.

19.     Stellantis is one of the largest automotive manufacturers in the world, with over 242,000 employees across the globe, and approximately 20 manufacturing facilities in the United

States, including 8 in Michigan.[4]

20.    Upon information and belief, Stellantis employs and directs the engineers and other professionals responsible for designing the Class Vehicles.

21.    Defendant FCA US LLC ("FCA") is a limited liability organized under the laws of Delaware, and is headquartered in Auburn, Michigan. It is a wholly owned subsidiary of Stellantis and owns the licensing rights to the following brand names: Chrysler, Dodge, Jeep, Ram, Alfa Romeo, Fiat, Mopar, and SRT performance designation.

22.    Upon information and belief, FCA is responsible for marketing the Class Vehicles, administering dealership franchise agreements, administering the express warranties for the Class Vehicles, and drafting owner manuals for the Class Vehicles. FCA performs the above functions under the direction and approval of Stellantis.

23.    This Court has personal jurisdiction over Defendants because Defendants transact business within the State of Michigan and committed one or more tortious acts within the State of Michigan. Defendants have transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

24.    Defendants also design, manufacture, distribute, and/or sell dangerous and/or defective vehicles in Michigan. Defendants placed the Class Vehicles and dangerous products into the stream of commerce, sold and/or supplied said products for use, used said products, and/or transacted business, and committed tortious acts in Michigan from which Plaintiffs' claims arise.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events that gave rise to the claims in this case occurred in Michigan including the purchase of Class Vehicles by Plaintiffs.

---

[4] https://media.stellantisnorthamerica.com/newsrelease.do?id=9117 (last accessed on September 5, 2024)

26.     The Court has specific jurisdiction over Stellantis pursuant to the long-arm statute of Michigan (MCL 600.715) based on its forum-related activities from which this case arises, and the forum-related activities of its primary domestic subsidiary, FCA, which Stellantis substantially controls.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Defendants' improper conduct alleged in this complaint occurred in, was directed from, and/or emanated from this judicial district, because Defendants have caused harm to Class Members residing in this district, and/or because Defendants are subject to personal jurisdiction in this district.

### III.   PARTIES

**A.     Arizona Plaintiff**

#### 1.     Cicely Tegeler

28.     Plaintiff and proposed class representative, Cicely Tegeler ("Plaintiff," for purposes of this section), is a resident of Peoria, Arizona. On or about April 18, 2023, Plaintiff purchased a 2023 Jeep Wrangler Sahara, VIN 1C4HJXEN1PW668426 from Larry H. Miller Chrysler Jeep located in Surprise, Arizona. Plaintiff paid approximately $52,600.00 for the vehicle.

29.     Larry H. Miller Chrysler Jeep is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory.[5] Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.[6]

30.     Plaintiff purchased the Class Vehicle because Plaintiff believed that it was safe,

---

[5] https://www.jeep.com/find-dealer.html (last accessed on September 6, 2024).
[6] https://www.jeep.com/crossbrand_us/privacy (last accessed on September 6, 2024).

secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

31.    Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

32.    Plaintiff saw Jeep television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

33.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

34.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

35.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

36.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of the bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and Plaintiff did not receive a vehicle that met ordinary and reasonable consumer expectations

regarding quality design, and safety and security.

37.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased the Class Vehicle, or would have paid less to do so.

38.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

**B.    California Plaintiffs**

**1.    Burton Way Investments LLC**

39.    Burton Way Investments, LLC is a California limited liability company, with a principal place of business in Beverly Hills, California.

40.    Burton Way Investments, LLC is engaged in the business of leasing vehicles to customers. Plaintiff purchased the following Class Vehicles new on or about the following dates:

| 2021 | Dodge | CHARGER | 10/03/2021 |
| 2021 | Jeep | WRANGLER HYBRID UNLIMITED SAHARA 4XE | 09/02/2021 |
| 2021 | Jeep | WRANGLER SAHARA HARD TOP 4X | 07/15/2021 |
| 2021 | Jeep | WRANGLER SAHARA HARD TOP 4X | 07/15/2021 |
| 2021 | Jeep | WRANGLER SAHARA HARD TOP 4X | 07/15/2021 |
| 2021 | Jeep | WRANGLER SAHARA HARD TOP 4X | 07/15/2021 |
| 2021 | Jeep | WRANGLER SAHARA HARD TOP 4X | 07/15/2021 |
| 2023 | Jeep | COMPASS | 04/26/2023 |
| 2023 | Jeep | COMPASS | 04/24/2023 |
| 2023 | Jeep | COMPASS | 04/19/2023 |
| 2023 | Jeep | COMPASS | 04/19/2023 |
| 2023 | Jeep | COMPASS | 04/26/2023 |
| 2023 | Jeep | COMPASS | 06/28/2023 |
| 2023 | Jeep | COMPASS | 06/28/2023 |
| 2023 | Jeep | COMPASS | 06/28/2023 |
| 2023 | Chrysler | PACIFICA | 04/19/2023 |
| 2023 | Chrysler | PACIFICA | 04/25/2023 |

41.    Plaintiff bought the Class Vehicles with the belief that they were safe, secure, and of high quality. Before purchasing the Class Vehicles, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

42.     Plaintiff visited the Jeep, Dodge and Chrysler websites and reviewed representations about the Class Vehicles' safety, security, and quality.

43.     Plaintiff saw Jeep, Dodge and Chrysler television commercials that touted, among other things, the safety, security, and quality of Jeep, Dodge and Chrysler branded vehicles.

44.     Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicles.

45.     Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicles were affected by the Anti-Theft Security Defect.

46.     At no point before Plaintiff purchased these vehicles did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders them highly susceptible and predisposed to theft by experienced as well as amateur thieves, and which makes them a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicles, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salespersons at the various car dealerships from which it purchased the Class Vehicles.

47.     Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of its bargain. Plaintiff purchased vehicles that are of a lesser standard, grade, and quality than represented, and it did not receive vehicles that met ordinary and reasonable consumer expectations regarding quality design and safe and secure operation.

22

48.     Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased its Class Vehicles, or would have paid less to do so.

49.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 2.     Jeremy Mora

50.     Plaintiff and proposed class representative, Jeremy Mora, is a resident of California. On May 28, 2021, Plaintiff purchased a 2021 Ram 2500, VIN 3C6UR5FL6MG633813, from My Jeep Chrysler Dodge located in Salinas, California. Plaintiff paid approximately $81, 283.00 for the Class Vehicle.

51.     My Jeep Chrysler Dodge is part of the Ram brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Ram's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Ram website.[7]

52.     The Ram 2500 is a Class Vehicle.

53.     Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

54.     Plaintiff visited the Ram website and reviewed representations about the Class Vehicle's security, safety, and quality.

55.     Plaintiff saw Ram television commercials that touted, among other things, the

performance, security, safety, and quality of Ram branded vehicles.

56.      Plaintiff relied, specifically, on Defendants' representations of security, safety, and quality in making the decision to purchase the Class Vehicle.

57.      Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

58.      At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from consumers like Plaintiff. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

59.      Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

60.      Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

61.      On or about June 13, 2024, Plaintiff parked the Class Vehicle in a parking garage at Los Angelas International Airport in California. Plaintiff secured the Class Vehicle by locking

the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

62.     If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

63.     On or about June 13, 2024, the Class Vehicle was stolen. When Plaintiff returned to retrieve the Class Vehicle, Plaintiff observed broken glass in the space where the vehicle had been parked.

64.     The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

65.     Plaintiff's Class Vehicle has not been recovered.

66.     Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect.

67.      Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

68.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future

if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 3.   Paul Soberano

69.    Plaintiff and proposed class representative, Paul Soberano, is a resident of Novato California. On December 8, 2018, Plaintiff purchased a 2018 Jeep Grand Cherokee Trackhawk, 1C4RJFN97JC435421, from Thompsons Chrysler Dodge Jeep Ram located in Placerville, California. Plaintiff paid approximately $105,000.00 for the Class Vehicle.

70.    Thompsons Chrysler Dodge Jeep Ram is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

71.    The Grand Cherokee was a Trackhawk, which is a performance variant with a powerful engine and other performance parts. The performance components are valuable and desirable on the secondary market.

72.    The Grand Cherokee is a Class Vehicle.

73.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

74.    Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

75.    Plaintiff saw Jeep television commercials that touted, among other things, the performance, safety, security, and quality of Jeep branded vehicles.

76.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and

quality in making the decision to purchase the Class Vehicle.

77.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

78.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from consumers like Plaintiff. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

79.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

80.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

81.    On or about December 8, 2023, Plaintiff parked his Class Vehicle in his driveway outside his home in Novato, California. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class

Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

82.     If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

83.     On or about December 8, 2023, Plaintiff's Class Vehicle was stolen by thief using a key programmer that exploited the Anti-Theft Security Defect.

84.     Video footage of the theft shows a thief breaking a rear window, another thief passing a device through the broken window, and the vehicle being started a few minutes later. The vehicle's alarm was not activated during the theft.

85.     The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

86.     Plaintiff's Class Vehicle has not been recovered.

87.     Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect.

88.      Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

89.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future

if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

**C.      Delaware Plaintiff**

**1.      Wanya Warren**

90.      Plaintiff and proposed class representative, Wanya Warren, is a resident of Folsom Pennsylvania. On May 24, 2024, Plaintiff purchased a 2016 Dodge Challenger, VIN 2C3CDZFJXGH199820, from United Auto Sales, Inc. in New Castle, Delaware. Plaintiff paid $42,573.00 for the Class Vehicle.

91.      The Dodge Challenger is a Class Vehicle.

92.      Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

93.      Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

94.      Plaintiff saw Dodge television commercials that touted, among other things, the performance, safety, security, and quality of Dodge branded vehicles.

95.      Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

96.      Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

97.      At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity.

Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from consumers like Plaintiff. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

98.     Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

99.     Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

100.     On or about March 20, 2022, Plaintiff parked his Class Vehicle at a parking lot in the Philadelphia Airport. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

101.     If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures

such as purchasing a third-party anti-theft system.

102.    On or about March 20, 2022, Plaintiff's Class Vehicle was stolen and has not been recovered.

103.    Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect.

104.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

105.     Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

106.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

**D.    Colorado Plaintiff**

**1.    Mark Pfeifer**

107.    Plaintiff and proposed class representative, Mark Pfeifer, is a resident of Sanibel, Florida. On October 25, 2018, Plaintiff paid $50,515.00 to purchase a 2019 Jeep Grand Cherokee, VIN 1C4RJFLT5KC558005, from AutoNation Chrysler Jeep West, in Golden Colorado.

108.    AutoNation Chrysler Jeep West is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory.  Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

31

109.    The Jeep Grand Cherokee is a Class Vehicle.

110.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

111.    Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

112.    Plaintiff saw Jeep television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

113.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

114.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect, and instead Defendants touted the Class Vehicle's safety, security, and quality.

115.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

116.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct

associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

117.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

118.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

**E.    Florida Plaintiff**

      **1.    Aron Wozniak**

119.    Plaintiff and proposed class representative, Aron Wozniak, is a resident of Florida. On or about August 12, 2023, Plaintiff paid $68,539.45 to purchase a 2023 Dodge Charger, VIN 2C3CDXGJ3PH603771, from Arrigo Chrysler Dodge Jeep Ram in Pompano Beach, Florida.

120.    Arrigo Chrysler Dodge Jeep Ram is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

121.    The 2023 Dodge Charger is a Class Vehicle.

122.    Plaintiff purchased the Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

123.    Plaintiff visited the Dodge website and reviewed representations about the Class

Vehicle's safety, security, and quality.

124.   Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

125.   Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

126.   Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

127.   At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

128.   Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

129.   Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

130.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 2.     Emmanuel Turcotte

131.     Plaintiff and proposed class representative, Emmanuel Turcotte, is a resident of Florida. On or about December 31, 2023, Plaintiff paid $108,814.71 to purchase a 2024 Ram TRX, VIN 1C6SRFU90RN101279, from Sarasota Chrysler Dodge Jeep Ram Fiat, in Sarasota, Florida.

132.     Sarasota Chrysler Dodge Jeep Ram Fiat is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

133.     The 2024 Ram TRX is a Class Vehicle.

134.     Plaintiff purchased the Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

135.     Plaintiff visited the Ram website and reviewed representations about the Class Vehicle's safety, security, and quality.

136.     Plaintiff saw Ram television commercials that touted, among other things, the safety, security, and quality of Ram branded vehicles.

137.     Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

138.     Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

139.     At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

140.     Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

141.     Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

142.     On or about April 4, 2024, Plaintiff's Class Vehicle was stolen from Sarasota Chrysler Dodge Jeep Ram Fiat dealership. Video footage of the incident shows a thief breaking a window, entering the vehicle through the broken window, and starting the vehicle.

143.     The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

144.     Plaintiff's Class Vehicle has not been recovered.

145. Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect the value of which is estimated to exceed $100,000.00.

146. In addition, to loss of the vehicle, the Plaintiff also lost Hilti power tools worth approximately $800.00, which were located in the vehicle at the time of theft.

147. Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

## F.   Georgia Plaintiff

### 1.   Emma Pire

148. Plaintiff and proposed class representative, Emma Pire, is a resident of Georgia. On April 8, 2023, Plaintiff purchased a 2021 Jeep Wrangler 4XE, VIN 1C4JJXP6XMW702950, from Palmer Dodge Chrysler Ram for $54,699.29.

149. Palmer Dodge Chrysler Ram is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

150. The Jeep Wrangler 4XE is a Class Vehicle.

151. Plaintiff purchased the Class Vehicle because she believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

152. Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

153. Plaintiff saw Jeep television commercials that touted, among other things, the

37

safety, security, and quality of Jeep branded vehicles.

154.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

155.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

156.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from consumers like Plaintiff. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

157.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of her bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

158.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased her Class Vehicle, or would have paid less to do so.

159.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and

durability, were accurate.

**G.    Illinois Plaintiffs**

      **1.    Joseph Curb**

160.    Plaintiff and proposed class representative, Joseph Curb, is a resident of Chicago, Illinois.   On July 24, 2020, Plaintiff purchased a 2020 Dodge Charger Scat Pack, VIN 2C3CDXGJ5LH194859, from Hawk Chrysler Dodge Jeep Ram FIAT in Des Plaines, Illinois. Plaintiff to purchase the Charger.

161.    Hawk Chrysler Dodge Jeep Ram FIAT is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

162.    The Charger was a Scat Pack, which is a performance variant with a powerful engine and other performance parts. The performance components are valuable and desirable on the secondary market.

163.    The Charger is a Class Vehicle.

164.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

165.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

166.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

167.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and

quality in making the decision to purchase the Class Vehicle.

168. Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

169. On or about November 2, 2022, Plaintiff parked his Class Vehicle in a parking lot located at 1901 W 29th Street Chicago, Illinois 60608. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

170. If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

171. On or about November 2, 2022, Plaintiff's Class Vehicle was stolen and has not been recovered.

172. The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

173. Plaintiff suffered a complete and total loss of the Class Vehicle, and his direct compensatory damages are equal to market value of the vehicle on the day it was stolen, which the Plaintiff estimates to be in excess of $30,000.

174.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

175.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

176.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

177.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

178.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 2.    Dawn Gibbs-Allen

179.    Plaintiff and proposed class representative, Dawn Gibbs-Allen, is a resident of Oak

Forest, Illinois.  Plaintiff leased a 2021 Ram 1500, and a 2024 Ram 1500 Big Horn, VIN 1C6SRFFT7MN534423, from Bettenhausen Motor Sales Inc.

180.    Bettenhausen Motor Sales Inc. is part of the Ram brand network of authorized dealers across the United States and is promoted on Ram's website, which includes an updated list of the dealership's inventory. Ram's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Ram website.

181.    The 2021 Ram 1500 and 2024 Ram 1500 are Class Vehicles.

182.    Plaintiff purchased the Class Vehicles because she believed that the vehicles were safe, secure, and high quality. Before purchasing the Class Vehicles, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

183.    Plaintiff visited Defendants' website and reviewed representations about the Class Vehicle's safety, security, and quality.

184.    Plaintiff saw Defendants' television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

185.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicles.

186.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicles were affected by the Anti-Theft Security Defect.

187.    At no point before Plaintiff leased the vehicles did Defendants disclose that they suffered from the Anti-Theft Security Defect, which renders them highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes them a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal

activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff leased the Class Vehicles, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

188.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of her bargain. Plaintiff leased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

189.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have leased her Class Vehicles, or would have paid less to do so.

190.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 3.    Christian Keating

191.    Plaintiff and proposed class representative, Christian Keating, is a resident of St. Charles, Missouri.  On May 31, 2023, Plaintiff purchased a 2023 Dodge Challenger RT Scat Pack, VIN 2C3CDZFJ0PH558771, from Faulkner Automotive in Mount Carmel, Illinois. Plaintiff paid approximately $66,000 to purchase the Challenger.

192.    Faulkner Automotive is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA

states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

193.    The Challenger was a Scat Pack, which is a performance variant with a powerful engine and other performance parts. The performance components are valuable and desirable on the secondary market.

194.    The Challenger is a Class Vehicle.

195.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

196.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

197.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

198.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

199.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

200.    On or about May 11, 2024, Plaintiff parked his Class Vehicle in the parking lot of a Super 8 by Wyndham, located at 6200 N Broadway, St. Louis, MO 63147. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would

provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

201.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

202.    On or about May 11, 2022, Plaintiff's Class Vehicle was stolen and has not been recovered.

203.    A thief breached the passenger-side window and began driving the vehicle under its own power in a matter of minutes.

204.    The theft was made possible by, and carried out, as a direct result of the Anti-Theft Defect.  The vehicle was stolen in a manner directly consistent with the theft method of exploiting this Defect, as detailed in this Complaint.

205.    Plaintiff suffered a complete and total loss of the Class Vehicle, and his direct compensatory damages are equal to market value of the vehicle on the day it was stolen, which the Plaintiff estimates to be in excess of $60,000.

206.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

207.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity.

Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

208.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

209.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

210.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 4.    Michelle Laskowski

211.    Plaintiff and proposed class representative, Michelle Laskowski, is a resident of Plano, Illinois. On December 17, 2021, Plaintiff purchased a 2021 Dodge Durango SRT, VIN 1C4SDJGJ6MC883933 from Riverfront Chrysler Jeep located at 200 Hansen Blvd, North Aurora, IL 60452. Plaintiff paid a total of $84,160.79, including taxes and dealer mark-up.

212.    Riverfront Chrysler Jeep is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of

46

visitors to the Jeep website.

213.    The Durango was an SRT, which is the performance variant with a powerful engine, performance transmission, and performance AWD drive system. The performance components are valuable and desirable on the secondary market. The Durango is a Class Vehicle.

214.    Plaintiff purchased her Class Vehicle because she believed that the vehicle was safe, secure and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

215.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

216.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

217.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

218.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

219.    At no point before Plaintiff purchased her vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described

above or through discussions with the salesperson at Riverfront Chrysler Jeep.

220. Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of her bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

221. Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased her Class Vehicle, or would have paid less to do so.

222. On or about December 10, 2023, Plaintiff parked her Class Vehicle in a public parking garage at Midway International Airport, 5700 S. Cicero Ave, Chicago, IL 60638. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

223. If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

224. On or about December 10, 2023, Plaintiff's Class Vehicle was stolen.

225. The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class

48

Vehicle was stolen as direct result of the Anti-Theft Security Defect.

226.    On December 14, 2023, Plaintiff's Class Vehicle was recovered in a completely destroyed condition. The vehicle had been dismantled and set on fire. All of the valuable performance components were removed including the engine, transmission, transfer case, and front axles.

227.    Plaintiff suffered a total loss of the Class Vehicle, and her direct compensatory damages are equal to market value of the vehicle on the day it was stolen minus the price obtained at auction, which the Plaintiff estimates to be in excess of $30,000.00.

228.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

229.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 5.    Katrina O'Connor

230.    Plaintiff and proposed class representative, Katrina O'Connor, is a resident of Chicago, Illinois. On March 16, 2020, Plaintiff purchased a 2016 Dodge Charger R/T Scat Pack, VIN 2C3CDXGJ8GH283640 from Berman Subaru of Chicago Inc. located at 4330 W Irving Park Rd, Chicago, IL 60641. Plaintiff paid $38,636.00, including sales tax.

231.    The Challenger was an R/T Scat Pack, which is a performance variant with a powerful engine and other performance parts. The performance components are valuable and desirable on the secondary market, and the performance capabilities of the vehicle make it desirable for criminals to use in the commission of crimes. The Challenger is a Class Vehicle.

232.    Plaintiff purchased her Class Vehicle because she believed that the vehicle was

safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

233.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

234.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

235.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

236.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

237.    At no point before Plaintiff purchased her vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson.

238.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of her bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding

quality design, and safe and secure operation.

239.   Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased her Class Vehicle, or would have paid less to do so.

240.   On or about September 2, 2020, Plaintiff parked the Class Vehicle at 10238 S Halsted, Chicago, IL 60628. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

241.   If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

242.   On or about September 2, 2020, Plaintiff's Class Vehicle was stolen.

243.   The stolen Charger was recklessly driven through the streets of Chicago by criminals with utter disregard for the law and the safety of the public. Between September 4, 2020, and September 6, 2020, the Charger was issued three speeding violations of 11+ miles per hour over the speed limit and one red light violation by an automatic camera in Chicago.

244.   The crime spree culminated on September 7, 2020, when the Plaintiff's Charger was used in the tragic homicide of an eight-year-old girl in the Canaryville neighborhood of Chicago. Surveillance video captured the Plaintiff's Charger following the vehicle in which the

victim was riding with her mother and stopping behind it at the intersection of Union Avenue and 47th Street.

245. A passenger stepped out of the Charger and fired a firearm several times at the victim's vehicle as the driver turned the vehicle around. Surveillance video footage captured the Charger speeding away.

246. Plaintiff suffered a complete and total loss of the Class Vehicle, and her direct compensatory damages are equal to market value of the vehicle on the day it was stolen, which the Plaintiff estimates to be in excess of $35,000.00.

247. The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

248. Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

249. Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 6. Aric White

250. Plaintiff and proposed class representative, Aric White, is a resident of Chicago, Illinois. On March 30, 2020, Plaintiff purchased a 2017 Dodge Challenger R/T Scat Pack, VIN 2C3CDZFJXHH507389 from Fort Wayne Kia located at 1112 Avenue of the Autos, Fort Wayne, IN 46804. Plaintiff paid $33,555.44, including sales tax.

251. The Challenger was an R/T Scat Pack, which is a performance variant with a powerful engine and other performance parts. The performance components are valuable and

desirable on the secondary market, and the performance capabilities of the vehicle make it desirable for criminals to use in the commission of crimes.

252.    The Challenger is a Class Vehicle.

253.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

254.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

255.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

256.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

257.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

258.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson.

259.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of the bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and Plaintiff did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

260.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased the Class Vehicle, or would have paid less to do so.

261.    Plaintiff's Challenger was stolen twice.

262.    On or about September 2, 2020, Plaintiff parked his Class Vehicle at 10238 S. Halsted, Chicago, IL 60628.  Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

263.    On or about September 2, 2020, Plaintiff's Class Vehicle was stolen from 10238 S. Halsted, Chicago, IL 60628.

264.    On September 7, 2020, the Challenger was involved in a high-speed chase with the Dolton Police Department who attempted to apprehend the driver in response to a call complaining of a "2017 Dodge Challenger racing up and down the street on 145th Street and Murray…" The driver fled as police vehicle approached, running traffic lights and stop signs, and exceeding 80

mph in a 35-mph zone before the police officer terminated the pursuit. Although Plaintiff's Challenger outran the police that night, it was subsequently seized by police on September 21, 2020, in Chicago.

265.    In addition to street racing and evading police, the Challenger was apparently used in the commission of other felonies because there were bullet holes in the door when the vehicle was returned to Plaintiff. The total cost to repair the damage was $16,901.21.

266.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

267.    On September 4, 2022, the Plaintiff's Challenger was stolen again despite the Plaintiff taking additional security measures including installing an anti-theft device that prevents the brake from being completely depressed and by hiding Apple AirTags to help locate the Challenger in the event it was stolen. The thieves were able to drive the vehicle a short distance with the brake device installed, and the Plaintiff tracked the car himself using the Apple AirTags.

268.    Subsequent to the second theft, the Plaintiff paid an aftermarket company to install an antitheft device on his Challenger that prevents thieves from re-programming keys. The aftermarket programming costs $1,200.00.

269.    Plaintiff suffered damage to his Class Vehicle, and his direct compensatory damages are equal to the cost to repair the vehicle from the theft damage, amounting to $16,901.21, plus the loss of use of the vehicle for three weeks, and the cost of installing aftermarket antitheft devices amounting to $1,200.00.

270.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business'

name.

271.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 7.     Narciso Maldonado

272.     Plaintiff and proposed class representative, Narciso Maldonado, is a resident of Chicago, Illinois.

273.     Plaintiff purchased a Certified Pre-Owned, 2018 Dodge Durango, 1C4SDJCT4KC770695, from St. Charles Chrysler Dodge Jeep, for $65,342.16.

274.     St. Charles Chrysler Dodge Jeep is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

275.     The Dodge Durango is a Class Vehicle.

276.     Plaintiff's Class Vehicle was stolen twice using key programmers that exploited the Anti-Theft Security Defect.

277.     Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

278.     Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

279.     Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

280.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

281.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

282.     Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

283.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

284.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

285.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

286.    On October 10, 2022, Plaintiff's son, Noe Rabadan ("Mr. Rabadan"), parked the Class Vehicle at 5515 S. Kostner Ave, Chicago, Illinois. Mr. Rabadan secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Mr. Rabadan did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that Mr. Rabadan's actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

287.    On October 10, 2022, Plaintiff's Class Vehicle was stolen by a thief who broke a window and use a key programmer to add new keys while also deactivating the Plaintiff's keys. Plaintiff believes that a key programmer was used because his keys were deactivated, which can be achieved with a key programmer.

288.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have allowed his son to park the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

289.    Plaintiff's Class Vehicle was recovered on October 26, 2022 with serious damage that took several months to repair.

290.    On February 28, 2024, the Plaintiff's Class Vehicle was stolen a second time by a thief who also broke a window and used a key programmer to add a new key while also deactivating the Plaintiff's keys.

291.    Plaintiff's Class Vehicle was recovered with damage that rendered it a total loss.

292.    Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the

Anti-Theft Security Defect the value of which is estimated to exceed $50,000.00.

293.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

294.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

**H.    Indiana Plaintiffs**

**1.    Anthony Spangler**

295.    Plaintiff and proposed class representative, Anthony Spangler, is a resident of Indiana. Plaintiff purchased a new 2022 Jeep Grand Cherokee, 1C4RJFAG8NC114241, from DuPage Chrysler Dodge Jeep Ram located in Glendal Heights, Illinois, for a price of $48,772.42.

296.    DuPage Chrysler Dodge Jeep Ram is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

297.    The Jeep Grand Cherokee is a Class Vehicle.

298.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

299.    Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

300.    Plaintiff saw Jeep television commercials that touted, among other things, the

safety, security, and quality of Jeep branded vehicles.

301.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

302.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

303.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

304.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

305.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

306.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and

durability, were accurate.

       **2.**    **Walter Kwak**

307.    Plaintiff and proposed class representative, Walter Kwak is a resident of Highland, Indiana. In 2021, Plaintiff paid $47,084.25 to purchase a new 2021 Jeep Grand Cherokee, 1C4RJFBG6MC616114, from Bosak Motors of Merrillville, Indiana. Plaintiff still owns the Class Vehicle.

308.    Bosak Motors of Merrillville is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

309.    The Jeep Grand Cherokee is a Class Vehicle.

310.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

311.    Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

312.    Plaintiff saw Jeep television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

313.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

314.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

315.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it

suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

316.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

317.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

318.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

## I.    Maryland Plaintiff

### 1.    Garrett Pfeifer

319.    Plaintiff and proposed class representative, Garrett Pfeifer, is a resident of Maryland. Plaintiff paid $56,516.70 to Don White's Timonium Chrysler Inc., located in Cockeysville, Maryland, to purchase 2019 Dodge Ram 1500 Rebel, VIN 1C6SRFLT7KN696831, and still owns the vehicle.

320.    Don White's Timonium Chrysler Inc. is part of the Ram brand network of authorized dealers across the United States and is promoted on Ram's website, which includes an updated list of the dealership's inventory. Ram's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Ram website.

321.    The Dodge Ram 1500 Rebel is a Class Vehicle.

322.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

323.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

324.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

325.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

326.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

327.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed

the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

328.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

329.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

330.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

## J.    Michigan Plaintiffs

### 1.    Michael Bush

331.    Plaintiff and proposed class representative, Michael Bush, is a resident of Kalamazoo, Michigan. On March 24, 2018, Plaintiff leased a 2018 Jeep Wrangler Unlimited Sahara 4WD, VIN 1C4HJXEGXJW119185 from LaFontaine Jeep Kalamazoo formerly known as Hayes Jeep Kalamazoo located at 3718 Stadium Dr. Kalamazoo, MI 49008. On August 22, 2022, Plaintiff purchased the Jeep after the lease expired. Plaintiff paid $29,821 to purchase the vehicle, including sales tax.

332.    LaFontaine Jeep Kalamazoo formerly known as Hayes Jeep Kalamazoo is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Jeep's website is owned,

controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

333.    The Jeep Wrangler is a Class Vehicle.

334.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

335.    Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

336.    Plaintiff saw Jeep television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

337.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

338.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

339.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at Hayes Jeep Kalamazoo.

340.    After learning of the Anti-Theft Security Defect on or about February 23, 2024, Plaintiff purchased a steering wheel lock for a total price of $23.84, in an attempt to deter thieves from stealing the Class Vehicle. Plaintiff suffered damages equal to the cost to purchase an aftermarket security device because, if the Class Vehicle did not contain the Anti-Theft Security Defect, then no additional device would have been required.

341.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

342.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

343.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 2.    Daniel Chandler

344.    Plaintiff and proposed class representative, Daniel Chandler, is a resident of Clinton Township, Michigan. On July 6, 2022, Plaintiff purchased a 2016 Dodge Challenger SRT Scat Pack, VIN 2C3CDZFJ0GH193508 from RPM Quality Cars located at 16346 Plymouth Road, Detroit, Michigan 48227. Plaintiff paid $38,742.00, including sales tax.

345.    The Challenger was an R/T Scat Pack, which is a performance variant with a powerful engine and other performance parts. The performance components are valuable and desirable on the secondary market, and the performance capabilities of the vehicle make it desirable for criminals to use in the commission of crimes.

66

346.    The Challenger is a Class Vehicle.

347.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

348.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

349.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

350.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

351.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

352.    On or about February 12, 2024, Plaintiff Class Vehicle parked his Class Vehicle in his driveway at 19870 Vermander Ave,  Clinton Twp,  MI 48035.

353.    Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

354.    On or about February 12, 2024, Plaintiff's Class Vehicle was stolen and was

recovered on February 22, 2024 with damage that rendered it a total loss.

355. The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

356. If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

357. Plaintiff suffered a complete and total loss of the Class Vehicle, and his direct compensatory damages are equal to market value of the vehicle on the day it was stolen, which the Plaintiff estimates to be in excess of $30,300.

358. Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

359. At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at RPM Quality Cars.

360. Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct

associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

361.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

362.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate

### 3.    Labraun Crayton

363.    Plaintiff and proposed class representative, Labraun Crayton, is a resident of Lansing, Michigan. In July 2021, Plaintiff custom ordered a Jeep Grand Cherokee Trackhawk, 1C4RJFN91MC822485, from Suburban Chrysler Jeep Ram of Garden City located in Garden City, Michigan, and he received delivery of the vehicle in September 2024.

364.    Suburban Chrysler Jeep Ram is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

365.    The Jeep was a Trackhawk, which is a performance variant with a powerful engine and other performance parts. The performance components are valuable and desirable on the secondary market, and the performance capabilities of the vehicle make it desirable for criminals to use in the commission of crimes.

366.    The Jeep Grand Cherokee Trackhawk is a Class Vehicle.

367.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

368.    Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

369.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

370.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

371.    Plaintiff saw Jeep television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

372.     Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

373.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson.

374.    In February 2024, Plaintiff's Class Vehicle was stolen from the driveway in front of his home and has not been recovered.

375.    Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

376.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

377.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

378.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

379.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

380.   Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 4.   Tamara Darby

381.   Plaintiff and proposed class representative, Tamara Darby, is a resident of Eastpointe, Michigan. On August 23, 2021, Plaintiff purchased a 2016 Chrysler 300S, VIN 2C3CCAGG6GH349350, from Jim Riehl's Friendly Chrysler Jeep in Warren, Michigan.

382.   Jim Riehl's Friendly Chrysler Jeep is part of the Chrysler  brand network of authorized dealers across the United States and is promoted on Chrysler 's website, which includes an updated list of the dealership's inventory. Chrysler 's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Chrysler  website.

383.   The Chrysler 300S is a Class Vehicle.

384.   Plaintiff purchased her Class Vehicle because she believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

385.   Plaintiff visited the Chrysler website and reviewed representations about the Class Vehicle's safety, security, and quality.

386.   Plaintiff saw Chrysler television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

387.   Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

388.   Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

389.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

390.    At no point before Plaintiff purchased her vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

391.    On or about January 29, 2024, Plaintiff's Class Vehicle was stolen and has not been recovered.

392.    Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

393.    The vehicle was stolen in a manner consistent with the method of theft that exploits

the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

394.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

395.    Plaintiff suffered a complete and total loss of the Class Vehicle, and her direct compensatory damages are equal to market value of the vehicle on the day it was stolen, which the Plaintiff estimates to be in excess of $10,000.

396.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of her bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

397.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased her Class Vehicle, or would have paid less to do so.

398.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 5.    Ivy Stryker

399.    Plaintiff and proposed class representative, Ivy Stryker, is a resident of Farmington, Michigan. On March 7, 2022, Plaintiff purchased a 2020 Dodge Charger SRT Hellcat, VIN 2C3CDXL90LH184638 from Lafontaine Chrysler Dodge Jeep Ram of Lansing located at 6131 S Pennsylvania Ave, Lansing, MI 48911. Plaintiff paid $88,667.24, including sales tax.

400.    Lafontaine Chrysler Dodge Jeep Ram is part of the Dodge brand network of

authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

401.    The Charger was a Hellcat, which is an elite performance variant with a powerful engine and other performance parts. The Hellcat is extremely fast with a top speed in excess of 200 mph. The performance components are valuable and desirable on the secondary market, and the performance capabilities of the vehicle make it desirable for criminals to use in the commission of crimes.

402.    The Charger SRT Hellcat is a Class Vehicle.

403.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

404.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

405.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

406.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

407.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

408.    On May 6, 2022, the Plaintiff paid an aftermarket company to install an anti-theft device on his Charger that prevents thieves from re-programming keys without using a security

code. The aftermarket programming cost $2,576.00.

409.    On or about December 13, 2022, thieves attempted to steal Plaintiff's Class Vehicle using a key programmer but were unable to complete the theft because of the aftermarket system installed by the Plaintiff. The thieves caused $8,380.04 in damage to the Plaintiff's Class Vehicle.

410.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

411.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson.

412.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of the bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and Plaintiff did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

413.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased the Class Vehicle, or would have paid less to do so.

414.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate

### 6.     Leslie Wilczewski

415.     Plaintiff and proposed class representative, Leslie Wilczewski, is a resident of West Bloomfield, Michigan. On August 23, 2021, Plaintiff purchased a 2017 Jeep Grand Cherokee SRT, VIN 1C4RJFDJ2HC695036 from Crest Ford Flat Rock located at 22675 Gibraltar Road, Flat Rock, Michigan 48134. Plaintiff paid $52,793.44, including sales tax.

416.     The Grand Cherokee was an SRT, which is the performance variant with a powerful engine, performance transmission, and performance AWD drive system. The performance components are valuable and desirable on the secondary market.

417.     The Grand Cherokee is a Class Vehicle.

418.     Plaintiff purchased her Class Vehicle because she believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

419.     Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

420.     Plaintiff saw Jeep television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

421.     Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

422.     Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

423.     At no point before Plaintiff purchased her vehicle did Defendants disclose that it

suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at Crest Ford Flat Rock.

424. Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of her bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

425. Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased her Class Vehicle, or would have paid less to do so.

426. On or about December 22, 2023, Plaintiff's Class Vehicle was stolen from her designated parking space outside her apartment at 1036 S. Cass Lake Road, Waterford, Michigan 48328. Broken tinted glass similar to the tinted glass of the Class Vehicle was found in the parking space.

427. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing

vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

428.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

429.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

430.    Plaintiff's Class Vehicle has not been recovered.

431.    Plaintiff suffered a complete and total loss of the Class Vehicle, and her direct compensatory damages are equal to market value of the vehicle on the day it was stolen, which the Plaintiff estimates to be in excess of $40,000.00.

432.    Plaintiff purchased the Class Vehicle primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name.

433.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

## K.    Missouri Plaintiff

### 1.    Doug Yarrington

434.    Plaintiff and proposed class representative, Doug Yarrington, is a resident of Missouri. On or about July 31, 2021, Plaintiff paid approximately $67,000.00 to purchase a 2021

Dodge Charger Wide Body 392 Scat Pack, from Gladstone Dodge Chrysler Jeep Ram, in Gladstone, Missouri.

435.    Gladstone Dodge Chrysler Jeep Ram is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

436.    The 2021 Dodge Charger is a Class Vehicle.

437.    Plaintiff purchased the Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

438.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

439.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

440.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

441.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

442.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity.

Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

443.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

444.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

445.    On or about February 20, 2024, Plaintiff's Class Vehicle was stolen from outside Plaintff's home near Kansas City, Missouri. There was broken glass where the car was parked indicating a broken window, which means the thief did not have a key to enter the vehicle. The Plaintiff heard the car start and watched it drive away. All keys to the vehicle were inside Plaintiff's home at the time of the theft.

446.    Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the

Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

447.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

448.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

449.    Plaintiff's Class Vehicle was recovered with a broken window, damaged dashboard, missing mirrors and emblems, damaged rear suspension, and missing personal items.

450.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

L.    **Nevada Plaintiff**

1.    **Larry Cole**

451.    Plaintiff and proposed class representative, Larry Cole, is a resident of California. On or about March 28, 2019, Plaintiff paid $36,990.00 to purchase a 2019 Dodge Charger, 2C3CDXGJ6KH576655, from Towbin Dodge RAM in Henderson, Nevada.

452.    Towbin Dodge RAM is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

453.    The 2019 Dodge Charger is a Class Vehicle.

454.    Plaintiff purchased the Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

455.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

456.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

457.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

458.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

459.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

460.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and

he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

461.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

462.    On or about September 1, 2023, Plaintiff's Class Vehicle was stolen from near Plaintiff's home in Los Angeles, California.

463.    Plaintiff's Class Vehicle has not been recovered.

464.    Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

465.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

466.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

467.    Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect the value of which is estimated to exceed $30,000.00.

468.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate

## M.     New Jersey Plaintiff

### 1.     Joyce Jones

469.     Plaintiff and proposed class representative, Joyce Jones, is a resident of New Jersey. On or about June 15, 2018, Plaintiff paid $49,612.00 to purchase a 2018 Jeep Grand Cherokee Limited, VIN 1C4RJFB63JC425438, from Salerno Duane Automotive Group in Summit, New Jersey.

470.     Salerno Duane Automotive Group is part of the Jeep brand network of authorized dealers across the United States and is promoted on Jeep's website, which includes an updated list of the dealership's inventory. Jeep's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Jeep website.

471.     The 2018 Jeep Grand Cherokee is a Class Vehicle.

472.     Plaintiff purchased the Class Vehicle because she believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

473.     Plaintiff visited the Jeep website and reviewed representations about the Class Vehicle's safety, security, and quality.

474.     Plaintiff saw Jeep television commercials that touted, among other things, the safety, security, and quality of Jeep branded vehicles.

475.     Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

476.     Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

477.     At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

478.     Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of her bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

479.     Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased her Class Vehicle, or would have paid less to do so.

480.     Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate

### 2.     Carl Patelli

481.     Plaintiff and proposed class representative, Carl Patelli, is a resident of New York. On or about January 3, 2023, Plaintiff paid $62,177.66 to purchase a 2022 Dodge Challenger, VIN

2C3CDZFJ5NH246653, from Lilliston Jeep Dodge Chrysler, in Millville, New Jersey.

482.    Lilliston Jeep Dodge Chrysler is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

483.    The 2022 Dodge Challenger is a Class Vehicle.

484.    Plaintiff purchased the Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

485.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

486.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

487.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

488.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

489.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose

to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

490.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

491.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

492.    On or about December 8, 2023, Plaintiff's Class Vehicle was stolen 1268 Woodrow Road, Staten Island, New York. There was broken glass in the space where the vehicle had been parked.

493.    Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

494.    The vehicle was stolen in a manner consistent with the method of theft that exploits

the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

495.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

496.    Plaintiff's Class Vehicle was recovered on December 9, 2023 with a broken window.

497.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

## N.    Oregon Plaintiff

### 1.    Charles Zimmerschied

498.    Plaintiff and proposed class representative, Charles Zimmerschied, is a resident of Albany, Oregon. In April 2023, Plaintiff purchased a 2021 Dodge Challenger, 2C3CDZJG5MH560832, for approximately $34,000. The 2021 Dodge Challenger is a Class Vehicle.

499.    Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

500.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

501.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

502.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and

quality in making the decision to purchase the Class Vehicle.

503.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

504.    At no point before Plaintiff purchased his vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

505.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

506.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

507.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

O.    **Texas Plaintiffs**

1.    **Cameron Cardin**

508.    Plaintiff and proposed class representative, Cameron Cardin, is a resident of Texas. On or about January 14, 2023, Plaintiff paid $68,539.45 to purchase a 2022 Dodge Durango, VIN 1C4SDHCT6NC210089, from Victoria Dodge in Victoria, Texas.

509.    Victoria Dodge is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

510.    The 2022 Dodge Durango is a Class Vehicle.

511.    Plaintiff purchased the Class Vehicle because he believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

512.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

513.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

514.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

515.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

516.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed

to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

517. Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

518. Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

519. On or about March 6, 2024, Plaintiff's Class Vehicle was stolen from near Plaintiff's home in Houston, Texas

520. Plaintiff's Class Vehicle has not been recovered.

521. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the

Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

522.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

523.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

524.    Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect the value of which is estimated to exceed $50,000.00.

525.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

### 2.    Andrew Morill

526.    Plaintiff and proposed class representative, Andrew Morill, is a resident of Illinois. On or about September 2, 2019, Plaintiff paid $37,727.60 to purchase a 2019 Dodge Charger, VIN 2C3CDXGJ2KH685551, from Helfman Dodge Chrysler Jeep, in Houston, Texas.

527.    The 2019 Dodge Charger is a Class Vehicle.

528.    Helfman Dodge Chrysler Jeep is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

529.    Plaintiff purchased the Class Vehicle because he believed that the vehicle was safe,

secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

530.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

531.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

532.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

533.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

534.    At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

535.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding

quality design, and safe and secure operation.

536.    Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

537.    On or about March 1, 2023, Plaintiff's Class Vehicle was stolen from a secured parking garage in Schiller Park, Illinois garage near O'Hare International Airport.

538.    Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

539.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

540.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

541.    Plaintiff's Class Vehicle has not been recovered.

542.    Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect the value of which is estimated to exceed $30,000.00.

543.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future

if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

## P.      Wisconsin Plaintiffs

### 1.      Jenna Forster

544.    Plaintiff and proposed class representative, Jenna Forster, is a resident of New Jersey. On or about April 2, 2016, Plaintiff paid $44,728.00 to purchase a 2015 Dodge Charger, VIN 2C3CDXEJ3FH770231, from Van Horn Manitowoc, located at 4611 Expo Drive Manitowoc, Wisconsin.

545.    Van Horn Manitowoc is part of the Dodge brand network of authorized dealers across the United States and is promoted on Dodge's website, which includes an updated list of the dealership's inventory. Dodge's website is owned, controlled, and managed by FCA. FCA states that it "collect[s], use[s], disclose[s], share[s], and otherwise process[es] the personal information" of visitors to the Dodge website.

546.    The 2015 Dodge Charger is a Class Vehicle.

547.    Plaintiff purchased the Class Vehicle because she believed that the vehicle was safe, secure, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it made by Defendants.

548.    Plaintiff visited the Dodge website and reviewed representations about the Class Vehicle's safety, security, and quality.

549.    Plaintiff saw Dodge television commercials that touted, among other things, the safety, security, and quality of Dodge branded vehicles.

550.    Plaintiff relied, specifically, on Defendants' representations of safety, security, and quality in making the decision to purchase the Class Vehicle.

551.    Because Defendants failed to disclose the Anti-Theft Security Defect, Plaintiff's

research did not uncover that the Class Vehicle was affected by the Anti-Theft Security Defect.

552. At no point before Plaintiff purchased the vehicle did Defendants disclose that it suffered from the Anti-Theft Security Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as the instrumentalities through which thieves engage in reckless driving or other criminal activity. Indeed, Defendants had an affirmative duty to disclose the Anti-Theft Security Defect but chose to conceal its existence from Plaintiff and other similarly situated consumers. Had they disclosed the Anti-Theft Security Defect before Plaintiff purchased the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the dealership.

553. Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Anti-Theft Security Defect. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and secure operation.

554. Had Defendants disclosed the Anti-Theft Security Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

555. On or about June 28, 2024, Plaintiff's Class Vehicle was stolen from near Plaintiff's driveway in Deptford, New Jersey.

556. Plaintiff's Class Vehicle has not been recovered.

557. Plaintiff secured the Class Vehicle by locking the doors and activating the alarm with the key fob in accordance with the instructions contained in Defendants' operating manual for the Class Vehicle. Plaintiff did not leave any keys in the Class Vehicle. Based on

representations made by Defendants and Plaintiff's common-sense expectations for securing vehicles, Plaintiff believed that these actions would provide a reasonable level of theft deterrence that is customary and standard in the automotive industry. Specifically, Plaintiff believed that the Class Vehicle could not be started surreptitiously with a publicly available device within a few minutes.

558.    The vehicle was stolen in a manner consistent with the method of theft that exploits the Anti-Theft Security Defect using a key programmer. Upon information and belief, the Class Vehicle was stolen as direct result of the Anti-Theft Security Defect.

559.    If Plaintiff had been aware of the Anti-Theft Defect, then Plaintiff would not have parked the Class Vehicle in an area accessible to the public or would have taken other measures such as purchasing a third-party anti-theft system.

560.    Plaintiff suffered a complete and total loss of the Class Vehicle as a result of the Anti-Theft Security Defect.

561.    Plaintiff would purchase a vehicle manufactured or sold by Defendants in the future if Defendants' representations about the vehicle, including its quality, security, safety, and durability, were accurate.

## Q.    Defendants

### 1.    FCA

562.    Defendant FCA US LLC ("FCA"), formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware. FCA's principal place of business and headquarters are at 1000 Chrysler Dr., Auburn Hills, MI 48326.

563.    FCA is a wholly owned subsidiary of Defendant Stellantis N.V. and its predecessor

Fiat Chrysler Automobiles N.V. Stellantis has control and power over FCA. [8]

564.    FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, Ram, Alfa, and Fiat brand motor vehicles. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under these brands.

565.    FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. FCA and/or its agents designed and manufactured the Class Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials related to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

566.    As further detailed below, FCA-authorized automobile dealerships act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its over 2,000 authorized dealerships nationwide.

## 2.    Stellantis

567.    In January 2021, Peugeot S.A. merged with and into Fiat Chrysler Automobiles

---

[8] https://www.sec.gov/Archives/edgar/data/1605484/000160548421000032/stellantis-20201231.htm "Subsidiaries are entities over which the FCA Group had control. Control was achieved when the FCA Group had power over the investee, when it was exposed to, or had rights to, variable returns from its involvement with the investee and had the ability to use its power over the investee to affect the amount of the investor's returns. Subsidiaries were consolidated on a line by line basis from the date which control was achieved by the FCA Group. The FCA Group reassessed whether or not it controlled an investee if facts and circumstances indicated that there were changes to one or more of the three elements of control listed above."

N.V. The combined company was renamed Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. Fiat Chrysler Automobiles N.V. was the sole owner of Defendant FCA.

568.    At the time of the merger, Fiat Chrysler Automobiles N.V. was a global automotive manufacturer with approximately 189,500 employees and "more than 100 manufacturing facilities and more than 40 research and development centers."[9]

569.    In 2023, Stellantis employed over 250,000 employees, achieved 6.2 million automotive sales, and reported global revenues of $205.144 billion, with 78,000 employees and 1.8 million sales in the United States. [10]

570.    According to stellantisnorthamerica.com, Stellantis operates 21 manufacturing facilities in the United States including 7 in Michigan.[11] This website is controlled and operated by the Defendants.[12]

---

[9] https://www.stellantis.com/content/dam/stellantis-corporate/sustainability/csr-disclosure/fca/fca_2020_sustainability_report.pdf last accessed on August 28, 2024.

[10] https://www.stellantis.com/content/dam/stellantis-corporate/sustainability/csr-disclosure/stellantis/2023/Stellantis-2023-CSR-Report.pdf last accessed on August 28, 2024.

[11] https://s3.amazonaws.com/chryslermedia.iconicweb.com/mediasite/attachments/2023_CORP_Manufacturingjn1uhihk6ekgra70688fear4sh.pdf last accessed on August 28, 2024

[12] https://media.stellantisnorthamerica.com/page.do?file=legal last accessed on August 28, 2024

571.    Stellantis represents to the public, both on its website and through the installation of prominent signage at its automotive plants, that it operates manufacturing facilities in Michigan. An example of such signage is displayed at the Detroit Assembly Plant, as shown below:[13]



572.    Upon information and belief, Stellantis was responsible for approving the specifications and design of the defective components, including the RF Hub, that caused the Anti-Theft Security Defect. According to Stellantis' 2021 Corporate Social Responsibility Report[14]:

> Stellantis has long been working on making vehicles resistant to theft and protecting vehicles and the objects inside them from malicious individuals. Vehicles are designed to help avoid break-ins referring to standards in line with leading authorities and taking into account current threats.
>
> Since 2011, a unit has been analysing and addressing potential or known vulnerabilities, conducting statistical and Internet monitoring, and analysing theft methods in conjunction with the police. This work has, for example, spurred alterations to the design of door locks to strengthen their resistance to break-ins.
>
> We work closely with cybersecurity experts and are assisted by specialized firms. For instance, encryption algorithms used to protect vehicle unlocking

---

[13] https://media.stellantisnorthamerica.com/newsrelease.do?id=329&mid=105# last accessed on August 28, 2024.
[14] https://www.stellantis.com/content/dam/stellantis-corporate/sustainability/csr-disclosure/stellantis/2021/Stellantis_2021_CSR_Report.pdf last accessed on August 28, 2024.

and starting are continually improved. The latest generation vehicles use encryption that meets the highest standards.

573.    The defective push-button SKIS system with the Anti-Theft Security Defect was introduced in 2011, which is the same year Stellantis began "analysing and addressing potential or known vulnerabilities, conducting statistical and Internet monitoring, and analysing theft methods in conjunction with the police."

574.    Stellantis monitors vehicle safety and defects across all vehicles manufactured by its subsidiaries. According to Stellantis' 2022 Vigilance Plan[15]: "Stellantis has a dedicated team to investigate field issues including those with potential safety consequences. Investigations are launched to determine root causes, potential consequences and corresponding safety risks and countermeasures e.g., field actions and product safety recalls."

575.    Further, Stellantis operates "[r]egional decision-making bodies called Vehicle Regulations Committees (VRC) [that] meet regularly to systematically analyze the potentially safety-relevant anomalies detected in production or in the field."[16] The VRC determines "the proper course of action, e.g. safety recalls, under the chairmanship of the Technical Safety and Regulatory Compliance Officer."

576.    At least one current Senior Vice President of Technical Safety and Regulatory Compliance, who is the executive responsible for determining the appropriate course of action to address vehicle safety defects, is an employee of Stellantis currently working in Auburn Hills, Michigan. [17]

577.    Upon information and belief, a Stellantis Vehicle Regulations Committee and a

---

[15] https://www.stellantis.com/content/dam/stellantis-corporate/sustainability/csr-disclosure/stellantis/2022/2022-Vigilance-Plan-EN.pdf last accessed on August 28, 2024.
[16]
[17] https://www.linkedin.com/in/cheryl-stark-aa166a24 last accessed on August 28, 2024.

Technical Safety and Regulatory Compliance Officer were responsible for, or substantially involved in, the decision by Defendants to limit the availability of Key Programming Lockdown and to continue selling Class Vehicles with the Anti-Theft Security Defect.

578.    Stellantis—not FCA—has directly issued at least three recalls affecting the Class Vehicles via press releases on its website, https://media.stellantisnorthamerica.com. Each of these press releases identifies Auburn Hills, Michigan, as the location of the announcement.

579.    On February 11, 2022, Stellantis issued a recall announcement stating: "Auburn Hills, Mich. - Stellantis is recalling an estimated 19,808 plug-in hybrid minivans from model years 2017 and 2018 to resolve a potential fire risk. A routine company review of customer data led to an internal investigation that discovered 12 fires among model-year 2017 and 2018 vehicles…Stellantis is unaware of any related injuries or accidents… Stellantis is working to confirm the cause of the fires."[18]

580.    On December 13, 2022, Stellantis issued another recall announcement stating: "Auburn Hills, Mich. - Stellantis is voluntarily recalling an estimated 1.23 million pickup trucks to inspect and realign, as needed, certain latching components on their tailgates. A routine review of customer service records led to a Stellantis investigation that discovered tailgate striker plates on certain pickup trucks may not be sufficiently aligned to accommodate complete closure…Stellantis is unaware of any potentially related injuries or accidents." [19]

581.    On November 22, 2023, Stellantis issued a recall press release stating: "Auburn Hills, Mich. - Stellantis is recalling an estimated 32,125 U.S.-market plug-in hybrid SUVs to resolve a potential fire risk. A routine Company review of customer data led to an internal investigation that discovered eight vehicle fires…Stellantis is unaware of any related injuries or

---

[18] https://media.stellantisnorthamerica.com/newsrelease.do?id=23538&mid=431 last accessed on August 28, 2024.
[19] https://www.linkedin.com/in/cheryl-stark-aa166a24 last accessed on August 28, 2024.

accidents."[20]

582.    In addition to performing safety compliance operations in Michigan, Stellantis also uses the location to conduct substantial financial and corporate functions.

583.    Stellantis' current Chief Financial Officer is "based in the Auburn Hills, Michigan office…"[21]

584.    On June 13, 2024, Stellantis hosted its first Investor Day in Auburn Hills. During the event, Stellantis' Chief Executive Officer, Chief Financial Officer and "other members of the Top Executive Team also shared updates on several areas of the business."[22]

## IV.    SUBSTANTIVE ALLEGATIONS

**A.    Federal Legislative and Regulatory Framework Setting Forth Automotive Anti-Theft Requirements**

**1.    Safety concerns relating to vehicle thefts lead to the mandate for automotive anti-theft devices intended to prevent the ability of amateur thieves to quickly steal vehicles.**

585.    During the 1960s, the United States experienced a significant increase in motor vehicle thefts. The lack of adequate anti-theft devices in vehicles made it easier for thieves to steal cars.

586.    Before the implementation of FMVSS 114, there was a lack of standardized requirements for theft protection, resulting in widely varying vehicle security across different makes and models, with many vehicles lacking effective anti-theft features.

587.    Congress attempted to address the growing automotive theft by passing the Auto Theft Prevention Act of 1968 but was unsuccessful. However, their objectives and concerns were later addressed when the DOT promulgated FMVSS 114. At a hearing on the Act, Dr. William

---

[20] https://media.stellantisnorthamerica.com/newsrelease.do?id=25511&mid=431 last accessed on August 28, 2024.
[21] https://www.stellantis.com/en/news/press-releases/2023/april/natalie-knight-to-join-stellantis-as-chief-financial-officer last accessed on August 28, 2024.
[22] https://www.stellantis.com/en/investors/events/stellantis-investor-day-2024   last accessed August 28, 2024.

Haddon, Jr, the Director of the National Highway Safety Bureau, made the following statement in support of automotive anti-theft standards:

> The National Highway Safety Bureau, a part of the Department, is now considering the promulgation of Motor Vehicle Safety Standards designed to make it more difficult for amateur and professional thieves to steal motor vehicles. In the course of its proceedings, the Bureau has accumulated data demonstrating that there is a definite correlation between vehicle accidents and stolen vehicles. In summary, there is mounting evidence that stolen cars are lethal.[23]

588.    According to a DOJ study from 1966, an estimated 94,900 stolen cars were involved in accidents, leading to over 18,000 incidents resulting in personal injuries. Stolen cars were disproportionately more likely to be involved in accidents—18.2% of stolen cars became involved in accidents, and 19.6% of these accidents resulted in personal injuries. The accident rate for stolen cars was roughly 200 times higher than that for vehicles not reported stolen.

589.    The safety hazards presented by auto thefts were further magnified by projections for 1967, anticipating about 650,000 automobile thefts, with approximately 100,000 of these stolen vehicles expected to become involved in highway accidents.

590.    In response to the escalating issue of vehicle theft during the 1960s, industry stakeholders and Congressmen recognized the need to directly address specific methods of theft and inherent vehicle vulnerabilities.

591.    Primary among these methods were owners leaving keys in their cars, and the widespread availability and use of master keys and similar devices that allowed thieves to easily start multiple vehicles.

592.    The DOJ survey found that master keys were used in over half automotive thefts

---

[23] National Highway Safety Bureau, Statement by Dr. William Haddon Jr., Director, Federal Highway Administration, Department of Transportation, Auto Theft Prevention Act of 1968, Hearing on H.R. 15215 Before the Subcomm. on Crime of the H. Comm. on the Judiciary, 90th Cong. 55 (1968) .

where the owner did not leave keys in the vehicle and accounted for approximately 30,000 thefts

in 1966. Based on their survey, the DOJ made the following recommendation:

> Lastly, it is apparent that the automobile itself can and should be made a more difficult target for the would-be auto thief. Opportunity is a major factor in youth crime, and this is particularly so in auto theft. Changes in automobile design should be incorporated which will prevent or discourage motorists from leaving their keys in the ignition when the car is not running, which will make ignition locks more secure against picking or opening with so-called master keys and which will protect cars from short-circuiting of wires in the ignition system. Such a comprehensive approach will produce, with respect to this crime, a reversal of the recent trend toward lawlessness which is such a serious problem in our country today.

593.    FMVSS No 114 was promulgated by the DOT in 1968 and went into effect in 1970.

The regulator's goal in establishing FMVSS No. 114 was to make it difficult to activate the engine

"within a short period of time." 41 F.R. 9374 (Mar. 4, 1976). The Safety Standard was amended

in 2006 to account for developments in automotive technology, namely the use of electronic keys

with codes to start the vehicles as opposed to mechanical keys.

594.    FMVSS No. 114 is currently codified as 49 C.F.R. 571.114, and provides as

follows:

> **S1. Scope**. This standard specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles.
>
> **S2. Purpose**. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> **S3. Application**. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with a GVWR of 4,536 kilograms (10,000 pounds) or less. However, it does not apply to walk- in van-type vehicles. Additionally, paragraph S5.3 of this standard applies to all motor vehicles, except trailers and motorcycles, with a GVWR of 4,536 kilograms (10,000 pounds) or less.
>
> **S4. Definitions**.
> *Combination* means a variation of the key that permits the starting system

106

of a particular vehicle to be operated.

*Key* means a physical device or an electronic code which, when inserted into the starting system (by physical or electronic means), enables the vehicle operator to activate the engine or motor. ...

*Starting system* means the vehicle system used in conjunction with the key to activate the engine or motor.

S5 **Requirements**. Each vehicle subject to this standard must meet the requirements of S5.1, S5.2, and S5.3. Open-body type vehicles are not required to comply with S5.1.3.

S5.1 **Theft protection**. S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
(a) The normal activation of the vehicle's engine or motor; and
(b) Either steering, or forward self-mobility, of the vehicle, or both.

49 C.F.R. 571.114.

595.     The theft protection requirements of FMVS No 114 are simple and should be easily achievable by most automotive manufacturers. The standard dictates that vehicles must not start without the key present. Critically, the "key" is intended to refer to authorized keys belonging to the legal owner of the vehicle, as opposed to master keys or other device that is capable of starting the engine outside its normal activation.

596.     FMVSS No. 114 sets the bare minimum anti-theft requirements that manufacturers must install in their vehicles to comply with Federal Motor Vehicle Safety Standards.

597.     FMVSS No. 114 is a "self-certification" process and "NHTSA does not issue type approval certifications and does not certify any motor vehicles or motor vehicle equipment as complying with applicable FMVSS." Therefore, automotive manufacturers are responsible for ensuring their vehicles comply with the standard.

> **2.     NHTSA strengthens the requirements for anti-theft devices if used to obtain part marking requirements ("PMR") exemptions.**

598.     In 1984, Congress passed the Motor Vehicle Theft Law Enforcement Act (the

"Theft Act"), 49 U.S.C. 33101, *et seq*., granting NHTSA the authority to pass the Theft Prevention Standard, which requires that automotive manufactures permanently affix VINs to major components of the vehicles and such inscription is referred to as the 'part marking requirements.

599.    In 2016, NHTSA issued a new rule that created an option for manufacturers to obtain an exemption from the PMR on certain components by installing immobilizers that met one of four sets of performance criteria, which included three international standards and one new standard published by NHTSA in Appendix A, 49 CFR Appendix-A-to-Part-543(1).

600.    NHTSA's immobilizer standard matched the Canadian counterpart requirements set forth in CMSSV 114. SOR/79-940. Both the existing Canadian standard and new NHTSA performance criteria required, among other things, the following:

> (1) Subject to paragraph (2) of this appendix, an immobilization system shall arm automatically within a period of not more than 1 minute after the disarming device is removed from the vehicle, if the vehicle remains in a mode of operation other than accessory mode or on throughout that period.
>
> ***
>
> (4) If armed, the immobilization system shall prevent the vehicle from moving more than 3 meters (9.8 feet) under its own power by inhibiting the operation of at least one electronic control unit and shall not have any impact on the vehicle's brake system except that it may prevent regenerative braking and the release of the parking brake.
>
> ***
>
> (10) The immobilization system shall be designed so that, when tested as installed in the vehicle neither the replacement of an original immobilization system component with a manufacturer's replacement component nor the addition of a manufacturer's component can be completed without the use of software; and ***it is not possible for the vehicle to move under its own power for at least 5 minutes after the beginning of the replacement or addition of a component referred to in this paragraph (1)***.
>
> (11) The immobilization system's conformity to paragraph (10) of this appendix shall be demonstrated by testing that is carried out without

damaging the vehicle.

(12) Paragraph (10)(i) of this appendix does not apply to the addition of a disarming device that requires the use of another disarming device that is validated by the immobilization system.

49 CFR Appendix-A-to-Part-543 (emphasis added).

**B.  The Class Vehicles Were Marketed and Sold as Safe, Secure, and of the Highest Quality.**

601.    The Class Vehicles include all makes and models manufactured and sold by Defendants in the United States since MY 2012, that were installed with Defendants' SKIS, which, can be accessed through its Radio Frequency Hub module ("RF Hub"), and a push-button start system.

602.    Defendants were able to sell millions of Class Vehicles, earning billions in profit, based on their marketing of the vehicles as safe, secure, of the highest quality, and containing the latest safety and security technology.

603.    For example, FCA's brochure for the 2017 Chrysler Pacifica claims that the vehicle is "[t]he most technologically advanced vehicle in its class," adding that the vehicle "transforms passenger productivity, entertainment and safety technology with the future of applied science and automation."[24] FCA further tells consumers that "Your family's safety and security are what matter most" and that the vehicle contains "[o]ver 100 standard and available safety and security features." Further, the brochure touts "Keyless Enter 'n Go" as a standard feature across all trim packages, and the "Security Alarm" standard on most trim packages.

604.    FCA states in the brochure for the 2021 Dodge Durango that the "Dodge Durango handles all of life's demands while also satisfying our drivers' demand for intense performance"

---

[24] https://www.auto-brochures.com/makes/Chrysler/Pacifica/Chrysler_US%20Pacifica_2017-3.pdf last accessed September 6, 2024.

and contains "even more technology."[25] FCA specifically touts that "Keyless Enter 'n Go with push-button start" and "SENTRY KEY ANTITHEFT ENGINE IMMOBILIZER" are "standard" across all trim packages. The brochure also contains a section devoted to "safety & security features," touting a suite of features installed in the vehicle. Further, the brochure markets an optional "premium suite of safety and convenience services," which include "lock/unlock," "theft alarm notification," and "stolen vehicle assistance."

605.     Similarly, FCA's brochure for the 2016 Jeep Cherokee states the vehicle is the "MOST LUXURIOUS VEHICLE IN ITS CLASS."[26]  FCA touts its "Keyless Enter 'n Go. Live, ride and drive key-free. This technology automatically unlocks doors when you pull the handle, eliminating the fumbling for keys. Once inside, a simple press of the STOP/START button brings the engine to life." The brochure likewise contains a section titled "safety & security features," in which FCA promotes the "SENTRY KEY ENGINE IMMOBILIZER: *A unique, embedded key code matched only to your vehicle helps keep your Grand Cherokee safely where it belongs*." And FCA again promotes the availability of a "suite of features and services, [which] [are] the next generation of in-vehicle connectivity," including "theft alarm notification" and "stolen vehicle assistance."

606.     For the 2017 brochure published by FCA promoting all Fiat vehicles, FCA touts its "Security Alarm" and "Sentry Key® Engine Immobilizer System — Antitheft technology" as "Safety & Security" available in the 2017 Fiat 500.[27] FCA's individual brochure for the 2019 Fiat 500 contains a section for "safety and security" titled "stress-free zones" in which it touts the

---

[25] https://www.auto-brochures.com/makes/Dodge/Durango/Dodge_US%20Durango_2021.pdf (last accessed September 6, 2024).

[26] https://www.auto-brochures.com/makes/Jeep/Grand%20Chrerokee/Jeep_US%20GrandCherokee_2016.pdf (last accessed September 6, 2024).

[27] https://www.auto-brochures.com/makes/Fiat/Fiat_US-FullLine_2017.pdf  (last accessed September 6, 2024).

"Remote Keyless Entry[:] Affords easy access by remotely locking and unlocking doors and turning on interior lamps. For vehicles equipped with the optional security alarm, this device also arms and disarms that system. Standard."[28]

607.    Prior to sale, Defendants also self-certify that the Class Vehicles conform to all U.S. Safety Standards and affix a certificate label to each vehicle that is similar to the one below:



## C.    The Class Vehicles Suffer from the Anti-Theft Security Defect which Allows Amateur Thieves to Easily Steal the Vehicles in Under Two Minutes Without Making a Sound.

### 1.    The Class Vehicles' keyless ignition and anti-theft systems can be bypassed with a cheap key programming device.

608.    The primary anti-theft system in the Class Vehicles is called the Sentry Key Immobilizer System. SKIS is a type of anti-theft system commonly referred to as an 'immobilizer.' Defendants began installing a variation of SKIS in their vehicles around 1996 in Jeep Grand Cherokees and has been standard equipment in Defendants' vehicles since 1999.

609.    When the SKIS was first released, it used a transponder chip attached to the metal key used to start the ignition. When the key was turned in the ignition, the transponder communicated via radio frequency to the RF Hub module, and if the RF Hub confirmed the transponder key was valid, then the vehicle would start.

---

[28] https://www.auto-brochures.com/makes/Fiat/500/Fiat_US%20500_2019.pdf  (last accessed September 6, 2024).

610. Following the introduction of keyless or electronic "Smart Keys" and push-button ignition systems in 2011, the transponder chip was installed in the key fob. Keyless push-button ignition systems rely on a Keyless Ignition Node module ("KIN") which contains the customer interface for ignition switch activation in the form of a momentary switch. When an authorized key is in the interior of the vehicle and the driver presses the Start/Stop or push button a message is transmitted to the RF Hub, which sends a signal to start the vehicle.



**KIN Module front view**

611. Upon information and belief, the RF Hubs installed in the Class Vehicles function in an identical manner, have the same design, are manufactured by third-party suppliers based on Defendants' specifications, and installed with software coded by Defendants.

612. In the 2020 Owner's Manual for 2020 Dodge Charger, Defendants describe the SKIS as an "automatic" means of "prevent[ing] unauthorized" use of the vehicle and how the system purportedly has security methods to detect the use of "invalid key fob[s]":[29]

> ***The Sentry Key Immobilizer system prevents unauthorized vehicle operation*** by disabling the engine. The system does not need to be armed or activated. Operation is automatic, regardless of whether the vehicle is locked or unlocked. The system uses a key fob, keyless

---

[29] https://cdn.dealereprocess.org/cdn/servicemanuals/dodge/2020-charger.pdf (last accessed September 6, 2024).

push button ignition and a Radio Frequency (RF) receiver to prevent ***unauthorized*** vehicle operation. Therefore, only key fobs that are programmed to the vehicle can be used to start and operate the vehicle. The system cannot reprogram a key fob obtained from another vehicle.

After placing the ignition switch in the ON/RUN position, the vehicle security light will turn on for three seconds for a bulb check. If the light remains on after the bulb check, it indicates that there is a problem with the electronics. ***In addition, if the light begins to flash after the bulb check, it indicates that someone attempted to start the engine with an invalid key fob***….

613.    Similarly, in the 2015 Dodge Charger Owner's Manual, Defendants claim that "invalid Key Fobs" cannot start the vehicle, stating: "The system will not allow the engine to crank if an ***invalid*** Key Fob is used to start and operate the vehicle. The system will shut the engine off in two seconds if an invalid Key Fob is used to start the engine."[30]

614.    All vehicles that incorporate engine immobilizer systems, including the Class Vehicles and the SKIS, have a unique four-digit Personal Identification Number ("PIN") code assigned by the manufacturer that correspond to the Vehicle Identification Number (the "VIN"), and those codes are necessary to program new valid keys. Defendants maintained a database of PINs and VINs for the Class Vehicles and, in order to program a new key, a locksmith or independent mechanic was supposed to request the PIN from one of Defendants' dealers or attempt to purchase it from a third-party security vendor who had access to Defendants' database.

615.    In the owner's manuals for the Class Vehicles, Defendants do not disclose to consumers that anyone—viz., non-authorized dealerships, third party mechanics, or thieves—are easily able to program replacement keys. Instead, the Class Vehicles' owner's manuals repeatedly state that "duplication of" or "[p]rogramming key fobs may be performed at an ***authorized***

---

[30] https://www.fcacanada.ca/owners/en/manuals/2015/2015E-Charger-OM-4th_R1.pdf  (last accessed September 6, 2024).

*dealer*."[31]

616.    However, by 2002, locksmiths discovered they could remove the RF Hub, disassemble it on a work bench, and read the PIN using special electrical interface tools, thereby avoiding the need to access Defendants' PIN database.

617.    In 2004, Defendants introduced a new version of SKIS that used the controller area network data bus ("CAN bus") to communicate between the various modules of the security system. The CAN bus is a system of wires, wiring harnesses and connections that the electronic control units or modules, including the engine immobilizer and ignition system, in the vehicle use to communicate.  This version of SKIS is found in each Class Vehicle.

618.    The RF Hub connects through the CAN bus to other vehicle components including door locks and the ignition system. The below image depicts the location of the RF Hub (indicated by the white line) and a portion of the CAN bus shown by the red cables and blue connection ports:



619.    PIN reading devices called key programmers are able to gain access to the RF Hub

---

[31] https://cdn.dealereprocess.org/cdn/servicemanuals/dodge/2020-charger.pdf; *see also* https://www.fcacanada.ca/owners/en/manuals/2015/2015E-Charger-OM-4th_R1.pdf.  (last accessed September 6, 2024).

by plugging into a vehicles' access ports for the CAN bus. The most common access port used by key programmers is in the driver footwell, and is indicated by the orange arrow in the diagram below, known as the On Board Diagnostics ("OBD") port:



620.    For MY 2017, Defendant installed a new module, called the Secured Gateway Module, in the Class Vehicles that prevented access to the RF Hub through the OBD port. However, the design of the new module contained a serious defect that allowed it to be bypassed by simply plugging key programmers into another port readily accessible in or around the passenger footwell and glove compartment area, depending on the car model.

621.    Key programmers first appeared around 2008.[32] Some early devices required the simultaneous use of a laptop computer to read the PIN and program new keys,[33] but later evolved into the current handheld devices. For example, Autel, a global manufacturer of automotive diagnostic products, sells a handheld key programmer with two blank keys for the bargain price

---

[32] https://www.locksmithledger.com/keys-tools/article/10229399/chrysler-skim-pin-code-retrieval-tool (last accessed January 21, 2024).
[33] https://www.etlweb.com/doc/DmaxSkimCodeReader_UG.pdf (last accessed on January 21, 2024).

of $510:[34]



622.    Defendants began installing the current version of SKIS in the 2011 Dodge Charger, which is distinguished from earlier versions by the use of push-button ignition systems. The omission of a metal key made the vehicles easier to steal with a key programmer because a thief no longer needed to cut a new steel key in order to defeat a traditional mechanical "insert-and-turn" steel key ignition system in addition to the immobilizer. Further, the ability to instantly create a new unauthorized key allows a thief to start the car instantly, without delay.

623.    In addition to SKIS, Class Vehicles also have Vehicle Theft Alarms ("VTA"). Defendants manufacture two versions of VTA: (a) basic VTA; and (b) premium VTA.

624.    The basic VTA will activate the horn and exterior lights in the event the doors, trunk, or hood are opened when the alarm is active. But the basic VTA does nothing if a window

---

[34]    https://store.autel.com/collections/key-programmers/products/autel-maxiim-km100 (last accessed September 6, 2024)

is removed, broken or breached or entry to the interior of the vehicle is made in any other manner and have no ultrasonic capabilities to determine if there is an intruder inside of the vehicle.

625.    The premium VTA contains an Intrusion Module with ultrasonic sensors in the passenger compartment that are purportedly designed by Defendants to detect interior movement. The motion of a window being broken, or at the very least the sound and motion of a thief climbing through a broken window may be detected by the ultrasonic sensors of the Intrusion Module and cause premium VTA to activate an audible and visual alarm.

626.    While Defendants installed premium VTA in versions of the Class Vehicles sold outside the United States as a standard feature since around MY 2012, the basic version of VTA was the only alarm system available on the Class Vehicles in the U.S. market until model year 2022, at which time Defendants made premium VTA standard on high-end Challengers and Chargers, and an optional feature on lower-end trim levels of those models.

627.    The basic and premium VTAs, once triggered, do not deactivate SKIS or prevent thieves from entering the vehicle and using a key programmer to add an unauthorized new key – both versions of the VTA simply activate the horn and exterior lights.

628.    Thus, the basic and premium VTAs are wholly inadequate in deterring theft of the Class Vehicles in that they do not prevent thieves from entering the vehicle and using key programmers to create an unauthorized new key and drive away with the vehicle.

### 2.    The Anti-Theft Security Defect allows amateur thieves to steal Class Vehicles in under two minutes without making any sound.

629.    The Anti-Theft Security Defect is a series of design flaws in the Class Vehicles' anti-theft systems that allows thieves to steal the vehicles. The method of theft is simple and can be exploited by an amateur thief in less than two minutes:

(a)    A thief enters the vehicle through a window;

      (b)      The thief plugs an inexpensive publicly available key programmer into one of the vehicle's openly accessible CAN bus connection ports;

      (c)      the key programmer retrieves the RF Hub's PIN code and creates a new unauthorized key to the vehicle in under two minutes;

      (d)      the unauthorized key instantly starts the vehicle without any delay; and

      (e)      the addition of an unauthorized key does not trigger an audible or visual alarm.

630.    The Anti-Theft Security Defect allows thieves to steal Class Vehicles regardless of whether the doors are locked or unlocked and whether the VTA is armed or disarmed. There is no lockout function that would preclude a key programmer from adding a new key even if the door is locked and alarm armed.

631.    Notably, ***anyone*** can retrieve a vehicle's PIN by plugging a device into the CAN bus and reading the code from the RF Hub. Further, except for the useless Secure Gateway Module that is easily bypassed by plugging into ports other than the OBD port,  there are no alarms or other protections to prevent unauthorized access to the CAN bus.

632.    The ease in which thieves can buy a cheap key programmer online (including on Amazon with 2-day free shipping) and steal cars through this method is known industrywide, which is why Defendants' competitors include various common-sense features to prevent the unauthorized creation of new keys. For example, certain Chevrolet and Ford vehicles will sound an alarm when an unauthorized key is added and mandate a minimum ten-minute lockout period if a new key is programmed without an existing key present. But the Class Vehicles do not contain either of these safety features for creating new keys. Thus, once a Class Vehicles' PIN is retrieved using a key programmer, a new key could be programmed and instantly used to start the vehicle—

all of which takes less than two minutes.

633.    Accordingly, Class Vehicles are easily stolen using "devices which bypass the lock" and the anti-theft systems installed in the vehicles, in a manner that Congress warned of over fifty years ago and FMVSS No. 114 was intended to prevent.

634.    Compounding the harm caused by the ineffective SKIS, the limited capabilities of the VTA Defendants chose to install in the Class Vehicles sets the stage for easy theft of the vehicles via key programmer.

635.    The basic version of VTA is a very simplistic alarm that is only capable of monitoring the door, decklid, and hood ajar switches, which are simple electrical contact switches that can only detect the opening of the component to which they are connected.  The basic VTA cannot detect a thief breaking a window, moving in the interior, connecting a device to the CAN bus, reading the PIN from the RF Hub, programming a new key to the RF Hub, and starting a Class Vehicle.

636.    By only monitoring the status of door ajar switches, the decklid ajar switch, and the power lock switches, the basic VTA system has significant security gaps that allows entry through broken windows and sunroofs.

637.    Accordingly, the basic VTA, which is installed in nearly all Class Vehicles, is incapable of detecting or deterring the method of theft that created by the existence of the Anti-Theft Security Defect.

638.    Furthermore, the premium VTA does not cure the Anti-Theft Security Defect and fails to adequately deter theft of the Class Vehicles. .

> **3.    Surveillance videos reveal how easy it is for thieves to exploit the Anti-Theft Security Defect without any resistance.**

639.    While most methods of theft require a thief to strip the ignition cylinder and cause

other damage to the vehicle, the Anti-Theft Security Defect requires minimal force. The typical indicators of a thief exploiting the Anti-Theft Security Defect to steal a Class Vehicle include entry through a broken window and starting the vehicle shortly thereafter. If the vehicle is recovered, then additional evidence showing that the Anti-Theft Security Defect was exploited including the creation of unauthorized key fobs, pulled out trim panels in passenger footwell to access the connection port, and the owner may discover that their authorized key fobs no longer work because a key programmer can terminate all existing keys.

640.    Numerous instances of Class Vehicles being stolen have been documented by surveillance footage. In the below video screenshots, thieves are depicted using a key programmer to steal a Dodge Challenger, by first removing the front window:



Subsequently, one thief, equipped with a key programmer, enters the vehicle through the open window:



The vehicle is then driven off without activating any alarms:



641.     In another video capturing the theft of a 2021 Durango SRT Hellcat, the use of a key programmer is unmistakably evident. The footage shows one thief passing a device with an illuminated display to another who had just made entry into the car through a broken rear window:



642.     The theft of Class Vehicles using key programmers is so effortless and discreet that thieves boldly execute thefts in broad daylight. For example, on May 10, 2023, a Ram TRX, was stolen from the Helfman River Oaks Chrysler Jeep Dodge dealership in Houston during business hours. The below screenshot captures the moment the thief enters the vehicle, with an employee

unknowingly passing by completely oblivious to the silent theft unfolding.



643.     On May 27, 2020, in Atlanta, Georgia, law enforcement arrested two individuals for car theft, finding them with approximately 40 key fobs and a key programmer inside their stolen Dodge Charger.

644.     On October 16, 2022, the Associated Press published a story about a theft ring in Ohio, that was stealing Class Vehicles using hand-held electronic "pro pads," which is a model name for a type of key programmer.

645.     On January 26, 2023, a Newark-based car theft ring specializing in the theft of Dodge Challengers, Dodge Chargers, and Jeep Cherokees was uncovered, with operations including reprogramming key fobs and altering VINs or dismantling the cars to sell for parts.

646.     In addition to professional thieves, the key programmers are also used by amateurs to steal Class Vehicles. On April 3, 2023, in San Antonio, Texas, a crime ring was implicated in the theft of nearly a dozen Class Vehicles utilizing key programmers to exploit the Anti-Theft Security Defect.[35] A key detail from the arrest affidavit reveals the method used:

> According to the affidavit, Lozano-Velasco and Lopez both told police that Gonzalez purchased a device online that reprograms vehicle keys. Gonzalez

---

[35] https://www.ksat.com/news/local/2023/04/06/third-arrest-made-in-vehicle-theft-ring-involving-reprogrammed-keys-police-say/ (last accessed February 12, 2024).

later told police it was Lozano-Velasco who had a 'diagnostic programmer.'

The individuals involved in the vehicle theft ring were young, aged 20, 18, and 17, demonstrating that the operation did not rely on sophisticated criminal expertise. Instead, their method of coordinating the thefts included exchanging links through Instagram for purchasing blank key fobs, indicates that amateur criminals are also able to exploit the security defect in Class Vehicles.

### D.   As News of the Anti-Theft Security Defect Started to Spread, Theft Rates of Class Vehicles Began to Surge.

647.   NHTSA is required to periodically obtain and publish accurate and secure theft data. 49 U.S.C. 33104(b)(4). The National Crime Information Center of the Federal Bureau of Investigation provides this data to NHTSA. However, NHTSA has not published theft data for several years, and the most recent report only covers thefts through 2014.

648.   Current theft statistics are available from automotive insurance trade associations such as the National Insurance Crime Bureau ("NICB") and Highway Loss Data Institute ("HLDI").

649.   NICB publishes an annual Hot Wheels report and other periodic press releases identifying common car models stolen but refuses to share its comprehensive data outside of its members, which, upon information and belief, includes automotive manufacturers like Defendants.

650.   HLDI makes detailed theft data available to the public in its annual reports that provide, among other useful information, the relative whole vehicle theft claims frequency rates for most automobile models.[36] This information is useful to compare the relative theft rates of vehicles but does not indicate the total number of thefts per vehicle model.

---

[36] The data is "presented in relative terms where 100 corresponds to the average result for all passenger vehicles. Using relative values facilitates determining if a result is better or worse than average and by how much. Relative results are computed by dividing the vehicle series result by the all-passenger-vehicle result and then multiplying by 100."

651.     HLDI is a customary and standard source of theft data in the automotive industry. NHTSA has identified HLDI as a persuasive source of theft data to support automotive manufacturers' petitions for exemption from the Theft Prevention Standard.[37]

652.     On August 31, 2023, HLDI issued a press release warning that its data shows an emerging theft crisis. According to a press release:

> Theft claims for the Charger SRT Hellcat were more than ***60 times more frequent*** than the average for all 2020-22 models, relative to their numbers on the road, while theft claims for the Charger HEMI were more than ***20 times higher than average***, HLDI's latest whole-vehicle theft report shows.

> "If you own a Hellcat, you better check your driveway," said HLDI Senior Vice President Matt Moore. "These numbers are unbelievable."

(Emphasis added).

653.     The Class Vehicles have suffered from high theft rates dating back to 2011 and the rates continued to increase as key programmers proliferated. The Dodge Journey and Jeep Patriot are midsized sport utility vehicles that were built with SKIS, but both had higher theft rates than comparable vehicles sold by Defendants' competitors, such as the Hyundai Santa Fe and Tucson, which typically lacked any form of immobilizer.  Based on data from NHTSA for 2013 and 2014, the vehicles had the following theft rates per 1,000 vehicles sold:

---

[37] 85 FR 55,386 https://www.federalregister.gov/d/2020-17597/p-17 (last accessed January 20, 2024).



|                   | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|-------------------|------|------|------|------|------|------|
| Dodge Journey     | 1.51 | 0.94 | 0.53 | 0.8  | 1.13 | 1.34 |
| Jeep Patriot      | 0.71 | 0.61 | 0.77 | 0.57 | 1.21 | 1.18 |
| Hyundai Tucson    | 0.45 | 0.48 | 0.41 | 0.47 | 0.53 | 0.73 |
| Hyundai Santa Fe  | 0.73 | 0.7  | 0.89 | 0.82 | 0.41 | 0.55 |

654.    Although no data is available from NHTSA after 2014, the trend of the high theft

rates for Jeep Patriot and Dodge Journey continued to be tracked in the HLDI data until production

of those vehicles dropped off in 2017. The below graph compares the relative theft claim frequency

of the Jeep Patriot and Dodge Journey to several Hyundai and Kia vehicles—none of which were

equipped with immobilizers.



655.    The above graphs shows that the Hyundai and Kia vehicles were clustered around

or below 100, which represents the average relative claim frequency, while the Jeep Patriot was

around 150 (or 1.5x the average) and Dodge Journey was above 200 (or 2x the average). The theft

rates of Hyundai and Kia vehicles increased later in 2021 and 2022 after the viral TikTok videos,

but so did the theft rates of the Class Vehicles as key programmers proliferated. The comparison

is strong evidence that Defendants' anti-theft system is less effective at deterring theft than a basic

keyed ignition and other industry standard anti-theft systems installed by Defendants' competitors.

656.    Compared to other vehicles with immobilizers in the same class, the theft rate of Class Vehicles is alarming. The Dodge Challenger, Chevrolet Camaro, and Ford Mustang are in a category of vehicles commonly referred to as muscle cars. All of the vehicles offer high performance engines with power for the top-trim levels above 650 hp, 0-60 mph times under 4 seconds, and top speeds above 180 mph. These are fast cars with valuable components equipped with modern immobilizers. However, the Dodge Challenger lacks the common-sense security features of the Chevrolet and Ford, both of which will sound an alarm when an unauthorized key is added and mandate a minimum ten-minute lockout period if a new key is programmed without an existing key present. The effectiveness of those common-sense features is apparent in the relative theft claim rates for each vehicle:



| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chevy Camaro | 155 | 167 | 191 | 218 | | 149 | 172 | 178 | 212 | 186 | 173 |
| Ford Mustang GT | 186 | 186 | 192 | | 168 | 196 | 180 | 179 | 201 | 203 | 172 |
| Dodge Challenger | 212 | 213 | 261 | 314 | 331 | 351 | 358 | 340 | 342 | 517 | 766 |

657.     Similarly, the Dodge Durango has a much higher theft rate than its competitors, the Chevrolet Tahoe and Ford Expedition, in the full-sized sport utility vehicle segment. Like the Camaro and Mustang, the Tahoe and Expedition are both equipped with immobilizers that will trigger an audible alarm when an unauthorized key is added and mandate a minimum ten-minute lockout period to prevent a new key from being used to steal the vehicles. In contrast, the Durango is equipped with the ineffective SKIS and VTA that allows thieves to program new keys instantly and steal the Class Vehicles in less than two minutes. Predictably, the relative theft claim frequency of the Durango is 3 to 5 times higher than its competitors:



| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chevy Tahoe 4WD | 102 | 76 | 68 | 62 | 32 | 58 | 71 | 66 | 88 | 59 | 52 |
| Ford Expedition 4WD | 107 | 130 | 110 | 57 | 78 | 61 | | 42 | 21 | 15 | 49 |
| Dodge Durango 4WD | | 74 | 52 | 96 | 132 | 220 | 271 | 270 | 257 | 229 | 267 |

658.    Finally, the theft rates of the most stolen models of the Class Vehicles dwarves the theft frequencies of the Hyundai and Kias with the highest rates during their viral theft phenomenon. The Dodge Charger Hemi had a theft claim frequency of 2,197, which equates to 21.97 times the average theft claims, while the most stolen Kia model, the Sportage, peaked at only 479, meaning the Dodge Charger Hemi is four times as likely to be stolen as the most stolen Kia.



659.    Absent from the above chart is the Dodge Charger Hellcat because its theft rate of 6,128 in 2022 was so high relative to these other vehicles that its inclusion would render this graph impossible to read. In other words, the theft rates are literally 'off the chart.'

E.     **The Anti-Theft Security Defect Poses an Unreasonable Danger to Class Members and the Public.**

1.     **The theft of Class Vehicles creates an unreasonable safety threat to Class Members.**

660.     The Anti-Theft Security Defect poses a significant safety risk to Class Members who own or lease Class Vehicles. This risk is most apparent in two scenarios: when owners use tracking devices to locate stolen vehicles and when they directly confront the thieves.

661.     In November 2021, Elmhurst, Illinois, the theft of a Jeep Cherokee from a residential driveway was recorded on surveillance. Two thieves pointed firearms at the home's front door while another used a key programmer to steal the car. This act of theft, under the threat of violence, demonstrates the Anti-Theft Security Defect's role in facilitating dangerous thefts.



662.     In December 2021, Madison Heights, Michigan, another alarming incident related to the Anti-Theft Security Defect involved the theft of a vehicle directly from a residential driveway. Surveillance footage captured two thieves in the act; one was pointing an AR-style pistol at the front door of the home, lying in wait to shoot anyone who might appear, while the others work on stealing the Dodge Challenger.



663.    Similarly, in June 2023, Chicago, Illinois, a Dodge Durango was stolen from a firefighter's driveway. Surveillance showed an individual armed with a rifle guarding the car while a thief stole the vehicle, ensuring the theft proceeded without interference. This event further highlights the risks posed by the Anti-Theft Security Defect, threatening vehicle owners' safety even within their homes.



664.    By failing to address the Anti-Theft Security Defect adequately, Defendants have inexcusably placed their customers in harm's way, creating a hazardous environment where vehicle thefts can escalate into violent confrontations.

665.    The Anti-Theft Security Defect not only exposes customers to physical harm but also leaves them feeling vulnerable and powerless, potentially leading to instances of vigilantism

as individuals seek to protect themselves and their property. Despite purchasing a vehicle with what they believed to be reasonable antitheft measures, customers find themselves at the mercy of thieves who exploit the Anti-Theft Security Defect with relative ease. This sense of betrayal and disillusionment can drive individuals to take matters into their own hands, resorting to vigilantism as a means of reclaiming a sense of control over their safety and property.

666.    On January 28, 2024, the owner of a stolen Dodge Durango tracked his vehicle down and engaged in a shootout with the occupants. The vehicle crashed into a retail store. A man was shot in his shoulder and neck, and a boy was hurt in the crash. The mangled store and bullet-riddled-vehicle exemplify the threat to the public and Class Members posed by the theft-prone vehicles:



667.    There are several other documented incidents of vigilantes tracking down stolen Class Vehicles and shooting the thieves:

(a)    June 2023, Jennings, Missouri, a woman pursued her sister's stolen Dodge Challenger until it crashed and caught fire. The women shot the occupants of the stolen vehicle when they attempted to exit the burning vehicle.

(b)    July 2023, Harris County, Texas, an owner chased after his stolen Dodge

132

Charger in a Lexus. The owner shot and killed the car thief while driving down the roadway.

668.     Conversely, there are also several incidents where the car owners are injured or killed when attempting to retrieve their stolen Class Vehicles:

(a)     On March 29, 2023, Bakersfield, California, the owner of Dodge Charger Hellcat was tragically murdered while attempting to recover her stolen car. She had tracked the vehicle using an Apple AirTag and confronted the thieves, leading to her fatal shooting.

(b)     April 2023, Southaven, Tennessee, a man tracked down his stolen Dodge Charger and confronted the car thieves in the parking lot of an apartment complex who then shot him 4 to 5 times.

669.     The rise of vigilantism in response to the Anti-Theft Security Defect poses significant risks not only to Class Members but also to broader public safety, undermining the rule of law and potentially leading to violence or other unlawful behavior. Furthermore, the prevalence of vigilantism demonstrates the failure of Defendants to adequately address the Anti-Theft Security Defect and protect their customers from harm, leaving customers to fend for themselves.

**2.     Just as Congress warned in 1968, stolen Class Vehicles are a serious safety threat to the general public.**

670.     The Anti-Theft Security Defect in Class Vehicles has led to severe public safety hazards, highlighted by a series of incidents where stolen vehicles were involved in criminal activities causing the death of innocent people.

671.     The stolen Dodge Charger of Plaintiff Katrina O'Connor was used in the homicide of an eight-year-old girl in Chicago, Illinois. Thieves used Plaintiff Aric White's Challenger to evade police in a high-speed chase through Dolton, Illinois, and the vehicle was recovered weeks

133

later with bullet holes in the passenger door.

672.    According to the Metro Nashville Police Department, a significant increase in thefts of these vehicles has been reported, with 149 high-performance Dodges stolen in 2022 and an alarming continuation into 2023. Captain Lamar Ballard of the Gallatin Police Department identified the criminals' motives, stating, "They are getting these high-performance vehicles that they know are fast, that they know can probably outrun a police car, so they are coming up in that jurisdiction, in stolen vehicles, looking for high-performance vehicles to leave in."

673.    The use of stolen Class Vehicles in the commission of murder, robberies, and other felonies has been documented across the United States:

(a)    On March 23, 2021, in Detroit, Michigan, a stolen Dodge Charger crashed into another vehicle going 120 mph while attempting to evade Michigan State Police.[38] The police recovered a loaded Glock pistol with a 50-round drum magazine from the crash scene. The Dodge Charger had been stolen from Georgia.

(b)    On November 23, 2022, a stolen Dodge Charger was traveling the wrong way at a high rate of speed when it collided with seven other vehicles in the Southside of Chicago, Illinois.[39] Two people were killed, and sixteen others were injured including two children. *Id.*

(c)    On January 19, 2023, Toledo, Ohio, a stolen 2020 Dodge Charger ran a red light, travelling 66 mph in a 35 mph, crashed into another vehicle and killed two people.

(d)    On September 18, 2023, in Houston, Texas, a stolen Dodge Charger was

---

[38] https://www.fox2detroit.com/news/video-driver-going-120-mph-in-stolen-charger-crashes-in-front-of-msp-trooper-on-i-75 (last accessed February 14, 2024)
[39] https://www.cbsnews.com/news/2-killed-16-hurt-chicago-crash-stolen-dodge-charger-chatham/ (last accessed on February 3, 2024).

used to ram other cars and rob their occupants. The Dodge Charger evaded police in a high-speed chase before crashing into another car and killing the innocent driver.

(e)     October 24, 2023, Chicago, Illinois, burglars crashed a stolen Dodge Charger into store, and then stole merchandise.

(f)     On October 28, 2023, Houston, Texas, a stolen Dodge Challenger Hellcat, proved virtually uncatchable by law enforcement, even with helicopter support. Ultimately, the chase came to an end, not through law enforcement intervention, but because the Hellcat ran out of gas.

(g)     On December 6, 2023, Farmington Hills, Michigan, a stolen Dodge Charger crashed into a truck carrying a family who were on their way home from seeing Santa Claus. The family's truck flipped several times. The police recovered a stolen gun from the Dodge Charger.

674.     The Anti-Theft Security Defect in the Class Vehicles represents a clear and present danger to public safety, given their susceptibility to theft and subsequent use in criminal activities. These vehicles, some known for their high-performance capabilities, are prized targets for thieves seeking to exploit the Anti-Theft Security Defect to their advantage. As a result, the presence of this defect significantly heightens the risk of these vehicles falling into the wrong hands and being utilized in a manner that endangers public safety.

675.     The Anti-Theft Security Defect enables thieves to easily circumvent the vehicles' security measures, granting them unfettered access to powerful and potentially lethal machines. This ease of theft, combined with the allure of high-performance nature of some Class Vehicles, amplifies the attractiveness of these cars to criminal elements. Consequently, the public is at

135

greater risk of encountering stolen Class Vehicles being operated recklessly or used as instruments in violent crimes.

**F.   The Class Vehicles are Defective, Do Not Meet Industry Standards, and Violate Federal Law.**

**1.   The Class Vehicles do not satisfy FMVSS No. 114.**

676.   The Class Vehicles fail to comply with the essential theft deterrent element of FMVSS No. 114, which mandates that vehicles must not start after an authorized key has been removed. In Class Vehicles, the starting system is instantly bypassed by key programmers and blank keys, which is simply theft by digital master keys or lock bypass devices—the type of automotive theft that FMVSS No. 114 was specifically intended to prevent. 33 Fed. Reg. 6,471 (Apr. 27, 1968).

677.   Congress enacted FMVSS No. 114 to deter automotive theft by establishing a basic guideline that automotive manufacturers could easily meet and that consumers would reasonably expect: cars cannot start after the authorized key is removed. Defendants have utterly failed to meet that fundamental requirement.

678.   Defendants designed the Class Vehicles with an electronic key, without a mechanical key, which relies solely upon an immobilizer to control the starting system. Then, Defendants embedded what was supposed to be a confidential PIN code into the immobilizer and made the code openly accessible through various CAN ports in the vehicles. Finally, Defendants designed the immobilizer so that it could be programmed to accept new transponder keys using the PIN code, while the vehicle doors were locked, the alarm was armed, and no existing transponder key was present, with no lockout period. The end result is the cars start with just a programmer, a blank key, the push of a button, and two minutes of a thief's day to spare.

679.   FMVSS No. 114 is designed to safeguard against unauthorized use by ensuring that

136

vehicles cannot be started without the specific, authorized ignition method present — whether this involves a physical key or a valid electronic code.

680.    The ability for a thief to start the vehicle with a key programmer and a blank key, after the existing authorized transponder key has been removed from the vehicle, means that the starting system is being initiated without the authorized electronic code present since the owner has removed the valid transponder key. This process causes the vehicle's electronic system to recognize an unauthorized electronic code as valid, facilitating engine activation, steering, and mobility without the presence of the genuine, valid transponder key. This bypass not only violates FMVSS No. 114's essential key requirement element, but also runs afoul of the regulation's intended purpose of preventing vehicles from being started with a master device.

> **2.    The anti-theft systems installed in Class Vehicles do not meet industry standards, which include, at minimum, a 5-minute delay when creating new keys.**

681.    Class Vehicles fail to comply with industry standards for immobilizer equipped vehicles because new unauthorized keys can be added instantly and without triggering an alarm.

682.    In the United States and Canada, performance standards for immobilizers require minimum five-minute delay from the time a new component is added to the security system to the time that the vehicle can be started.

683.    In 2016, NHTSA adopted the Canadian performance criteria as an alternative standard that manufacturers could meet to obtain exemptions from the part marking requirements under Federal Motor Vehicle Theft Prevention Standard.[40] The immobilizer performance standard is set forth in Appendix A to 49 CFR 543, which provides, in relevant part, that an "immobilization system shall be designed so that…it is not possible for the vehicle to move under its own power

---

[40] 49 CFR Appendix-A-to-Part-543(10); CMVSR 114(17)(b).

137

for at least *5 minutes* after the beginning of the replacement or addition of a component [of the immobilization system]."[41] (Emphasis added).

684.    In addition to failing to conform to the North American standards, Class Vehicles also do not comply with international standards as established by the United Nations Economic Commission for Europe, which mandate both a time delay mechanism and an alarm to deter theft. Specifically, the standard stipulates:

> An immobilizer shall be designed and built such that, when installed on a vehicle, according to the manufacturer's instructions, it ***cannot rapidly and without attracting attention*** be rendered ineffective or destroyed by, e.g. the use of low cost easily concealed tools, ***equipment or fabrications readily available to the public at large***. It shall be ***difficult and time consuming*** to replace a major component or assembly in order to ***bypass the immobilizer***. [42]

(Emphasis added). The immobilizer in the Class Vehicles violates this standard because it can be disarmed instantly, without triggering an alarm, by key programmers that are readily available to the public at large.

685.    During the design phase of their anti-theft systems around 2011, Defendants were fully aware of the Canadian and European standards governing immobilizer performance. Despite NHTSA not formalizing an immobilizer performance standard until 2016, the adopted criteria mirrored those long established in Canada. Given that Defendants have been selling vehicles in Canada and Europe for decades, they were indisputably aware from at least 2011 that the anti-theft devices equipped in all Class Vehicles fell short of industry benchmarks for theft prevention.

686.    Their awareness and decision to develop the SKIS with the Anti-Theft Security Defect demonstrates a deliberate disregard for established international and North American

---

[41] 49 CFR Appendix-A-to-Part-543(10); CMVSR 114(17)(b).
[42] United Nations Economic Commission for Europe, Regulation No. 116 § 8.2.7, E/ECE/TRANS/505/Rev.2. Available at https://digitallibrary.un.org/record/227567?ln=en (last accessed on January 23, 2024).

standards, highlighting a systemic failure to prioritize the security and safety of consumers. The persistent installation of defective anti-theft devices in Class Vehicles, even after Defendants publicly pledged to fix the theft issues, not only evidences a blatant non-compliance with the minimum performance standards prevalent in the automotive industry but also reflects a calculated omission that has compromised Class Vehicle security to the detriment of Class Members and the public.

### 3. Defendants ignored feasible alternative designs, consistent with industry standards, that would alleviate the risk of theft created by the Anti-Theft Security Defect.

687.   Other automotive manufacturers like Ford and General Motors have already adopted secure anti-theft technologies in their vehicles and, upon information and belief, these technologies have been standard in their vehicles since at least 2010. The common-sense security measures used by General Motors and Ford include: (a) sounding the security alarm if an attempt is made to add a new key when an existing key is not present; and (b) delaying a new key from being added for at least ten minutes if the security alarm is active and no existing key is present.

688.   Other than these simple security measures, which are missing from all Class Vehicles, the Ford Mustang and Chevrolet Camaro have similar characteristics to the Dodge Challenger, yet the theft rate for the Dodge Challenger dramatically exceeds those of its counterparts. Specifically, HLDI's data from 2012 to 2022 shows that the Challenger experienced a theft claim rate significantly higher than that of the Camaro and Mustang GT, with the Challenger's rate peaking at 766 theft claims per 100,000 insured vehicle years in 2022 compared to 173 for the Camaro and 172 for the Mustang GT. This vast disparity demonstrates the effectiveness of the security measures implemented by Ford and General Motors and highlights the consequential impact of Defendants' failure to incorporate basic anti-theft technology, rendering the Class Vehicles disproportionately vulnerable to theft.

689.    Furthermore, even though the theft rates of General Motor vehicles are lower than the Class Vehicles manufactured and sold by Defendants, General Motors has nevertheless implemented additional security measures to prevent key programming theft of its vehicles. Upon information and belief, starting in March 2023, GM modified the immobilizer software in its vehicles to mandate a two-hour delay when adding new keys.

**G.    Defendants Knowingly Manufactured and Sold Millions of Class Vehicles that Contain the Anti-Theft Security Defect, Allowing Barrierless Exploitation By Thieves.**

690.    On information and belief, Defendants knew or should have known that the anti-theft systems installed in the Class Vehicles, including SKIS, would not deter or reduce thefts based upon a variety sources.

691.    *First*, the ability of key programmers to obtain PINs and create unauthorized keys was widely known in the automotive industry. Since at least 2008, locksmiths and independent automotive mechanics have used key programmers to retrieve PIN codes from Defendants' immobilizer system by plugging into the CAN bus of Defendants' vehicles and reading the key code.[43] Once the PIN is retrieved, it can be used to program a new unauthorized key to bypass Defendants' SKIS and anti-theft system. The process can be performed in under two minutes and without triggering an audible alarm.

692.    Defendants would have been aware that third-parties were creating new keys for their vehicles without accessing Defendants' secret database of key PINs because Defendants sold blank transponder keys to locksmiths, automotive mechanics and customers without providing access to such codes. Furthermore, as an automotive manufacturer, Defendants directly employed hundreds of engineers and participated in groups that shared information between automotive

---

[43] https://www.locksmithledger.com/keys-tools/article/10229399/chrysler-skim-pin-code-retrieval-tool (last accessed on May 14, 2024).

manufacturers. With such a large pool of experts in the automotive industry, Defendants must have been aware how third-parties added new keys to their vehicles.

693.    *Second*, Defendants also had expertise in automotive design and maintenance including the methodology for programming new keys for Class Vehicles. Defendants would have known that a key programmer could be used to bypass SKIS while the system was armed, thereby starting the vehicle without an existing key present. Defendants would also be aware that a thief could obtain a blank transponder key, a key programmer, and the security PIN codes necessary to reprogram a new key. Finally, Defendants were aware that the anti-theft systems installed in the Class Vehicles—viz, SKIS and VTA—were incapable of triggering an audible alarm or mandatory delay in the event an unauthorized person attempted to program a new key while the systems were armed.  Accordingly, Defendants knew that a thief could easily steal a vehicle equipped with SKIS and VTA.

694.    *Third*, Defendants' Class Vehicles, which were armed with SKIS and VTAs, had higher theft rates than vehicles not equipped with immobilizers since 2014 according to theft rates published by NHTSA and theft claim rates published by HLDI. Specifically, the Jeep Patriot and Dodge Journey had higher theft rates than comparable competitor vehicles from 2014 through 2017.  Likewise, the Challenger and Charger were some of the first Class Vehicles equipped with the version of SKIS found in all subsequent Class Vehicles and those vehicles had at least twice the relative theft claim frequency as vehicles without immobilizers manufactured by Hyundai and Kia from 2012 through 2022. Defendants had access to publicly available theft data from NHTSA and HLDI, and proprietary data on the theft rates of their vehicles.

695.    *Fourth*, Defendants were aware that their immobilizer (SKIS) was ineffective, and would not deter theft, as it failed to comply with industry standard features that have been

implemented by its competitors, based on international performance standards in effect at the time of manufacture, including Canadian Vehicle Manufacturer Safety Standard 114, CAN/ULC–S338–98, and United Nations Economic Commission for Europe (UN/ECE) Regulation No. 97 (ECE R97). Given that other manufacturers were building systems that complied with those standards, Defendants were aware that the Class Vehicles were attractive targets to thieves who would seek out the easiest vehicles to steal, and their vehicles were easier to steal then other vehicles on the market.

696.   *Fifth*, Defendants were founding members of Auto-ISAC and the association studied automotive security vulnerabilities including aftermarket devices that could be used to access data through the CAN bus without authorization. The association must have been aware of the use of inexpensive and publicly available key programmers to read key PINs and steal cars.

## 1.   Defendants and their predecessors belonged to automotive industry associations that monitor developing technology like key programmers since 1999.

697.   Defendants are members of numerous automotive trade associations that monitor and share information concerning emerging technologies, issues, and security threats in the industry. Through their membership in these organizations, Defendants would have received and had access to information concerning the ability of automotive diagnostic devices to bypass security features in vehicles and add new keys.

698.   Defendants, and their various predecessor companies, were members of the Alliance of Automobile Manufacturers from 1999 through 2019. In 2002, the Alliance of Automobile Manufacturers entered into an agreement with independent automotive technicians to share the same service and training information that was available to franchise dealerships. Upon information and belief, this information would have included restricted access to

DealerCONNECT, the database of key PINs, and training on how to add new keys to Defendants' vehicles using automotive diagnostic devices with key programming functions. Through the Alliance's continued cooperation and information sharing agreements with independent automotive shops, Defendants should have been aware of how the independent automotive technicians were adding keys to vehicles including, using key programmers to read PINs from the immobilizers, because Defendants were providing access to their confidential PIN database as well as providing training and other information.

699.    Defendants currently make key PINs available to members of the National Automotive Service Task Force ("NASTF"), which is comprised of locksmiths and automotive service technicians. Upon information and belief, Defendants have had an agreement with NASTF since at least 2017.  NASTF maintains a Vehicles Security Professional Registry, which is a data exchange system conceived and designed cooperatively by automakers, the independent repair, insurance and law enforcement communities; it allows the aftermarket to access security sensitive information and systems related to automobiles, i.e. key and immobilizer codes, PIN numbers, immobilizer resets, secure vehicle gateways and similar types of information. Upon information and belief, Defendants participated in the design and creation of the Vehicle Security Professional Registry, which would have granted Defendants access to information concerning the methods used by locksmiths to add new keys to vehicles including key programmers.

700.    Stellantis has been a member of the Auto Information Sharing and Analysis Center ("Auto-ISAC") since August 2015, which is an association of automotive manufacturers created for the purpose of sharing and researching emerging security threats in the automotive industry. A page on Auto-ISAC's website has an Automotive Threat Matrix that includes examples of known instances where researchers were able to use aftermarket, customer, or dealer equipment to access

and extract information from the ECU and other modules by plugging into the CAN bus of the vehicle. Upon information and belief, through their membership in Auto-ISAC, Defendants have received notice or had access to information disclosing that vehicles with immobilizers systems connected via CAN bus, like the Class Vehicles, are vulnerable to key programmers gaining unauthorized access to read the key PIN and add new keys.

### 2. Defendants should have uncovered the Defect through its FMVSS self-certification process and pre-sale testing.

701. Defendants are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants are aware of applicable Safety Standards, including FMVSS No. 114.

702. Under 49 U.S.C. § 30115, Defendants are required to certify that each of their vehicles "complies with applicable motor vehicle safety standards."

703. On information and belief, Defendants employ consultants and engineers that are knowledgeable of FMVSS No. 114 and who are involved in the design, manufacturing, and testing of the Class Vehicles prior to sale to ensure compliance with the Safety Standard.

704. On information and belief, Defendants also conduct pre-sale tests to verify the parts are free from defects and align with their specifications.

705. On its website, FCA previously stated that its "objective is to ensure vehicle quality and safety."[44] FCA further states that its "vehicles meet the highest standard in terms of safety, ecological profile, driving performance and quality."[45] To that end, FCA's touted its rigorous testing and quality control:

> To ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, ***every mechanical and electronic***

---

[44] *See* https://web.archive.org/web/20160714203632/http://www.fcagroup.com/en-US/group/brand_stories/Pages/quality_lifecycle.aspx (last visited April 11, 2024).
[45] *Id*.

> *component, body part and trim element is rigorously tested*. The designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality. [46]

706.    Through this testing and as part of their 49 U.S.C. § 30115 self-certification process, Defendants should have uncovered the Anti-Theft Security Defect which renders the Class Vehicles highly susceptible to theft and does not prevent "steering" or "forward self mobility" of Class Vehicles when the authorized keys are removed.

### 3.    Defendants were on notice of the Defect from their efforts to monitor Class Vehicle thefts.

707.    On information and belief, Defendants monitor and track these theft statistics on an ongoing basis and as part of its PMR petitions.

708.    Publicly available information concerning vehicle thefts in the United States over the last decade notified Defendants as to the extent of the issue created by the Anti-Theft Security Defect.

709.    For years, Class Vehicles have suffered high rates of thefts. But the number of reported Class Vehicle thefts would skyrocket in 2019 when the existence of Anti-Theft Security Defect started to spread. While the rate of Class Vehicle thefts exploded in 2020, the Class Vehicles have always suffered from the Defect, and as a result, have been among the most stolen vehicles in the nation for a decade.

710.    As detailed above, ¶¶651-658, Class Vehicles have been among the most stolen vehicles in the nation for years.

---

[46] *Id.*

711.    In addition to public data, Defendants maintain proprietary theft statistics[47] and insurance trade associations maintain theft statistics that are only voluntarily made available to their members.

712.    On information and belief, Defendants conducted investigations into the Class Vehicle thefts, which would have shown that the thefts were primarily conducted in a similar manner, through exploitation of the Anti-Theft Security Defect.

713.    The foregoing information relating to the number of thefts involving Class Vehicles did or should have provided notice of the Defect to Defendants.

### 4.    Defendants were aware of the specific vulnerabilities within SKIS that compromised security in Class Vehicles since its inception around 2011.

714.    Since its inception around 2011, Defendants were aware that unauthorized keys could be duplicated using the PIN codes, and that third parties were able to read the PIN codes of Class Vehicles by connecting to the CAN bus without permission.  Defendants' failure to address this vulnerability for more than a decade led to the foreseeable, predictable, and inevitable theft crisis of Class Vehicles.

715.    DealerCONNECT, a proprietary database maintained by Defendants, was designed as a secure repository for pairs of PIN codes and VINs for the Class Vehicles. This database was intended to ensure that the process of programming new transponder keys remained exclusively controlled by Defendants, which means that dealers or authorized parties would access DealerCONNECT to retrieve a vehicle's specific PIN code when programming a new key. This system was intended to safeguard vehicle security by limiting the ability to program keys to those

---

[47] See non-public theft statistics cited by Defendants here
https://www.dodgegarage.com/news/article/showcase/2021/08/dodge-announces-three-new-theft-protection-measures.html (last accessed on January 23, 2024).

with legitimate access to DealerCONNECT, thereby preventing unauthorized duplication of keys and forming the foundation for the anti-theft functions of SKIS.

716.   The availability of key programming tools since 2008, notably the Chrysler Skim PIN Code Retrieval Tool and the Dmax Chrysler Skim (PIN) Code Reader, revealed severe vulnerabilities within SKIS. These tools allowed unauthorized access to the vehicle's security system via the CAN bus, which enabled the unauthorized extraction and use of PIN codes without accessing DealerCONNECT database.

717.   That breach, which permitted third parties unrestricted access to PINs and the attendant ability to duplicate keys at will, marked a complete loss of control by Defendants over keys to Class Vehicles. Even though the key programmers were ostensibly for locksmiths, the reality that they could directly extract PINs meant that Defendants had forfeited any control over key duplication.

718.   Defendants must have been aware that third parties were able to program new keys for Class Vehicles without using the DealerCONNECT system because Defendants and their dealerships routinely sold new blank keys to locksmiths, customers, and automotive mechanics without providing the necessary PIN codes. Since these keys cannot function without the activation provided by the PINs, it logically indicates that Defendants knew these third parties had access to an unauthorized method for obtaining PINs. By ignoring this security loophole, Defendants enabled the proliferation of the unauthorized use of key programmers to steal Class Vehicles.

719.   By 2011, the public could learn how to access the PIN key codes for vehicles manufactured by Defendants through YouTube tutorials. On June 29, 2011, William McIntosh, a locksmith, posted a video on YouTube demonstrating the use of key programming tools on a Chrysler vehicle with the following video description:

> 2002 Chrysler, Sebring Sentry Key Immobilizer Module (SKIM) secret code determination. This process is necessary when the SKIM has been changed and the OEM code was not used. Only Certified Locksmiths have this ability. ***Thank God, this equipment is not available to everyone***.

(Emphasis added). The description shows that an ordinary person, with knowledge that key programmers could exploit the Anti-Theft Security Defect, would recognize the hazard created if such devices were available to the public.

720.    By 2013, key programmers, like the SuperOBD SKP-900, were for sale to the public on Amazon with the ability to read PIN codes and add keys to Class Vehicles in under one minute.

721.    Fast forward to 2024, and there is a wide selection of key programmers for sale on Amazon. The most popular model is currently the Xtool D7, with a price of $325.00, available for delivery on the same day, and with over 500 units sold in between January – February 2024. Below is a screenshot showing the available models as of February 16, 2024:



722.    The key programmer genie is out of the bottle at this point.

723.    The widespread availability of key programmers, as evidenced by online sales platforms and social media tutorials, would have made it apparent to any reasonable manufacturer

that these devices posed a significant risk to vehicle security. This risk was not only foreseeable but was also exacerbated by Defendants' failure to update or enhance the security of their immobilizers to counteract this threat.

724.    By failing to update the security in their immobilizers for over a decade, with knowledge of the vulnerability to key programmers, Defendants have knowingly created a car theft and safety crisis.

> **5.      Defendants were aware that thieves target RF Hubs to create unauthorized keys used to steal Class Vehicles.**

725.    According to Defendants' technical repair manuals for the Class Vehicles, the stock software in the RF Hub blocks key programmers for a mandatory twenty-five minute delay if more than three incorrect PINs were entered. This lockout feature was designed to prevent brute force attacks, where an unauthorized user attempts to guess the code by making multiple entries. But thieves utilizing key programmers do not use brute force attacks to steal Class Vehicles because the Anti-Theft Security Defect allows them to read it instantly from the RF Hub.

726.    Defendants' technical repair manual for a 2016 Dodge Charger, contains the following instructions:

> If, during programming, the diagnostic scan tool instructs to "Enter the vehicle PIN number," care should be taken because the ***RF-Hub will only allow 3 consecutive attempts to enter the correct PIN. If 3 consecutive incorrect PIN's are entered, the RF-Hub will Lock Out the scan tool***. To exit Lock Mode, the ignition must remain in the Off position for 25 minutes. All accessories must be off. A battery charger connected to the battery during this time period is recommended.

(Emphasis added).

727.    This lockout feature demonstrates that Defendants were aware of and contemplated the risk that the RF Hub could be targeted by unauthorized users attempting to bypass the secure PIN codes to add keys. Furthermore, the lockout feature indicates that the RF Hub was designed

with the capability to block key programmers for a mandatory period of time and that there was a plausible alternative design.

728.    Accordingly, the RF Hub could have been designed to comply with industry standards by implementing a mandatory delay when adding new keys, like General Motors and Ford, or adding additional security measures that prevent key programmer attacks altogether. However, despite awareness of the threat and the ability to block it, Defendants failed to implement any security protocols to stop the unauthorized use of key programmers to read the PIN from the RF Hub and then instantly use it to add new keys to Class Vehicles.

### 6.    A Class Vehicle is sensationally hacked and Defendants pledge to review electronic vulnerabilities in Class Vehicles in 2015.

729.    On July 21, 2015, Wired, an online blog, broke the sensational story that researchers were able to wirelessly hack into the infotainment system, called Uconnect, of a Jeep Cherokee to, among other things, shut down the engine and disengage the brakes. News of the hack made national headlines, coaxed a press release from U.S. Senators, and led to a recall from Defendants. According to Wired, Defendants made the following statement in response:

> "[Fiat Chrysler Automobiles] has a program in place to continuously test vehicles systems to identify vulnerabilities and develop solutions," reads a statement a Chrysler spokesperson sent to WIRED. "FCA is committed to providing customers with the latest software updates to secure vehicles against any potential vulnerability."[48]

730.    Defendants also published a statement on their website regarding a software update to address the vulnerability to Uconnect:

> FCA has an Embedded System Quality Engineering team dedicated to identifying and implementing software best practices across FCA globally. The team's responsibilities include development and implementation of cybersecurity standards for all vehicle content, including on-board and remote services. A number of best practices, procedures, standards, and policies govern FCA's cybersecurity program. Generally, there are many

---

[48]https://www.wired.com/2015/07/hackers-remotely-kill-jeep-highway/  (last accessed May 15, 2024).

tools and techniques that are utilized throughout the vehicle lifecycle.

731.    The Uconnect hack should have placed Defendants on notice to review their security systems, including SKIS for other vulnerabilities that would allow third-parties to access modules and components. Although Defendants issued statements assuring customers that they were committed to the electronic security of their vehicles, Defendants ignored the vulnerability of SKIS to infiltration by key programmers.

732.    On March 17, 2016, the Federal Bureau of Investigation issued a Public Service Announcement entitled "Motor Vehicles Increasingly Vulnerable to Remote Exploits" that referenced the Jeep Cherokee hack, and identified steps that automakers and law enforcement were taking to address the cyber security of vehicles. The public notice stated, in relevant part, as follows:

> In addition to the steps taken by individual automakers to address vehicle safety and security, the auto industry has established an Information Sharing and Analysis Center (ISAC) to provide a trusted mechanism for exchanging cyber security information. The Auto ISAC will act as a central hub for gathering intelligence to help the industry analyze, share, and track cyber threats. Automakers are also collaborating on best practices for enhancing the cyber resiliency of motor vehicle electronics and associated in-vehicle networks.

**7.    Defendants offer public bounties for those who identify security vulnerabilities in Class Vehicles beginning in 2016.**

733.    On July 13, 2016, Defendants announced that they were offering "bounties" for anyone who found cybersecurity vulnerabilities, which Defendants defined as "bugs in a vehicle's system that could open it up to security breaches from nefarious individuals or groups." The primary targets included the following:

> Vehicle Head Units, TPMS sensors, remote keyless entry, and any other system that is present in a hardware product that you own or are authorized to test against.

Based on the targets identified by Defendants, using a key programmer to start a Class Vehicle by

151

bypassing SKIS would certainly qualify as a cybersecurity vulnerability and enable the finder to win a bounty payout of up to $1,500.00. Given the incentives, and the public availability of key programmers, Defendants likely received numerous submissions highlighting the Anti-Theft Security Defect through their bug bounty program.

### 8. Auto thieves exploited key programming to steal Class Vehicles by hacking DealerCONNECT in 2016.

734.    On July 30, 2016, the Houston Police Department broke up a theft-ring that stole Class Vehicles using laptops and devices to reprogram new keys. These thieves used PINs retrieved from Defendants' secured PIN/VIN database called DealerCONNECT. A spokesperson for Defendants called the thefts a "modern-day hot-wiring…"

735.    Shortly after the incident, Defendants further restricted access to DealerCONNECT and instituted new terms and conditions for users to ensure that unauthorized parties did not obtain PINs.

736.    The widely publicized theft of vehicles using key PINs placed Defendants on notice that thieves would use hacked key PINs to steal vehicles if the information was not protected. Defendants showed that they recognized such a risk because they restricted access to DealerCONNECT. However, Defendants continued to ignore that key programmers had the ability to quickly read PINs through the CAN bus.

### 9. Defendants installed new security modules in Class Vehicles with a design defect in 2018.

737.    In 2018, Defendants began installing Secure Gateway Modules on new Class Vehicles. The Secure Gateway Module was designed for the following purpose:

> to secure the numerous on board control modules behind a "firewall" to prevent against security breaches and external issues. Only FCA US approved Diagnostic Scan Tools that have been validated by FCA and adhere to their compliance protocols are authorized to access the Secure Gateway Module.

The intended design function of the Secure Gateway Module was to prevent unauthorized access to modules in the vehicle such as the RF Hub.

738.    However, Defendants' design of the Secure Gateway Module can be bypassed with a cable that plugs into a CAN bus. Below is a description of the bypass method on the website from a supplier of key programmers:

> Chrysler's security gateway module was put into place to block direct communication to and through the OBD-II port in any of their vehicles. This eliminated hacking capabilities through hotspots and laptops and limited communications to basic diagnostics that shops often need to complete repairs. ***However, that doesn't mean you can't bypass this system if you lack the proper tools***. While we don't recommend this route, you can access the gateway module using our 12+8 Connector Cable. With this cable, the wiring to the gateway is disconnected, and this cable takes its place, allowing you and your techs to access critical vehicle operation information. This route has been a universally common yet effective way of getting around the new requirements.

The bypass cables are sold alongside key programmers on popular online retailers, and the locations of alternative connections to the CAN bus to bypass the Secure Gateway Module in Class Vehicles are published online.

### 10.    Defendants grant permission to key programmers to bypass the security modules in 2020.

739.    In June 2020, Defendants granted access to the makers of key programmers to bypass the Secure Gateway Modules so that the devices could be used to steal Class Vehicles without using a special cable. Below is an announcement, effective June 1, 2020, from a popular

## UNLOCK SW MODULE ON 2017+ CHRYSLER & FIAT VEHICLES
DIAGNOSTICS – CLEAR CODES, BI-DIRECTIONAL FUNCTIONS, ACTIVE TESTS, ACTUATION & RELEARNS IMMO KEY PROGRAMMING – PULLS PIN & WRITE / ADAS CALIBRATION – PROVIDES CALIBRATION PROCEDURES

Since FCA implemented a Secure Gateway Module (SW), much like a "firewall", to protect vehicle networks, only licensed diagnostic tools with internet access are compliant to unlock the SW's tester authentication process to perform particular diagnostic functions. Now you'll have full access!

manufacturer of key programmers:[49]

The reference to "RELEARNS IMMO KEY PROGRAMMING – PULLS PIN & WRITE" means that the key programmers can read the key PIN and create new unauthorized keys to bypass the immobilizer in Class Vehicles. Accordingly, Defendants knowingly authorized the use of key programmers to defeat the security features in Class Vehicles with Secure Gateway Modules.

> **11.    Defendants had direct notice that key programmers were fueling rampant theft of Class Vehicles since 2020.**

740.    On November 15, 2020, thieves stole a pre-production model of the 2021 Dodge Durango SRT Hellcat directly from the driveway of Defendants' employee. The employee, described the incident as follows:

> 2021 Durango Hellcat stolen from driveway (yes not a yet released vehicle) in SCS (Jefferson) at 4:41am Sunday morning. Thieves had it started and gone within 3 minutes of entering the vehicle.

Given the theft of a pre-production vehicle under the care of their employee, Defendants should have investigated how one of their newest models, equipped with the most advanced security system, could be stolen in less than three minutes.

741.    On February 19, 2021, WXYZ Detroit, a local ABC affiliate station, published a story based on a Special Intelligence Bulletin from the Michigan State Police warning that Dodge Charger, Challenger, Durango, and Jeep Grand Cherokees are being targeted by thieves who are hacking the electronics system to clone keys.[50] The story stated as follows:

> An internal Michigan State Police document obtained by 7 Action News spells out how car thieves are targeting FCA's hot vehicles by hacking into the electronics.

---

[49] https://www.autel.com/c/www/USgateway.jhtml (last accessed May 15, 2024).
[50] https://www.wxyz.com/news/michigan-state-police-internal-bulletin-shows-widespread-thefts-of-fiat-chryslers-hot-cars

According to the report, vehicles were being stolen with key programmers from the parking lot of Defendants' Sterling Heights Assembly Plant. While the news station was "not going to reveal exactly how this is done," it noted that "[t]he bulletin says hundreds have been stolen over the last two years and 'gathering an accurate count… is nearly impossible.'" One owner who had their Class Vehicle stolen intimated that a key programmer was used and complained: "'Why can somebody that quickly figure out how within seconds to get in that vehicle, reprogram it and leave?'" The news station contacted FCA for a response to the story, which provided notice to Defendants of the facts stated therein.

742.    On March 22, 2021, Defendants issued a press release announcing future security features for Dodge Challenger and Chargers performance models with 392 cubic inch V-8 engines and supercharged 6.2-liter V-8 engines.[51] This announcement was made in response to pressure from Michigan State Police and WXYZ Detroit regarding the rampant theft of Class Vehicles.

743.    On March 23, 2021, WXYZ Detroit, published a second story about the growing theft of Class Vehicles, which contained the following statements from Detroit Police Chief James Craig: "Your story prompted a conversation I had with **Tim Kuniskis high-ranking member of Dodge. He agreed this has to be an easy fix**," (Emphasis added).

744.    On May 12, 2022, WXYZ Detroit published a third story about the surging theft of Class Vehicles. The story interviewed the head of Macomb County Auto Theft Squad, who made the following statements:

> "You know, it is an epidemic. It is an epidemic," he said. "It's been the Dodge Chrysler's Challengers, Jeeps, and Durangos …**
>
> "Employee cars and brand new cars, they're very brazen,**
>
> "Very rarely are they going to stop for a marked police car ... they're very fast powerful cars,"

---

[51] https://media.stellantisnorthamerica.com/newsrelease.do?id=22616&mid=1 (last accessed on February 18, 2024).

Defendants responded to WXYZ Detroit by saying that they were installing a new security measure to stop thefts.

745.    On July 20, 2021, WXYZ Detroit published a fourth story noting that Defendants had not yet presented a fix to stop the thefts as previously promised.

### 12.    Defendants acknowledged that SKIS was vulnerable to key programmers in 2021.

746.    On August 12, 2021, Defendants announced on DodgeGarage.com, an official FCA website, new theft prevention measures, including the Programming Lockdown, for the top-trim levels of Dodge Challenger and Charger. The Programming Lockdown modified the software in the RF Hub to permanently prevent any new keys from being added to the vehicles. According to Defendants, this lockdown was so effective that even the dealerships would not be able to add new keys without replacing the RF Hub.

747.    Around December 2021, Defendants sent a letter to some owners that states, in relevant part, as follows:

> The Radio Frequency Hub (RF-Hub) module on your vehicle contains a software security vulnerability that allows experienced thieves to program their own key fob using aftermarket diagnostic tools.

748.    This announcement, alongside the later issuance of Technical Service Bulletins ("TSBs") starting around December 2021, conclusively demonstrates Defendants' awareness of the Anti-Theft Security Defect affecting Class Vehicles.

### H.    Defendants Engaged in a Concerted Effort to Conceal the Existence and Extent of the Defect.

#### 1.    Berj Alexanian's misleading statements in response to the hack of DealerCONNECT.

749.    On July 30, 2016, in response to the arrest of a theft-ring that stole Class Vehicles using PIN key codes from the DealerCONNECT database, Berj Alexanian, a spokesperson for

Defendants, stated that "[w]e're looking at every and all solutions to make sure our customers can safely and without thinking park their vehicles." This statement was false or misleading because Defendants knew that owners of Class Vehicles should have extremely been concerned about parking their vehicles in public because all Class Vehicles could be stolen quickly and quietly using a key programmer.

**2.    Stellantis' false and misleading response to theft story published by WXYZ Detroit.**

750.    In response to the story of Class Vehicle thefts published on February 19, 2021, by WXYZ Detroit, Defendants made the following statement:

> Stellantis vehicles meet or exceed all applicable federal safety standards. While such events are rare, they are not exclusive to any make or model of vehicle. Further, Stellantis uses industry-standard technology. Notwithstanding, we urge all motorists to take due care in securing their vehicles.

751.    The statement that "Stellantis vehicles meet or exceed all applicable federal safety standards," is false because the vehicles fail to comply with FMVSS No. 114. Likewise, the claim that "Stellantis uses industry-standard technology" is false and misleading because the Class Vehicles do not contain standard and effective theft deterrent features employed by its competitors. *See supra* ¶ 749.

752.    Advising motorists to "take due care in securing their vehicles" without fully disclosing the extent of the Anti-Theft Security Defect is deceptive because it suggests that ordinary measures are sufficient to prevent theft of Class Vehicles.

753.    Describing the thefts as "rare" is misleading given the documented evidence of higher theft rates for Defendants' vehicles compared to industry competitors like General Motors and Ford, which have implemented effective anti-theft measures that comply with industry standards.

754.    The claim that the issue is "not exclusive to any make or model of vehicle" is misleading because it fails to acknowledge that the Anti-Theft Security Defect in Class Vehicles makes them uniquely susceptible to theft.

### 3.    Stellantis and Tim Kuniskis's false and misleading press release concerning new security features.

755.    On March 22, 2021, Defendants issued a press release entitled "Dodge Announces New Security Feature for Charger and Challenger"[52] The press release contained the following statements:

> "Today, Dodge is launching a new owner-customized 'double verification' security system," said Tim Kuniskis, Dodge Brand Chief Executive Officer – Stellantis. "When flashed into the computer of affected 2015 or newer Dodge muscle cars, the protective software will limit the engine output to less than 3 horsepower, foiling fast getaways and joyrides."
>
> The software upgrade can be installed free of charge by any Dodge dealer on 2015 through 2021 model-year Dodge muscle cars. The complimentary enhancement applies second-level vehicle security encryption via Dodge's Uconnect 4C infotainment system.
>
> "More than 150 cars are stolen every day in the United States," added Kuniskis. "For any car owner, it's terrible, it's a hassle and it's a personal violation. ***Though statistically rare***, car thieves have targeted the high-horsepower Dodge muscle cars, and ***we want the Dodge 'Brotherhood' to know we're taking quick action and covering their backs***."
>
> ***
>
> The four-digit encryption code is designed to discourage key-code-spoofing thieves.
>
> Dodge will ***continue to pursue other enhancements to vehicle-theft deterrence in order to protect owners' investments***.

(Emphasis added).

756.    The characterization of vehicle theft as "statistically rare" is directly contradicted

---

[52] https://embargoed.stellantisnorthamerica.com/newsrelease.do?id=22616&mid=60  (last accessed February 7, 2024).

by the data available from HLDI. Specifically, for high-performance models like the Dodge Charger SRT Hellcats, theft claims in 2022 were about 2.5% of the total number of insured vehicles. This translates to a 2.5% chance of a Dodge Charger SRT Hellcat being stolen in a single year. Given the average auto loan term of 6 years, this implies that the average owner faces a chance of approximately 14.1% that their Charger Hellcat will be stolen before their loan is paid off, which is not statistically rare. The rate of theft claims, more than 60 times the average for all 2020-22 models, contradicts Defendants' mischaracterization of the theft frequency as rare.

757.   The reference to "covering their backs" and taking "quick action" misleads consumers into believing that Defendants are adequately addressing the theft risk, despite the long-standing existence of the Anti-Theft Security Defect. Such statements give a false sense of security and trust in the effectiveness of Defendants' actions against vehicle theft.

### 4.   Defendants' false and misleading announcement of the Programming Lockdown.

758.   On August 12, 2021, Defendants announced on DodgeGarage.com that they were releasing new theft prevention measures for Challenger and Chargers.[53] Defendants' theft prevention measures included the Programming Lockdown which purportedly prevented new keys from being programmed.

759.   Despite knowing that the immobilizers in Class Vehicles were completely ineffective and could be defeated in a matter of minutes by widely available key programmers and admitting that the Class Vehicles "have become popular targets of thieves," Defendants withheld the truth and presented false statistics and misleading statements:

> If you drive a Dodge Challenger or Charger, you have likely read an article about how the modern Mopar muscle cars have become popular targets of thieves. Some reports have glorified it enough to

---

[53] https://www.dodgegarage.com/news/article/showcase/2021/08/dodge-announces-three-new-theft-protection-measures.html (last accessed on January 23, 2024).

sound like these are the only vehicles being stolen, when in reality, it is less than two tenths of a percent of all thefts annually. Since 2016, there have been around 6,000 Challengers and Chargers stolen in the United States and while that might sound high, during that same 5-year period, roughly 3.75-million vehicles were stolen across America, as thieves take advantage of vehicles with keyless entry and push-button starting systems.

760.   Defendants' representation that approximately 6,000 Challengers and Chargers were stolen between 2016 and August 2021 is contradicted by publicly available data indicating a significantly higher number of thefts. The NICB data, shows 2,847 Chargers were stolen in a two-year period in only three states (Georgia, Illinois, and Michigan), which strongly suggests that the actual number of stolen Chargers plus Challengers is substantially higher than 6,000 over a five-year period nationwide.

761.   Moreover, the article attempts to generalize the Defect in Class Vehicles as a common issue across all vehicles with keyless entry systems and fails to acknowledge that competitors like Ford and General Motors have implemented additional security measures that are absent in Class Vehicles. This omission conceals the fact that the SKIS installed in the Class Vehicles are uniquely susceptible to theft and that the Class Vehicles do not otherwise contain adequate and industry standard anti-theft systems.

**5.   Defendants' misleading letters to customers informing them of the Programming Lockdown TSBs.**

762.   Upon information and belief, around the same time that Defendants issued the TSBs to their dealers with the Programming Lockdown software updates around December 2021 (*see supra* ¶ 747), they also sent letters to some owners of the Class Vehicles covered by the TSBs. While Defendants admitted that the RF-Hub module contains a "software security vulnerability" that allows thieves to steal their vehicles, Defendants sought to conceal, among other things, the extent and seriousness of the safety defect. The letter stated as follows:

**6.2L AND 6.4L ENHANCED SECURITY FEATURE**

[Defendants' brand] is offering security improvements on certain [brand, model and year] vehicles equipped with a 6.2L or a 6.4L engine.

The Radio Frequency Hub (RF-Hub) module on your vehicle contains a software security vulnerability that allows experienced thieves to program their own key fob using aftermarket diagnostic tools. This may result in the vehicle being stolen.

The RF-Hub module may now be updated with software which will prevent hackers from programming their own key fob for the vehicle. In addition, the software update will also prevent the dealer from programing new key fobs for the vehicle in the future and the RF-Hub module will be permanently locked preventing it from receiving future software updates.

You will be provided the option to purchase and program additional key fobs for your vehicle at your expense prior to locking the RF-Hub module with this software update. If new key fobs are to be programmed after receiving this software update, the RF-Hub module will need to be replaced.

[Defendants' brand] will update your vehicle RF-Hub module free of charge (software and labor). To do this, your dealer will reprogram the RF-Hub module with the latest available software. The estimated repair time is 30 minutes. In addition, your dealer will require your vehicle for proper check-in, preparation, and check-out during your visit, which may require more time. Your time is important to us, so we recommend that you schedule a service appointment to minimize your inconvenience. Please bring this letter with you to your dealership

763.    *First*, the title "Enhanced Security Feature" used by Defendants in their communication to vehicle owners represents a significant mischaracterization of the software update's true purpose and necessity. This choice of wording deliberately frames the update as an optional improvement rather than an urgent fix to a critical and dangerous flaw within the SKIS. Such framing serves to downplay the gravity of the situation, misleading owners into perceiving the update as a mere enhancement rather than an essential correction to a system that fails to comply with established safety standards and industry norms.

764.    *Second*, the letter's attribution of the security risk solely to "experienced thieves"

161

significantly underrepresents the actual threat posed by the vulnerability in the SKIS. This characterization is not just misleading; it is dangerously reductive, glossing over the reality that the tools and knowledge required to exploit this flaw are readily accessible to a much broader base. The internet, especially platforms like YouTube, offers extensive resources that can guide even those with minimal technical expertise through the process of bypassing vehicle security systems using inexpensive, easily obtainable key programmers available for delivery the same day from Amazon.

765. *Third*, by framing the software update as merely an option rather than an essential corrective measure, the letter significantly undermines the urgency of addressing a known and serious security defect in the vehicles. This presentation not only minimizes the perceived importance of the update but also introduces a deterrent by highlighting a significant negative consequence: post-update, the vehicle's RF-Hub module will no longer accept new key fobs without undergoing an expensive replacement. This stipulation, particularly the advisory that any additional key fobs must be purchased "at your expense" prior to the update, places an undue burden on vehicle owners. It effectively shifts the financial and logistical responsibility of mitigating the defect onto them, without providing a full and clear context of the security risk at hand.

766. *Fourth*, the letter from Defendants selectively addresses owners of vehicles equipped with 6.4L and 6.2L engines, implying that the security update pertains exclusively to these specific powertrains. This narrow framing significantly misleads owners by suggesting that the vulnerability is confined to vehicles with these particular engines, thereby obscuring the reality that the security flaw has affected all Class Vehicles with all powertrains since 2011. Such a representation minimizes the perceived scope of the issue, mischaracterizing it as a limited

oversight rather than a universal defect. Consequently, this selective communication strategy likely diminishes concern among the broader owner base and restricts word-of-mouth dissemination of vital information regarding the defect's true extent.

**I.**    **Defendants' Made Fraudulent Misrepresentations in order to Induce Class Members to Acquire Class Vehicles.**

        **1.**    **Defendants made false and misleading statements concerning the anti-theft systems installed in the Class Vehicles and their compliance with FMVSS No. 114.**

767.    The first source of Defendants' false statements is the press releases that they published when introducing new car models. The press releases are provided to media outlets for the purpose of being distributed to the public, their dealerships, and automotive industry professionals.

768.    On November 14, 2010, Defendants issued a press release announcing the introduction of the 2011 Dodge Charger. The document identifies Kristen Starnes as the contact. Upon information and belief, she was responsible for the content. The press release contains the following false and misleading statements:

> Sentry Key® Engine Immobilizer: Uses a key fob that has an embedded transponder with a preprogrammed security code to shut off the engine after a few seconds and discourage vehicle theft (standard)
>
>         ***
>
> Vehicle Theft Security Alarm: Deters vandalism and theft, frequently lowering insurance premiums. System protects the vehicle from theft by monitoring door-ajar switches and the ignition circuit for unauthorized entry

769.    The statements that the Sentry Key® Engine Immobilizer utilizes a transponder key with a "preprogrammed security code" and that the engine will shut off if an incorrect key is used, are false because a key programmer can read the security code and instantly program a new blank to the car.

770.     Additionally, the statement that the Vehicle Theft Security Alarm "protects the vehicle from theft by monitoring door- and liftgate-ajar switches and the ignition circuit for unauthorized entry" is significantly misleading or outright false in the context of the vehicle's vulnerability to key programmers. This statement implies a comprehensive monitoring system capable of detecting and responding to unauthorized attempts to start the vehicle. However, the reality is that vehicles equipped with this alarm system can be started with a key programmer, even while the alarm is armed, and without triggering any alert. The failure of the alarm to activate under such circumstances reveals a significant gap in the vehicle's theft protection measures, rendering the statement about monitoring the ignition switch for unauthorized entry and usage false.

771.     Upon information and belief, from 2010 through 2024, Defendants routinely published press releases for all new models, and the press releases contained substantially similar statements to those contained in the November 14, 2010 press releases for the 2011 Dodge Charger regarding SKIS and VTA.

772.     The second source of Defendants' false statements was owner manuals that described SKIS and VTA.

773.     The 2011 Dodge Charger owner manual contains the following false statement regarding the immobilizer system:

> **SENTRY KEY** The Sentry Key Immobilizer system prevents unauthorized vehicle operation by disabling the engine. The system does not need to be armed or activated. Operation is automatic, regardless of whether the vehicle is locked or unlocked. The system uses a Key Fob with Remote Keyless Entry (RKE) transmitter, a Keyless Ignition Node (KIN) and a RF receiver to prevent unauthorized vehicle operation. Therefore, only Key Fobs that are programmed to the vehicle can be used to start and operate the vehicle.

774.     The manual misrepresents the ability of SKIS by stating that it "prevents

164

unauthorized vehicle operation by disabling the engine" and operates automatically "regardless of whether the vehicle is locked or unlocked," because a thief, without authorization, can add a new key and start the vehicle.

775.   The statement that "only key fobs that are programmed to the vehicle can be used to start and operate the vehicle" is misleading because aftermarket key programmers instantly add blank keys to start the vehicle.

776.   The 2011 Dodge Charger owner manual contains the following false statements regarding the VTA alarm system:

> **VEHICLE SECURITY ALARM — IF EQUIPPED** The Vehicle Security Alarm monitors the vehicle doors for unauthorized entry and the Keyless Enter 'n Go™ Ignition for unauthorized operation. While the Vehicle Security Alarm is armed, interior switches for door locks and liftgate release are disabled. If something triggers the alarm, the Vehicle Security Alarm will provide the following audible and visible signals: the horn will pulse, the parking lamps and/or turn signals will flash, Vehicle Security Light in the instrument cluster will flash.

777.   The ability of the VTA described in the owner manual misstates that it will "monitor the vehicle doors for unauthorized entry" and the "Keyless Enter 'n Go for unauthorized ignition" by activating "audible and visible signals" upon such incidents. This is false because, with the VTA armed, a thief can break a door window, add a key, and start the vehicle ignition without triggering the alarm.

778.   Defendants continued to make the substantially same false statements in the owner manuals of Class Vehicles through at least the model year 2023, including the 2023 Dodge Charger, despite having knowledge that SKIS was defective and required software updates to the RF-Hub as described in the TSBs.

779.   The owner manuals were provided to all purchasers and lessees of new vehicles and are made available to purchasers of used cars via Defendants' website. Upon information and

belief, all Class Vehicles contain permanent labels and stickers instructing the vehicle operators to consult the owner manuals.

780.    The Federal Motor Vehicle Safety Act requires automotive manufacturers to certify to the distributor or dealer at delivery that their vehicles comply with all applicable Federal Motor Vehicle Safety Standards. 49 U.S. Code § 30115(a). The Act describes the duty as follows:

> A person may not issue the certificate if, in exercising reasonable care, the person has reason to know the certificate is false or misleading in a material respect. Certification of a vehicle must be shown by a label or tag permanently fixed to the vehicle.

49 U.S. Code § 30115(a).

781.    Prior to sale, Defendants affixed to each Class Vehicle a certificate label that is similar to the one below:



782.    The certification label on each Class Vehicle is false because it states the vehicle conforms with all applicable U.S.A. Federal Motor Vehicle Safety Standards, which includes FMVSS No. 114. In reality, the Class Vehicles violate FMVSS No. 114 due to the presence of the Defect, which allows the vehicles to easily be started with the authorized key removed.

### 2.    Defendants knew all statements were false at the time they were made.

783.    Defendants were aware that the anti-theft system contained the Anti-Theft Security Defect since its design and inception around 2012, because they designed the system to be immediately bypassed by key programmers.

784.    Defendants were aware that statements made in owner manuals, press releases, and

certification labels regarding the security and anti-theft capabilities of Class Vehicles were false at the time they were made.

785.    Despite possessing comprehensive knowledge of the Anti-Theft Security Defect and the ease with which key programmers could bypass the anti-theft systems, Defendants continued to assert the effectiveness of these security measures.

786.    Defendants continued to publish the false certification label and owner manuals even after acknowledging a security vulnerability in the RF Hub and issuing TSBs with software updates.

### 3.    Defendants intended to induce Plaintiffs and Class Members to acquire Class Vehicles.

787.    Defendants intentionally made false and misleading statements regarding the security features of Class Vehicles with the intent to induce Class Members to: (a) purchase or lease new Class Vehicles; and (b) purchase used Class Vehicles for the purpose of increasing the desirability and resale values of all Class Vehicles, thereby inflating the price at which Defendants could sell new vehicles.

788.    Defendants' false and misleading statements were deliberately crafted and disseminated to induce Class Members into purchasing or leasing these vehicles by providing a misleading sense of security, normalcy, and compliance with federal safety standards.

789.    These false and misleading statements were strategically placed in the promotional materials, press releases, and owner manuals associated with the Class Vehicles to create a facade of security, notwithstanding the Anti-Theft Security Defect.  This deliberate misinformation campaign was aimed at preventing potential buyers from questioning the effectiveness of the vehicles' anti-theft systems. Without such statements, consumers might have been more cautious, potentially seeking vehicles with genuinely secure systems or demanding further proof of the

167

claimed security features, ultimately affecting Defendants' sales and market position.

790.    Therefore, the intent behind these false and misleading statements was clear: to induce Class Members into purchasing or leasing Class Vehicles by exploiting their concerns for quality, dependability, safety, and security, while masking the vehicles' vulnerability to theft. This strategy not only facilitated the sale of Class Vehicles but also allowed Defendants to avoid the scrutiny and financial implications that would arise from a public acknowledgment of the Anti-Theft Security Defect.

791.    If Defendants had not made false and misleading statements regarding the security features of Class Vehicles, they would have faced the potential for significant consumer pushback, decreased sales, and heightened scrutiny over the effectiveness of their anti-theft systems. By misleading the public and consumers about the SKIS, VTA, and Keyless Enter 'n Go system, Defendants aimed to avoid the inevitable questions and concerns that would arise if the true vulnerability of these vehicles to theft was known. Such transparency would likely have led to a loss of consumer confidence, a decline in the perceived value of the vehicles, and likely demands for recalls or compensation for the Anti-Theft Security Defect. Defendants were hoping to sidestep the financial and reputational costs associated with admitting to and addressing the inherent security flaws in their vehicles. The false assurances were, therefore, a calculated effort to maintain market position, safeguard sales figures, and avoid the expense and logistics of a comprehensive recall or redesign to genuinely secure the vehicles against unauthorized use.

### 4.    Plaintiffs and Class Members relied on Defendants' false and misleading statements.

792.    Class Members, encompassing new purchasers, lessees, and used buyers or lessees, placed their trust in Defendants' representations regarding the security and compliance of Class Vehicles with federal safety standards, even if each Class Member did not directly read the owner

manuals, observe the press releases, or scrutinize the certificate labels. Indirectly, each Class Member was led to believe a fundamental yet false premise: that the vehicles could only be started with authorized keys. This belief was predicated on misleading statements by Defendants that obscured the true vulnerability of the vehicles' anti-theft system to key programmers.

793.    Furthermore, the general expectation among consumers is that vehicles available for sale must meet all federal safety regulations. The presence of certificate labels on Class Vehicles, attesting compliance with Federal Motor Vehicle Safety Standards, including FMVSS No. 114, played a critical role in reinforcing this expectation. Such labels, by declaring that the vehicles met requisite safety standards, directly assured consumers of their security features and compliance with federal law, thereby influencing purchasing and leasing decisions. The fact that these vehicles could be easily started and operated without the authorized keys, due to the Anti-Theft Security Defect, contradicts the assurance expressed by these labels and Defendants' statements, misleading consumers about the vehicles' adherence to specific federal standards designed to prevent theft and unauthorized use.

794.    The reliance of Class Members on these misrepresentations was reasonable and foreseeable, given the authority and trust vested in Defendants as manufacturers. Echoing this trust, Defendants themselves proclaimed a commitment to their consumers, stating, "we want the Dodge 'Brotherhood' to know we're taking quick action and covering their backs," a sentiment that further solidified the expectation of transparency and security among consumers. Given such assurances and other statements made by Defendants, Class Members did not know facts that would have caused a reasonable person to suspect that there was an Anti-Theft Security Defect affecting their vehicle and an ordinary person would be unable to appreciate that the vehicle was defective without disclosure by Defendants. This contrast between Defendants' statements

concerning effective anti-theft measures and FMVSS compliance, on the one hand, and their actual knowledge about the ineffectiveness of SKIS—as shown by empirical theft data showing alarmingly high theft rates—on the other hand, facilitated the sale and circulation of Class Vehicles under false and misleading pretenses of compliance and security, leading Class Members to unknowingly accept risks undisclosed and contrary to Defendants' statements.

795.    In sum, every Class Member's expectation that their vehicle required an authorized key to start—a standard feature implied by the vehicles' sale and reinforced by Defendants' misstatements and federal compliance labels—and had adequate anti-theft systems was founded on misinformation.

796.    If Class Members had been aware of the Anti-Theft Security Defect at the time they acquired their Class Vehicles, then they would have chosen not to proceed with their transactions, opting instead for vehicles from competitors with more robust and effective security features. Alternatively, they would have sought a significant reduction in the purchase or lease price to account for the elevated risk of theft.

797.    At the time that they purchased their Class Vehicles, Plaintiffs believed that their Class Vehicles complied with all federal and industry safety standards in place when the vehicle was manufactured and had adequate anti-theft systems. Plaintiffs also believed that Defendants had disclosed all defects in their Class Vehicle that Defendants may have discovered subsequent to the manufacturing date.

**J.    Fraudulent Omission/Concealment/Nondisclosure Allegations.**

**1.    Who, What, Where, When, How, and Why**

798.    Without discovery, Plaintiffs are unable, through reasonable investigation, to obtain the true names and identities of all individuals employed by Defendants responsible for making false and misleading statements regarding the Class Vehicles. Defendants necessarily are in

possession of all of this information. Plaintiffs' claims arise out of Defendants' fraudulent omission, concealment, and nondisclosure of the Anti-Theft Security Defect, as well as their representations about the security and safety of the Class Vehicles.

799. Plaintiffs allege that at all relevant times, including specifically at the time they and Class Members acquired their Class Vehicles, Defendants knew, or were reckless in not knowing, of the Anti-Theft Security Defect; Defendants had a duty to disclose the Anti-Theft Security Defect based upon their exclusive knowledge, position of authority, the safety risk of the defect, and duty to disclose under statute; and Defendants never disclosed the full scope of the Anti-Theft Security Defect to Plaintiffs or the public at any time or place in any manner.

800. *Who*: each Defendant (FCA and Stellantis) actively concealed and omitted the Anti-Theft Security Defect from Plaintiffs and Class Members while simultaneously touting the quality, dependability, safety, and security of the Class Vehicles, as alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of all individuals responsible for such decisions; but have identified the following declarants who made false statements in their capacities as Defendants' employees, agents, and/or representatives:

    (a)    Berj Alexanian in his statements to ABC News, Detroit Free Press, Houston Chronicle, and other media organizations regarding the theft of Class Vehicles using stolen PIN codes; and

    (b)    Tim Kuniskis in his statements to WXYZ Detroit, and the press release regarding the purported security enhancements to Class Vehicles in 2021;

    (c)    Dianna Gutierrez, Rick Deneau, Kristen Starnes, Trevor Dorchies and David Elshoff in false and misleading press releases for new models of Class Vehicles.

801.    *What*: that the Class Vehicles do not contain adequate anti-theft security features and suffer from the Anti-Theft Security Defect, as alleged herein.

802.    *Where*: Defendants concealed and omitted material information regarding the true nature of the Anti-Theft Security Defect in every communication they had with Plaintiffs and Class Members and made representations about the security and safety of the Class Vehicles. Plaintiffs are unaware of any document, communication, or other place or thing, in which Defendant disclosed the truth about the full scope of the Anti-Theft Security Defect in the Class Vehicles. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites. There are channels through which Defendants could have disclosed the Anti-Theft Security Defect, including, but not limited to: (a) point of sale communications; (b) the owner's manual; and/or (c) direct communication to Class Members through means such as safety recall notices, Customer Satisfaction Notices, and state vehicle registry lists and e-mail notifications. Defendants failed to disclose the Anti-Theft Security Defect to Class Members through their dealerships at the time of sale or lease of Class Vehicles.

803.    *When*: Defendants concealed and omitted the existence of the Anti-Theft Security Defect at all times when making representations about the quality, safety, and dependability of the Class Vehicles on an ongoing basis, and continuing to this day, including:

(a)    when the vehicles were first introduced and announced via media releases that falsely touted the security of the Class Vehicles;

(b)    when the certification labels were affixed to the Class Vehicle falsely certifying compliance with Federal Motor Vehicle Safety Standards;

(c)    when each Class Vehicle was first placed on the market with the false certification labels;

(d)      when the owner manuals were printed and published online that falsely and misleadingly described the functions of SKIS and VTA installed in the Class Vehicles;

(e)      when the vehicles were delivered to the dealerships, for sale to Class Members, with the false and misleading owner manuals and certification labels;

(f)      when the Class Vehicles were delivered to the initial buyer or lessee with the false certification labels and owner manuals, and the dealership demonstrated the functioning of the anti-theft and starting system;

(g)      when FCA responded to media articles regarding the hacking of a Jeep Cherokee in 2015, and the thefts of the Class Vehicles in August 2016, and throughout 2021;

(h)      when Defendants published the article on DodgeGarage.com regarding the new theft prevention measures for Challenger and Charger on August 12, 2021;

(i)      when Defendants issued the TSBs to its dealerships regarding the reprogramming of the RF-Hub in late 2021; and

(j)      continuing through the present day, Defendants have failed to fully and truthfully disclose the extent of the Anti-Theft Security Defect.

804.      ***How***: Defendants concealed and omitted the Anti-Theft Security Defect from Plaintiffs and Class Members and made representations about the quality, dependability, safety and security of the Class Vehicles. Each Defendant actively concealed and omitted the truth about the existence, scope, and nature of the Anti-Theft Security Defect from Plaintiffs and Class Members at all times, even though they each knew about the Anti-Theft Security Defect and knew that information about the Anti-Theft Security Defect would be important to a reasonable

consumer, and Defendants promised in their marketing materials that Class Vehicles have qualities that they do not have. At the time of sale of new Class Vehicles, the dealership should have informed purchasers and lessees that the vehicles suffered from the Anti-Theft Security Defect and did not contain adequate anti-theft systems, allowing thieves to surreptitiously steal the vehicles in under two minutes. If Plaintiffs and Class Members had known of the Anti-Theft Security Defect prior to their purchase or lease of a Class Vehicle, then they would not have purchased or leased the Class Vehicles or would have paid less for them.

805.     *Why*: Defendants actively concealed and omitted material information about the Anti-Theft Security Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the security and safety of the Class Vehicles. Had Defendants disclosed the truth, for example, in their advertisements or other materials or communications, Plaintiffs and Class Members (and all reasonable consumers) would have been aware of it and would not have bought or leased the Class Vehicles or would not have paid as much for them. Likewise, Defendants are required to pay their dealerships for any work performed on customer vehicles under warranty and recalls. Defendants concealed and omitted material information to avoid the additional costs to pay for a comprehensive remedy for the Anti-Theft Security Defect for all Class Vehicles.

> **2.     Defendants had a duty to disclose based upon their superior knowledge and special relationship to Class Members.**

806.     Due to Defendants' exclusive, specific and superior knowledge of the Anti-Theft Security Defect, Defendants had a duty to disclose the defect to Class Members. Defendants were aware of the technical design and operation of SKIS, including how new transponder keys could be programmed to the Class Vehicles, as well as the fact that thieves had learned of the Defect and

174

were utilizing it to easily steal Class Vehicles.

807.   Defendants made misleading statements to Class Members about reprogramming keys in the owner's manuals, which stated that "[d]uplication of key fobs may be performed at an authorized dealer" and the "procedure consists of programming a blank key to the vehicle electronics."   In addition, Defendants' own technical maintenance manuals instructed dealer technicians to reprogram keys by accessing DealerCONNECT to retrieve the PIN codes. Accordingly, even if Class Members had access to the dealer-level information, they would not have been aware that key programmers could bypass the immobilizer and instantly add keys to their vehicles.

808.   Defendants were in a position of trust and authority over the Plaintiffs and Class Members, whereby Defendants encouraged and induced Class Members into believing that Defendants' vehicles were of the highest quality, dependability, safety, and security and that they sought to protect owners and lessees of their vehicles. Dodge Brand Chief Executive Officer stated "we want the Dodge '***Brotherhood' to know we're taking quick action and covering their backs***" in response to the increasing theft of Class Vehicles. Defendants' use of familial language demonstrates the special relationship of trust and reliance they had built with and extended to Class Members who reasonably believed that Defendants would correct any theft vulnerability in Class Vehicles.

809.   For example, because Defendants possessed specialized and technical knowledge about the functioning of the anti-theft system, even if a consumer would come across external sources, such as unverified YouTube videos and internet blogs, a reasonable consumer would trust Defendants' representations over unverified reports. Given Defendants' authoritative stance and the trust they have cultivated with their customers, it is reasonable for consumers to prioritize

Defendants' statements over third-party claims, regardless of the emerging evidence of security vulnerabilities.

810.    By concealing the full extent of the Anti-Theft Security Defect, Defendants exploited the trust that Class Members placed in them, a trust highlighted by Defendants' own statements reassuring the quality, dependability, safety, and security of their vehicles. Such assurances, as evidenced by the Dodge Brand Chief Executive Officer's commitment to "covering their backs," only served to deepen Class Members' reliance on Defendants for accurate information.

### 3.    Defendants had a duty to disclose under statute and regulation.

811.    Pursuant to 49 CFR 577.5(a) and 49 U.S. Code § 30118(c), automotive manufacturers have a continuing duty to notify vehicle owners and lessees of safety defects, as well as failures of the vehicles to conform to Federal Motor Vehicle Safety Standards, even if the manufacturer does not discover the defect or non-conformance until after the vehicle is sold.

812.    Defendants breached their statutory duty to notify the Plaintiffs of the Anti-Theft Security Defect, and Defendants continue to intentionally conceal the defect from new purchasers, lessees, and other owners of the Class Vehicles.

### 4.    Defendants had a duty to disclose safety defects to customers.

813.    Given the inherent safety risks associated with the Anti-Theft Security Defect and serious implications for motor vehicle safety, Defendants had a duty to disclose such defects to Class Members. The documented incidents of stolen vehicles being used in activities that endanger public safety, including homicides, police evasions with resultant injuries, and fatal collisions, highlight the danger of the Anti-Theft Security Defect to the public and each Class Member specifically. In addition, the documented incidents of thieves pointing firearms at the homes of Class Members while stealing Class Vehicles and Class Members being murdered when

attempting to retrieve their stolen Class Vehicles demonstrates the danger to the Plaintiffs and Class Members created by the Anti-Theft Security Defect.

814.    Therefore, by failing to inform Class Members about the Anti-Theft Security Defect, Defendants breach their duty to notify Class Members of a known safety defect.

### 5.    Defendants had a duty to disclose because they knew Class Members were unaware of the Anti-Theft Security Defect.

815.    Defendants had a duty to disclose the existence of the Anti-Theft Security Defect to Class Members because they knew that Class Members were about to enter into transactions to purchase or lease Class Vehicles under the mistaken belief that the vehicles were secure and could not be started instantly with publicly available key programmers.

816.    This duty to disclose arises because the facts concerning the Anti-Theft Security Defect were basic to the transaction, as they directly affected the safety, value, and utility of the Class Vehicles. Defendants knew or should have known that Class Members would reasonably expect disclosure of such facts due to Defendants' superior knowledge and expertise, their representations of vehicle safety, and the objective circumstances surrounding the purchase or lease of Class Vehicles.

817.    Any reasonable person purchasing or leasing a vehicle, including all Class Members, would expect that it could not be instantly started and driven away without a valid key present. This expectation has been ingrained in the minds of consumers for decades, stemming from FMVSS No. 114, and the automotive industry's well-publicized efforts to reduce theft.

818.    Modern consumers, including all Class Members, are aware that vehicles with push-button ignition systems typically incorporate electronic security features to prevent unauthorized starting and theft. These systems are widely understood to require a unique, electronically coded key or fob to be present in or near the vehicle to initiate the engine start

177

sequence. This expectation is based on decades of industry standards, regulatory mandates, and common practices, where the norm has been for vehicles to include electronic anti-theft features that provide at least the same basic level of security as traditional mechanical locks.

819.    Defendants expected and intended that Class Members would believe that the Class Vehicles were equipped with such modern anti-theft features as a result of various marketing efforts, operating manuals, and press releases. Defendants specifically advertised the Class Vehicles as being equipped with the "Sentry Key Immobilizer System," which Defendants represented as providing passive vehicle protection that prevents the engine from operating unless a valid electronically encoded key is detected. Defendants further claimed in marketing materials that the Class Vehicles' security systems were designed to protect against unauthorized vehicle use and theft.

820.    For example, Defendants promoted the Class Vehicles as having a high level of security in their advertising campaigns and publicly available materials, including statements such as: "Drive with confidence knowing your vehicle is equipped with state-of-the-art security features." Defendants' owner's manuals for the Class Vehicles also reiterated these assurances, describing the SKIS as a sophisticated system that requires an authorized key fob to start the engine, which would ostensibly prevent unauthorized use. These representations were intended to create the impression that the Class Vehicles possessed modern and effective anti-theft features in line with industry standards.

821.    Defendants also issued press releases emphasizing the supposed security and technological advancements in the Class Vehicles. For instance, in response to rising concerns about vehicle theft, Defendants issued statements asserting that their vehicles were equipped with cutting-edge security technology, including systems that were purportedly resistant to hacking and

unauthorized access. These press releases were designed to bolster consumer confidence in the safety and security of the Class Vehicles and to suggest that the vehicles were equipped with advanced anti-theft systems comparable to those of other manufacturers.

822.    Defendants further knew that all Class Members were unaware of the Anti-Theft Security Defect and could not have reasonably discovered it through ordinary diligence or inspection. The Defect was latent, embedded in the vehicle's electronic and software systems, and not disclosed in any marketing materials, owner's manuals, or technical specifications provided by Defendants.

823.    Accordingly, Defendants' failure to disclose the material Anti-Theft Security Defect violated Class Members' reasonable expectations and breached the duty of Defendants to act in good faith and disclose critical safety and security information that directly impacted the desirability, value, and safety of the Class Vehicles.

### 6.    Defendants had a duty to disclose based on their partial statements.

824.    Defendants had a duty to disclose the Anti-Theft Security Defect based upon their representations about the safety and quality of the Class Vehicles, including touting their Keyless Enter 'n Go and Sentry Key Immobilizer System, without disclosing how thieves easily steal the vehicles in a few minutes, which renders representations about the safety and quality essentially useless and unreasonably dangerous in ordinary usage. Having provided information to Plaintiffs, Defendants had the duty to disclose not just the partial truth, but the entire truth.

### K.    The Anti-Theft Security Defect Has Caused Plaintiffs and Class Members to Suffer Immense Damages in a Variety of Forms.

#### 1.    The defect causes substantial damages to Class Vehicles beyond the defective ignition and anti-theft systems.

825.    First, when thieves steal Class Vehicles, they often cause thousands of dollars in damage to all parts of the vehicles before abandoning them. If a Class Member is lucky enough to

recover their vehicle, the first thing that must be done is repair the window and damage to the interior from broken glass. However, that is not the only expense a Class Vehicle owner incurs after their vehicle is stolen.

826.    For example, Plaintiff Michelle Laskowski's Dodge Durango was recovered after it was stripped of its engine, transmission, and transfer case, and then lit on fire. The vehicle was a total loss estimated to exceed $50,000. Similarly, Plaintiff Aric White's Dodge Challenger was recovered with bullet holes, and other body damage. The cost to repair his Challenger was $16.901.21.

827.    According to statistics collected in connection with the FBI's Uniform Crime Reporting (UCR) Program for 2019, stolen vehicles suffer an average of $8,886.

828.    Second, even if a thief is unsuccessful in stealing a Class Vehicle, the attempted theft causes thousands of dollars in damage. For example, Plaintiff Ivy Stryker installed an after-market system in his Dodge Charger Hellcat that blocks key programmers. When thieves attempted to steal his Charger they broke a window, tore a seat, and ripped out the dashboard in apparent frustration and anger because their key programmer would not work. The cost to repair Stryker's Charger was $8,380.04.

829.    Moreover, approximately one out of five drivers do not have theft coverage insurance coverage for their vehicles. If these drivers are lucky enough to recover their stolen Class Vehicle, they are left with thousands of dollars in unreimbursed expenses.

830.    Insured owners and lessees of Class Vehicles do not come off unharmed when their vehicle is stolen either because the average deductible for insurance policies in the United States is $500.

831.    On information and belief, Class Members have paid millions of dollars in

deductibles as a direct result of the Anti-Theft Security Defect.

832.    Finally, not all Class Members are lucky enough to recover their vehicles after they are stolen as a result of the Anti-Theft Security Defect.

833.    On average, approximately 40% of stolen vehicles are never recovered in the United States.[54]

834.    These Class Members suffer the complete loss of value of their Class Vehicles, which can be tens of thousands of dollars.

### 2.    Class Members suffer damages beyond those to their Class Vehicles themselves.

835.    Class Members suffer substantial damages beyond damage to the stolen vehicles themselves.

836.    *First*, personal property stored within the locked Class Vehicles is rarely found after the vehicles are stolen. For example, Plaintiff Leslie Wilczewski had thousands of dollars of photography equipment in her Jeep Grand Cherokee SRT when it was stolen.

837.    *Second*, even if the Class Vehicle is recovered, owners will typically go weeks or months before they get their vehicle back in an operable condition. During this time, owners incur hundreds and thousands of dollars in expenses related to rental cars, taxis, and alternative modes of transportation to replace their Class Vehicles. For example, Plaintiff Ivy Stryker was without his Dodge Charger Hellcat for nearly six months while he waited on parts to repair the damage caused by an attempted theft.

838.    *Third*, Class Members incur thousands of dollars in expenses attempting to alleviate the risks caused by the Anti-Theft Security Defect. For example, Class Members have paid for

---

[54] https://www.nicb.org/news/blog/fbi-releases-new-auto-theft-numbers-nearly-750000-motor-vehicles-stolen-2018 (last accessed February 3, 2024).

brake pedal locks, tire locks, gear shift locks, remote starter kill, Ravelco kill switch, tracking devices, steering wheel locks, aftermarket alarm systems, fuel line shut-off valves, and third-party key programmer locks, in the hope of deterring the thieves. For example, Plaintiff Michael Bush purchased a steering wheel lock for his Jeep Wrangler.

839. *Fourth*, Class Members, such as Plaintiff Katrina O'Connor, are reporting that months after their Class vehicles are stolen, they receive in the mail hundreds of dollars' worth of speeding tickets, red light camera violations, and parking tickets incurred by the thieves.

### 3. The existence of the defect in all Class Vehicles constitutes a concrete injury suffered by all Class Members.

840. All Class Vehicles were manufactured and sold with the Anti-Theft Security Defect, which renders the vehicles unsecured against unauthorized use and creates a significant likelihood that they will be stolen. Security against unauthorized use is a feature necessary for the safe operation of vehicles and as essential as starting, stopping, or steering.

841. This lack of security is a defect present in every Class Vehicle, regardless of whether the defect manifests into a full loss via theft. Because Class Members cannot secure their Class Vehicles against unauthorized use, they suffered actual and concrete damages, since they overpaid for vehicles with a promised feature that does not exist or function properly, and this has led to an immediate reduction in value and the loss of the benefit of their bargain.

### L. To This Day, Defendants Allow Millions of Class Vehicles to Remain on the Road, Suffering from the Anti-Theft Security Defect, And Posing Serious Danger to Class Members and the General Public.

#### 1. The theft rates of Class Vehicles continued to increase after Defendants' limited Programming Lockdown rollout.

842. Defendants' limited release of software updates for Class Vehicles, starting in August 2021, failed to reduce the theft rates of Class Vehicles as demonstrated by theft statistics published by NICB for the State of Michigan. Given that pressure from law enforcement and media

outlets in Detroit was the impetus for Defendants' development of the software updates, Defendants logically should have focused their theft deterrent efforts in that State and the theft statistics should show the results of their efforts.

843.    Yet, the theft statistics show that Defendants' software updates to only select models and trim levels were a complete failure at reducing the theft rates of Class Vehicles.

844.    The below NICB theft statistics for 2020 and 2022 in Michigan show the number of thefts of Dodge Chargers and Jeep Grand Cherokees, which also happen to be Michigan's two most stolen vehicles:

|  | 2020 Number of Vehicles Stolen | 2022 Number of Vehicles Stolen | Percent Increase YoY |
|---|---|---|---|
| **Dodge Charger** | 755 | 992 | 31% |
| **Jeep Grand Cherokee** | 583 | 1099 | 89% |

845.    The statistics show that thefts increased for the Dodge Charger and the Jeep Cherokee following the implementation of Defendants' purported security enhancements. Furthermore, the NICB found that the 2021 model year of the Dodge Charger was the most commonly stolen model year for that vehicle in Michigan for 2022, which is the same model year for which the software updates were first made available by Defendants in August 2021.

846.    Based upon the increase in thefts of the Class Vehicles, and particularly a model year that was initially targeted by Defendants' security enhancement campaign, Defendants' remedy for the Anti-Theft Security Defect has clearly failed.

847.    The result is unsurprising given that Defendants intentionally restricted the updated software to a narrow subset of Class Vehicles. Specifically, Defendants initially focused their efforts on high-performance trim levels of the 2020 and 2021 Dodge Challengers and Chargers, which may have been the logical starting point given that those were the vehicles with the highest theft rates. However, the facts that Defendants never made the update available to all Class

Vehicles and that Defendants continued selling defective vehicles, without disclosing the defect to buyers, are completely indefensible.

> **2.    Defendants sold over 3 million Class Vehicles suffering from the Anti-Theft Security Defect after developing the Programming Lockdown.**

848.    Defendants failed to install their updated software, which purportedly prevented key programmer thefts, in new vehicles it sold after releasing the software in August 2021.

849.    In October 2023, a key programmer was used to instantly add a key to a 2024 Jeep Wrangler 392, which was manufactured by Defendants in June 2023. Upon information and belief, Defendants have not updated the software in the RF Hub or otherwise fixed the Anti-Theft Security Defect in new vehicles that it manufactures and sells.

850.    Subsequent to developing a fix for the vulnerable software, Defendants sold over 3 million defective Class Vehicles with the defective RF Hub that allows thieves to instantaneously add new keys using a key programmer.

851.     Accordingly, Defendants likely could have put an end to the rampant theft of new Class Vehicles that they sold after August 2021, but chose to continue concealing the full extent of the Anti-Theft Security Defect and selling defective Class Vehicles.

852.    In order to start remediating the damage caused by the Anti-Theft Security Defect, Defendants must first stop producing and selling defective Class Vehicles, which means modifying the software in new vehicles to deter key programmer theft, and fully disclosing the consequences, the inability to add new keys, to future buyers and lessees. By failing to update the software or disclose the problems at the time of sale, Defendants are forcing owners to later choose between either accepting a high theft risk or forfeiting a valuable feature, the ability to add keys, in exchange for a basic level of security that they believed existed when they paid for the vehicle.

    **3.**    **Defendants' Refusal to Provide Fair Notice and Full Disclosure of the Anti-Theft Security Defect is Preventing a Resolution to the Rampant Theft of Class Vehicles**

853.    Defendants' persistent refusal to provide fair notice and full disclosure of the Anti-Theft Security Defect has significantly impeded the resolution of the rampant theft issue plaguing Class Vehicles. By withholding critical information about the full scope of the Anti-Theft Security Defect, Defendants have not only compromised the quality, dependability, safety, and security of Class Members' vehicles but have also undermined the efficacy of any proposed remedies, including Programming Lockdown and the software updates to RF Hub that are covered by TSBs.

854.    Without full disclosure of the Anti-Theft Security Defect, vehicle owners remain largely unaware of the significant risks their vehicles face, reducing the likelihood that they will seek out and implement the necessary updates. This has left a vast majority of vehicle owners in the dark about the true extent of the risks posed to their vehicles, and that lack of comprehensive disclosure is the primary factor contributing to the abysmally low uptake rate for the original Programming Lockdown, with only 240 vehicles having received the update.

855.    Defendants have refused to inform Class Members about the full scope of the Anti-Theft Security Defect in Class Vehicles. By withholding complete details regarding the ease with which Class Vehicles are being stolen with publicly available devices, Defendants have obstructed Class Members from making knowledgeable choices concerning the security of their vehicles.

856.    Consequently, even if Defendants proposed a suitable remedy, Class Members would lack the necessary information to understand the critical importance of addressing their vehicles' vulnerabilities and resolving the Anti-Theft Security Defect.

857.    Furthermore, Defendants' failure to openly acknowledge and comprehensively address the Anti-Theft Security Defect contributes to a broader climate of distrust and dissatisfaction among Class Members. This undermines any potential collaborative effort between

185

Defendants and vehicle owners to identify and implement a complete solution to the theft crisis and will likely cause Class Members to distrust any proposed solution offered by Defendants.

### 4. Defendants' Programming Lockdown was an insincere ploy designed to satisfy critics in media and law enforcement.

858. Assuming Programming Lockdown performs as represented by Defendants, then the software update may effectively prevent thieves from exploiting the key programmer vulnerability in the RF Hub. However, Defendants never intended to widely distribute the software upgrade and, instead, it was a perfunctory solution in response to pressure they were receiving from law enforcement and media to address the Anti-Theft Security Defect. *See supra* ¶¶ 740-744.

859. The Programming Lockdown was restricted to a narrow selection of models and excluded the majority of defective Class Vehicles.

860. The rollout of "Programming Lockdown" by Defendants was poorly executed and limited in scope, affecting only about 240 vehicles before being discontinued in January 2022.[55] The comment section on DodgeGarage is filled with complaints from customers about Programming Lockdown, including Class Members who had their Class Vehicles stolen subsequent to August 2021 and were not informed about the Anti-Theft Security Defect or Programming Lockdown by the dealer. Furthermore, several Class Members complained that dealers were unaware of Programming Lockdown and did not make the software update available when asked by customers. A selection of the Class Member's complaints to Defendants are below:

> SJOHN1926
> 1/7/24 8:33am
> Although there are said recalls for updating the security aspect, no dealerships know anything about these modules. My 2020 Scatpack widebody was stolen from an airport. The LoJack on the vehicle was useless. The car showed one spot. Officers say they combed the area, but no vehicle was found. ***More press should be done on national news stations to alert car owners and dealerships about these updates***. Furthermore, if

---

[55] https://static.nhtsa.gov/odi/tsbs/2022/MC-10222966-9999.pdf (last accessed on February 25, 2024)

the dealerships don't know about the module recalls, how many owners actually know about it?? This article was written in 2021 and *here it is 2024 and vehicles are still being stolen to include the newest models*. This article is worthless.

Mikiet60
9/13/23 11:39pm
I ordered a 2021 challenger hellcat redeye, widebody and have the lockout done but *it did not keep the morons from coming in five times and smashing the window and ripping the dash apart trying to program a key*, eventually sold the car because it was useless to me after all that damage And I read about the new security features so I ordered a 2022 jailbreak and *I was also told that it had glass breakage sensors and motion sensors for inside the cabin but the alarm did not go off when the window was broke nor did it go off* when they got in the car and tore the dash apart , I am so disgusted with Stellantis and Fair Oaks Dodge, I've been a Dodge fan since the early 70s and have purchased over 25 dodge vehicles and I will never buy a Dodge again.

Teddy_23
8/9/23 9:04am
I have a buddy that's a dodge dealer general manager and he can't seem to find anything on this. *Dodge needs to answer all the dodge owners*. I have a 2022 Hellcat widebody that arrived in Jan of this year and surely doesn't have it in it.

Klaatu
6/13/23 9:40am
Are the new three security systems available for a 2023 Dodge Challenger RT with a 5.7 l. *I was not offered this at the time of purchase* and am awaiting to hear from the dealership if they offer it as a reflash of the system or however they do it. Should this be available at any Dodge dealership?

croutonix
3/20/23 6:58pm
*Dodge doesn't care if your vehicle gets stolen or not. This was just a little PR move to make it look like they are working to stop theft* of our beautiful vehicles. The only update you'll be able to get on 2022 and 2023 model year vehicles is the "Intrusion Mode" as it comes standard no matter the engine. Dodge corporate and my local service department has told me that the *"Enhanced Security Mode" update and the "Key Programming Lockdown" update are only eligible on 2021 Challengers and Chargers*. On top of that, if you have a 2021, none of the dealers know what you're even talking about and have to do their own research and they STILL will not do the updates because Dodge dropped the ball and never told them. Shameful company.

187

North392

3/11/23 10:00pm

I'm really starting to believe dodge owners are being played with this "update" *not a single dealer in the metro Detroit area knows about this update*. They looked up my vin about 10 times, that's how many dealers I've called.

So here is what I'm doing next week, *I'll be contacting the Michigan AG office about this because another false hood is that dodge claims that they make up just a fraction of auto thefts* in the country when i took a ride down some of these side streets in Detroit. I saw a stripped down wagoneer, dodge Durango on blocks, a challenger body laying in the street and that was just on the first street.

So if this update really does exist then the dealers need to be educated on this TSB because people are fed up with it.

Walden

2/8/23 10:31am

Bought my 2022 challenger scat pack two weeks ago. *Dealer did not mention any of this to me*. Would have liked enhanced security mode and key programming lockdown. *Last night thieves stole my car in less than three minutes* ( neighbors heard the alarm go off and thought it was me outside and didn't mention anything until this morning). Went to where locator said it should be (65 miles away) and it wasn't there. *This Information at time of purchase would have saved my car*.

TCALDWELL22

12/31/22 2:47pm

Called several dealerships here in Dallas *no one has any idea about these knew security features* they are telling me it's aftermarket security that I'm looking for they don't offer that.

DpDFuzz

11/20/22 5:35pm

I had my 22 Scat Pack *stolen out of my driveway within minutes*. Evidently all these security features are on it. None which I was even aware of Unfortunately *was not aware it was this easy to steal prior to the updates either*. This is my second Challenger, I noticed what looks like 2 cameras/sensors on the head liner in the rear. So much for those. My alarm DID go off when my window was busted out. *But these suckers worked so fast and managed to get it down the road*… I don't know if my vehicle was in the enhanced security mode or not . They found my car on the side of the road undamaged.

Dakochillin

6/3/22 3:10pm
*Wish I would've been offer this* or even been told about my Uconnect app. Just had my *2021 wide body charger stolen out of Dallas. 4mins and they were gone with the car*…

Bcm392
4/29/22 7:37am
Bought a 22 Challenger Scat Pack in April 2022. *Dealer had no idea about Enhanced Security Mode or Key Programming Lockdown*. They contacted *Stellantis and were told these updates are not available*. Why release this information to the public when dealerships have no idea about it and they are not even available?

pwgarcia
4/14/22 1:13pm
Went to two Chrysler Dealerships, the first one told me *that there were no updates available at this time*. The second was familiar with the key programming lock down but had not heard of the enhanced security feature. They also informed me that they *would not discount the key fob*. Please issue information to the dealerships about these upgrades for us. This is ridiculous that I had to argue with the service department just to have my vehicle security updated!

Rick392sp
1/25/22 9:36pm
Can you *please let your dealer know of these new security measures*. I am also in Miami and *dealers dont have a clue of these security updates*. Kind of sad that customers know more than the dealers that service these cars.

786Kitty
1/17/22 1:01pm
The article states that the Enhanced Security Valet Mode will be available starting in January of 2022. I am at a large dealership in Miami, Florida (Planet Dodge) and *they do not have a clue*. I have been speaking with them since the middle of last year when I originally heard about this from Mopar Insiders and everyone looks like deers in headlights. It's pretty sad and *Stellantis ought to do a better job of informing their dealerships about the products that they offer*.
What really irks the heck out me is that I have been asking them about this since the middle of last year and no one from Planet Dodge has bothered to look into it and/or has had the courtesy to get back to me.
If someone from Dodge Garage would like to get back with me, please feel free to contact me.

(Emphasis added).

861.    DodgeGarage is an official FCA website and is monitored by employees of Defendants. A person using DodgeGarage username responded to some of the customer complaints listed above. Accordingly, Defendants were aware of the Class Members' complaints and the fact that the Anti-Theft Security Defect and Programming Lockdown were not being disclosed to Class Members by the dealers at the time of sale. Nevertheless, Defendants continued to produce, market, and sell defective vehicles to the Class Members.

862.    The rollout and availability of the "Programming Lockdown" feature, as evidenced by the numerous complaints on DodgeGarage, highlight a significant disconnect between Defendants' announced security measures and the actual implementation at the dealership level. These complaints reveal a pattern of misinformation and a lack of awareness among dealers about the existence and availability of Programming Lockdown, despite its announcement as a solution to the rampant theft of Class Vehicles. The limited scope and quick discontinuation of the Programming Lockdown further suggest that Defendants never intended for this security measure to be a widespread or long-term solution to the Anti-Theft Security Defect.

863.    The feedback from Class Members, who experienced thefts or attempted thefts even after seeking these updates, demonstrates the inadequacy of Defendants' response to the theft vulnerability. The fact that dealerships were either unaware of or unable to provide Programming Lockdown updates, as requested by vehicle owners, indicates a failure to effectively communicate and implement these measures across Defendants' sales and service network. This lack of action and communication effectively left Class Members uninformed and unprotected.

**5.    The Programming Lockdown TSBs failed due to severely limited scope, unreasonable side-effects, and shifting costs to customers.**

864.    The TSBs instructed dealerships to update the software, which upon information and belief was substantially similar to the Programming Lockdown software, in the RF Hub of

select Class Vehicles to address the following problem: "SYMPTOM/CONDITION: The customer may describe that they heard about these vehicles that can be unlawfully driven away by thieves when they are able to program new key fobs through the RF-Hub."

865. The problems with the TSBs are that: (a) they fail to cover all Class Vehicles; (b) they force all customers to pay for extra keys and some customers to pay for the software update itself; (c) they are only available if a customer learns about the Anti-Theft Security Defect on their own; and (d) the software update is not available to purchasers of new Class Vehicles because the TSBs are issued months or years after the vehicles go on sale.

866. *First,* the TSBs were limited only to the high-performance trim levels of certain models, which omitted the vast majority of Class Vehicles. For vehicles that were not included in the TSBs, the software update would not be available to the customer, and they were left without any protection. Accordingly, even though Defendants had a software update to address the risk of unauthorized key programmers (with the problematic side effect of preventing any new keys ever from being added without replacing the costly RF Hub), Defendants made the repair unreachable to the majority of the Class Vehicles by excluding the vehicles from the TSBs.

867. *Second*, owners of Class Vehicles that were outside of the 30,000 miles/36-month express warranty period were required to pay for the software update themselves. Furthermore, TSBs were typically accompanied by notices to customers informing them that they were responsible for paying to purchase any new keys prior to the lockdown.

868. *Third,* if a Class Member lost their keys or needed a key replacement after installing the Programming Lockdown, then they would be responsible for paying to replace the RF Hub. The cost to replace the RF-Hub is between $1,500 and $2,500 depending on dealership markup for labor. Thus, the software patch may prevent thieves from using key programmers to steal

vehicles, but it causes other ancillary damages to Class Members who have installed the software on their vehicles. The result of the forgoing additional costs and burdens was enough to discourage many Class Members from obtaining the software updates, thereby leaving their vehicles defective or the Class Members paid for third-party solutions.

869.    *Fourth*, the TSBs are communications to the dealerships and not to the public or Class Members. Although Defendants sent letters to some owners around the time they sent the TSBs to dealers, those letters were not official notices, such as a safety recall, and are not publicly available to subsequent purchasers of Class Vehicles.

870.    *Fifth*, the TSBs were not issued for some new vehicles until the vehicles had already been on sale for more than a year. For example, the TSB for the 2022 Durango was not issued until April 14, 2023, which means that the car was on sale for more than one year before the owners had the opportunity for the software update.

871.    Defendants' motivation for slow-rolling and limiting the applicability of the TSBs is that they are able to avoid paying dealers to perform the software update once the vehicle is outside of the express warranty period. By delaying the availability of the TSB for a few years, Defendants shift the cost to customers. Specifically, if a vehicle is under warranty, then a dealership that performs the RF Hub software update is compensated for a minimum of 0.2 hours at the warranty rate, which, upon information and belief, is $150.00 per hour, meaning the cost per vehicle to Defendants is at least $30.00. [56] When multiplied by the approximately 6 million Class Vehicles that were under warranty at the time the Programming Lockdown software was developed, Defendants' costs would have been at least $180 million if all vehicles had been immediately updated.

---

[56] https://www.moparrepairconnect.com/dA/bc290ccf39/1911_M_Basic_Limited_Warranty_Final.pdf (last accessed February 16, 2024).

6.   **Defendants have the ability to address the Anti-Theft Security Defect in all Class Vehicles immediately—but do not.**

872.    The remedies implemented by Defendants to address the Anti-Theft Security Defect in Class Vehicles have been wholly inadequate, largely because those efforts fail to confront the root of the problem. Specifically, despite the introduction of measures such as Programming Lockdown and subsequent TSBs, Class Vehicles continue to be produced and sold with the same inherent Anti-Theft Security Defect. This is a reckless and intentional failure to rectify the underlying vulnerabilities that have facilitated theft, leaving new buyers unprotected and unaware of the risks associated with their vehicles.

873.    Nevertheless, the software update provided through Programming Lockdown and the TSBs do, on its surface, appear to mitigate theft via key programmers. However, this solution comes at a significant cost to vehicle owners by stripping them of the ability to add new keys without incurring the substantial expense of replacing the RF-Hub—a service estimated between approximately $1,500 and $2,500. While this update effectively addresses one issue, it introduces another by placing an undue financial burden on owners for a problem originating from the Class Vehicles' defective initial design.

874.    The side effect of the Programming Lockdown and TSBs—preventing the addition of new keys without a costly RF-Hub replacement—could feasibly be rectified by Defendants offering free extra keys and RF-Hubs to vehicle owners. Such a measure would ensure that the anti-theft solution does not disproportionately impact vehicle owners, maintaining the security, utility, and value of their vehicles thereby encouraging owners to take advantage of the updated software.

875.    However, Defendants have opted against this approach, evidently to avoid the associated costs. This decision not only highlights Defendants' prioritization of their financial

interests over the quality, dependability, safety, and security of their customers but also demonstrates the inadequacy of the remedy provided. Defendants' choice to sidestep a comprehensive solution for the key programming vulnerability—despite having a clear path to mitigate its side effects—shows a deliberate disregard for the well-being of Class Members, leaving them to bear the consequences and costs of a defect of Defendants' own making.

## M.   Joint Venture and Agency Relationship Between Defendants and their Dealers

876.   Upon information and belief, Defendants have impliedly or expressly acknowledged that authorized dealerships are their sales agents, the dealers have accepted that undertaking, Defendants have the ability to control authorized dealers, and act as the principal in that relationship, as shown by the following:

(a)   Defendants can terminate the relationship with their dealers at will.

(b)   The relationships are indefinite.

(c)   Defendants are in the business of selling vehicles as are their dealers.

(d)   Defendants provide tools and resources for dealers to sell vehicles.

(e)   Defendants supervise their dealers regularly.

(f)   Without Defendants, the relevant dealers would not exist.

877.   Defendants require the following of their dealers:

(a)   Reporting of sales

(b)   Computer network connection with Defendants

(c)   Training of dealers' sales and technical personnel

(d)   Use of Defendants-supplied computer software

(e)   Participation in Defendants' training programs

(f)   Establishment and maintenance of service departments in dealerships

(g)   Certify pre-owned vehicles

194

(h)     Reporting to Defendants with respect to car delivery, including Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees

(i)     Displaying Defendants' logos on signs, literature, products, and brochures within dealerships

878.   Dealerships bind Defendants with respect to:

(a)     Warranty repairs on the vehicles the dealers sell

(b)     Issuing service contracts administered by Defendants

879.   Defendants further exercise control over their dealers with respect to:

(a)     Financial incentives given to dealer employees

(b)     Locations of dealers

(c)     Testing and certification of dealership personnel to ensure compliance with Defendants' policies and procedures

(d)     Customer satisfaction surveys, pursuant to which Defendants allocate the number of cars to each dealer, thereby directly controlling dealership profits

(e)     Dealers sell vehicles on Defendants' behalf, pursuant to a "floor plan," and Defendants do not receive payment for their cars until the dealerships sell them.

(f)     Dealerships bear Defendants' brand name, use its logo in advertising and on warranty repair orders, post signs for the public to see, and enjoy a franchise to sell Defendants' products, including the Class Vehicles.

880.   Defendants require dealers to follow the rules and policies of Defendants in

conducting all aspects of dealer business, including the delivery of Defendants' warranties described above, and the servicing of vehicles with security theft issues such as the Class Vehicles.

881.    Defendants require their dealers to post their name, logo, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized dealers and servicing outlets for Defendants' vehicles.

882.    Defendants require dealers to use service and repair forms containing Defendants' names and logos.

883.    Defendants require dealers to perform warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Defendants.

884.    Defendants require dealers to use parts and tools either provided by Defendants or approved by Defendants, and to inform Defendants when dealers discover that unauthorized parts have been installed on one of Defendants' vehicles.

885.    Defendants require dealers' service and repair employees to be trained by Defendants in the methods of repair of Defendants' vehicles.

886.    Defendants audit dealerships' sales and service departments and directly contact the customers of said dealers to determine their level of satisfaction with the sale and repair services.

887.    Defendants require their dealers to provide them with monthly statements and records pertaining, in part, to dealers' sales and servicing of Defendants' vehicles.

888.    Defendants provide technical service bulletins and messages to their dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

889.    Defendants provide their dealers with specially trained service and repair consultants with whom Defendants require dealers to consult when dealers are unable to correct a security defect on their own.

890.    Defendants require vehicle owners to go to authorized dealers to obtain servicing under warranties.

891.    Dealers are required to notify Defendants whenever a car is sold or put into warranty service.

## N.    Privity Exists Between Defendants and Plaintiffs and Class Members

892.    Plaintiffs and Class members purchased and/or leased their respective Class Vehicles from Defendants, through Defendants' authorized dealerships with the understanding that these dealerships were acting on behalf of Defendants, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.

893.    The sole and express purpose that each authorized FCA-brand dealership has when it acquires vehicles from Defendants is to immediately re-sell them to the end-users like Plaintiffs and Class members. Defendants' conduct, and the conduct of their dealerships, thus created a justifiable belief on the part of Plaintiffs and Class members that the dealerships are agents of Defendants, which the Plaintiffs relied on to their detriment. Thus, each FCA-brand dealership operates as the actual and/or apparent agents of Defendants, which satisfies any privity requirement

894.    Privity further exists between Defendants on the one hand, and the Plaintiffs and Class members on the other by virtue of the express warranties provided through their purchase and/or lease agreements.

895.    Defendants also control various details regarding their respective dealerships' operations through various written agreements, such as: (i) granting each dealership a license to

197

use their respective trademarks and intellectual property; (ii) furnishing each dealership with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealerships from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

896.    Plaintiffs and the Class members were the intended and direct beneficiaries of agreements between Defendants and their dealerships regarding sales and leases of the Class Vehicles, because, upon information and belief, the agreements expressly were made for the direct benefit of Plaintiffs and Class members as ultimate consumers of the Class Vehicles.

897.    Moreover, Defendants' false and misleading representations in marketing materials and brochures for each of the Class Vehicles, were intended for car purchasers and lessees, rather than the dealerships themselves.

## V.    TOLLING OF STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment Tolling

898.    Defendants have known of the Anti-Theft Security Defect in the Class Vehicles since at least around 2011, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, and yet have concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Anti-Theft Security Defect. Defendants continue to conceal the Anti-Theft Security Defect to this day.

899.    As the manufacturers, distributors, sellers, and/or warrantors of the Class Vehicles, Defendants were under a continuous duty to disclose to Class Members the existence of the Anti-Theft Security Defect found in the Class Vehicles.

900.    Defendants were and remain under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the

Anti-Theft Security Defect found in the Class Vehicles will allow unsophisticated thieves to steal the vehicle in less than two minutes with commercially available devices, that they will require costly repairs, pose safety concerns, cause damage to their personal property, and diminish the resale value of the Class Vehicles.

901.    Instead of publicly disclosing the Anti-Theft Security Defect in the Class Vehicles, Defendants kept owners and lessees in the dark about the Anti-Theft Security Defect present in their vehicles. To this day, Defendants have knowingly or recklessly failed to disclose the full extent of the Anti-Theft Security Defect, including that the Class Vehicles do not comply with FMVSS No. 114, and have failed to offer adequate remedies for the Anti-Theft Security Defect.

902.    Class Members were not at fault for failing to discover the existence of the Anti-Theft Security Defect present in their Class Vehicles.

903.    Plaintiffs had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice of such a connection. In particular, Class Members did not possess the aggregate data concerning vehicle thefts, which was beginning to cluster in specific areas around the United States, or the technical data related to the design of the Class Vehicles, which ultimately led to this crisis.

904.    This ignorance of the existence of the Anti-Theft Security Defect present in the Class Vehicles is common across each Plaintiff and Class Member.

905.    Due to Defendants' concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

**B.    Estoppel**

906.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. Defendants actively concealed—and continue to conceal—the true character, quality, and nature of the Class Vehicles

and knowingly made representations about the keying, security, and antitheft systems. Plaintiffs and Class Members reasonably relied upon Defendants knowing representations and active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

**C.      Discovery Rule**

907.    The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Anti-Theft Security Defect.

908.    As alleged above, Class Members had no way of knowing about the Anti-Theft Security Defect in their Class Vehicles. Defendants concealed their knowledge of the Anti-Theft Security Defect while they continued to market and sell the Class Vehicles as safe and secure vehicles. To this day, Defendants failed to disclose the full extent of the Anti-Theft Security Defect and the risks faced by Class Vehicle drivers.

909.    Within any applicable statutes of limitation, Class Members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the true qualities of the Class Vehicles.

910.    Class Members did not know facts that would have caused a reasonable person to suspect that there was an Anti-Theft Security Defect affecting their vehicle and an ordinary person would be unable to appreciate that the vehicle was defective. Even if a Class Vehicle owner or lessee learns that their vehicle or another's Class Vehicle was stolen, an ordinary consumer, without sophisticated knowledge of mechanical systems and antitheft devices, would not and could not suspect that the Class Vehicle theft was, in fact, attributable to a pervasive Anti-Theft Security Defect because Defendants withheld this information and pointed to their express warranties, which purport to disclaim liability for these damages.

911.    Plaintiffs and Class Members had no realistic reason to suspect that the Class

Vehicles were defective until—at the earliest—after their vehicles were stolen. Even then, Plaintiffs and Class Members had no reason to know that thefts were caused by a defect in the Class Vehicles because of Defendants' active concealment of the Anti-Theft Security Defect.

912.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

## VI.    CLASS ALLEGATIONS

913.    Plaintiffs bring this lawsuit as a class action under Federal Rule of Civil Procedure 23 on behalf of themselves and all others similarly situated.

914.    Plaintiffs seek to represent a Nationwide Class defined as:

**Nationwide Class**: All persons and entities that purchased or leased a Class Vehicle in the United States.

915.    Plaintiffs also seek to represent the following subclasses:

**Arizona Subclass:** All persons and entities that purchased or leased a Class Vehicle in Arizona.

**California Subclass:** All persons and entities that purchased or leased a Class Vehicle in California.

**Colorado Subclass:** All persons and entities that purchased or leased a Class Vehicle in Colorado.

**Delaware Subclass:** All persons and entities that purchased or leased a Class Vehicle in Delaware.

**Florida Subclass:** All persons and entities that purchased or leased a Class Vehicle in Florida.

**Georgia Subclass:** All persons and entities that purchased or leased a Class Vehicle in Georgia.

**Illinois Subclass:** All persons and entities that purchased or leased a Class Vehicle in Illinois.

**Indiana Subclass:** All persons and entities that purchased or leased a Class Vehicle in Indiana.

**Maryland Subclass:** All persons and entities that purchased or leased a Class Vehicle in Maryland.

**Michigan Subclass:** All persons and entities that purchased or leased a Class Vehicle in Michigan.

**Missouri Subclass:** All persons and entities that purchased or leased a Class Vehicle in Missouri.

**Nevada Subclass:** All persons and entities that purchased or leased a Class Vehicle in Nevada.

**New Jersey Subclass:** All persons and entities that purchased or leased a Class Vehicle in New Jersey.

**Oregon Subclass:** All persons and entities that purchased or leased a Class Vehicle in Oregon.

**Texas Subclass:** All persons and entities that purchased or leased a Class Vehicle in Texas.

**Wisconsin Subclass:** All persons and entities that purchased or leased a Class Vehicle in Wisconsin.

916.    The Nationwide Class and the State Subclasses are collectively referred to herein as the Classes.

917.    Excluded from the Classes are Defendants, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns, and any entity in which any of them have a controlling interest, as well as judicial officers assigned to this case as defined in 28 U.S.C. § 455(b) and their immediate families.

918.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**: Members of this class action are so numerous and geographically dispersed that joinder of all members of the Classes is impractical. Although a precise number of vehicles is not knowable until discovery takes place, Plaintiffs believe that Defendants have sold and leased millions of Class Vehicles throughout the United

202

States.

919.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3))**: Common questions of law and fact predominate over questions that may affect individual members of the class. Common questions that will determine the outcome of this class action include:

(a)     Whether Defendants designed and manufactured the Class Vehicles with the Anti-Theft Security Defect;

(b)     Whether Defendants knew of the Anti-Theft Security Defect misrepresented or omitted disclosure of the problem and its consequences to their customers;

(c)     Whether Defendants misrepresented the Class Vehicles as safe, secure, and secure;

(d)     When and how Defendants discovered the Anti-Theft Security Defect in the Class Vehicles, and what, if anything, they did in response;

(e)     Whether Defendants' concealment and misrepresentations about the defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

(f)     Whether Defendants' representations and omissions about the defective nature of the Class Vehicles were likely to mislead or deceive;

(g)     Whether Defendants' representations and omissions about the true defective nature of the Class Vehicles were and are unfair;

(h)     Whether Defendants represented, through their words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

(i)     Whether Defendants represented, through their words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

(j)     Whether Defendants' representations and omissions about the true defective nature

of the Class Vehicles were likely to create confusion or misunderstanding;

(k)     Whether Defendants' representations and omissions about the true defective nature of the Class Vehicles were and are deceptive;

(l)     Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability; and

(m)     Whether Plaintiffs and Class Members were deprived of the benefit-of-the bargain.

920.    **Typicality (Fed. R. Civ. P. 23(a)(3))**: Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, all purchased or leased Class Vehicles that share the same Anti-Theft Security Defect. The same materials published, advertising aired, and disclosures made relate to all Class Members and Class Vehicles.

921.    **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiffs will fairly and adequately protect the interests of the Classes because Plaintiffs and their experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Classes. Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex class action litigation, are committed to vigorously prosecuting this class action, and have the resources to prosecute this class action through trial and any subsequent appeals.

922.    **Superiority (Fed. R. Civ. P. 23(b)(3))**: Class treatment is the superior method for a fair and efficient adjudication of this controversy as individualized litigation of the claims of Class members is impractical. Class treatment will permit thousands of similarly situated person to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that individual lawsuits would entail. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially

outweigh potential difficulties in the management of this class action.

923.    The complex nature of the litigation, along with the expenses associated with vigorous prosecution of these claims, renders individual lawsuits irrational and not economically viable.

924.    Class certification is also appropriate for equitable or injunctive relief because Defendants have acted or refused to act on grounds that apply generally to the Classes such that final injunctive relief is appropriate for the Classes as a whole.

## VII.    CLAIMS FOR RELIEF

### A.    Nationwide Class Claims

#### 1.    Nationwide Count 1: Breach of Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. (Nationwide Class)

925.    Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

926.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Class.

927.    Congress enacted the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, mandating certain guidelines in connection with written warranties, to combat the misuse by merchants of express warranties and disclaimers.

928.    Consumers who are damaged by the failure of a supplier, warrantor, or service contractor to comply with obligations under the Act, or under written warranties, implied warranties, or service contracts, may bring suits for damages and other legal and equitable relief in any court of competent jurisdiction in any state.

929.    The Class Vehicles are "consumer products" that are covered by the Magnuson-Moss Warranty Act. *See* 15 U.S.C. § 2301(1).

930.    Defendants are "suppliers" and "warrantors" under the Act as defined in 15 U.S.C.

§2301(4) and (5).

931.    Plaintiffs and Class members are "consumers" under the Act as defined in 15 U.S.C. § 2301(3).

932.    Defendants provided written warranties in connection with the sale or lease of the Class Vehicles. *See* 15 U.S.C. § 2301(6).

933.    The Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty. *See* 15 U.S.C. § 2301(d)(1).

934.    Defendants provided Plaintiffs and Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is covered by the Magnuson-Moss Warranty Act. *See* 15 U.S.C. § 2301(7).

935.    Defendants provided an implied warranty of merchantability that warranted that Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as adequately designed, manufactured, and marketed, and as adequately contained, packaged, and labeled.

936.    Defendants breached the implied warranties as described herein and are therefore liable to Plaintiffs under 15 U.S.C § 2301(d)(1).

937.    Plaintiffs used their Class Vehicles in a manner consistent with their intended use and performed every duty required of them under the terms of the warranty, except as may have been excused or prevented by Defendants' conduct or by operation of law.

938.    Plaintiffs and Class members seek to recover damages resulting from Defendants' breach of their implied warranties and their deceitful and unlawful conduct described herein. Damages include, without limitation, overpayment for Class Vehicles, payments to repair Class Vehicles stolen or involved in attempted thefts, loss of use, replacement costs for vehicles and

property stolen in connection with the theft or attempted theft of Class Vehicles.

939.    Plaintiffs and Class members are also entitled to other legal and equitable relief as provided by the Act. 15 U.S.C. § 2310(d)(1). Plaintiffs seek injunctive relief requiring Defendants to cure the Anti-Theft Security Defect as alleged herein. Plaintiffs also seek the reformation of Defendants' written warranties to comport with Defendants' obligations under the Act and with consumers' reasonable expectations.

940.    Additionally, as permitted by the Act, Plaintiffs seek an award of costs and expenses, including attorneys' fees. *See* 15 U.S.C. § 2310(d)(2).

**B.    Arizona Counts:**

### 1.    Arizona Count 1: Breach of Implied Warranty of Merchantability (AZ Rev Stat § 47-2314) Against Defendants

941.    Arizona Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

942.    Arizona Plaintiffs bring this cause of action as individuals and on behalf of the members of the Arizona Subclass.

943.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Ariz. Rev. Stat. Ann. §§ 47-2314 and 47-2A212.

944.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. Ann. §§ 47-2104(A) and 47-2A103(C)(11), and "sellers" of motor vehicles under § 47-2103(A)(4).

945.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. Ann. § 47-2a103(A)(16).

946.    All Class members who purchased Class Vehicles in Arizona are "buyers" within the meaning of Ariz. Rev. Stat. Ann. § 47-2103(A)(1).

947.    All Class members who leased Class Vehicles in Arizona are "lessees" within the meaning of Ariz. Rev. Stat. Ann. § 47-2a103(A)(14).

948.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. Ann. §§ 47-2105(A) and 47-2A103(A)(8).

949.    Arizona law implies a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used.

950.    Therefore, Defendants provided Plaintiffs and Arizona Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

951.    In violation of the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with secure, safe, and high-quality transportation. The Class Vehicles suffer from the Anti-Theft Security Defect, as alleged herein, and Defendants knew of its existence at the time the Class Vehicles were sold or leased.

952.    The Class Vehicles' Anti-Theft Security Defect was present when the vehicles left Defendants' control. The Anti-Theft Security Defect results from Defendants' actions and decisions and were not created by subsequent events. Therefore, the Class Vehicles were not merchantable at the time of sale.

953.    Plaintiffs and members of the Arizona Subclass have complied with all obligations under the warranty or have otherwise been excused from the performance of obligations because of Defendants' acts and omissions described herein.

954.     Plaintiffs and members of the Arizona Subclass were not required to notify Defendants of the breach because affording Defendants additional opportunities to cure its breach would be futile. Defendants are on notice of the Anti-Theft Security Defect from complaints and requests they have received from Class Members, and complaints and reports they have received through other channels, including their monitoring and subsequent investigations of stolen Class Vehicles.

955.     Plaintiffs and the Arizona Subclass have suffered damages, and continue to suffer damages, resulting from the purchase of defective vehicles from Defendants as described herein.

### 2.     Arizona Count 2: Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*

956.     Arizona Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

957.     Arizona Plaintiffs bring this cause of action as an individual and on behalf of the members of the Arizona Subclass.

958.     Plaintiff, Class Members, and Defendants are all "persons" under the Arizona Consumer Fraud Act. Ariz. Rev. Stat. Ann. § 44-1521(6).

959.     The Class Vehicles are "merchandise" under the Arizona Consumer Fraud Act. Ariz. Rev. Stat. Ann. § 44-1521(5).

960.     The Arizona Consumer Fraud Act expressly prohibits and deems unlawful any unfair or deceptive business activities. *See* Ariz. Rev. Stat. Ann. §44-1522(A).

961.     Defendants, through their representatives, employees, and network of dealers, violated the Arizona Consumer Fraud Act through deliberate deception, suppression, omission, and non-disclosure of essential facts relating to the Class Vehicles' quality, dependability, and safety features as detailed herein.

962.    Defendants neglected their duty to abstain from unfair or deceptive acts, as prescribed by the Arizona Consumer Fraud Act, in their commercial dealings. In particular, Defendants withheld material facts about the Class Vehicles defective security systems.

963.    Defendants exclusively knew or controlled access to facts concerning the Anti-Theft Security Defect, which were neither known nor reasonably discoverable by Plaintiff or Class Members.

964.    Due to the latent and technical nature of the Anti-Theft Security Defect, Plaintiff and Class Members did not possess the necessary technical expertise required to detect the defect on their own.

965.    Defendants were aware that the Anti-Theft Security Defect presented substantial safety risks to consumers, which would have significantly influenced Class Members' decisions to purchase or lease said vehicles.

966.    Defendants have provided incomplete information about the Class Vehicles' safety and security, deliberately omitting facts about the Anti-Theft Security Defect. In all promotions, advertisements, and materials concerning the Class Vehicles, Defendants have intentionally concealed the Anti-Theft Security Defect, thus, deceiving consumers and failing to provide full disclosure as necessitated once they undertook the initiative to inform about the vehicles they sold or leased.

967.    The details of the Anti-Theft Security Defect were within the Defendants' knowledge at the time of marketing and selling the Class Vehicles, aimed to influence consumer purchasing decisions.

968.    By presenting the Class Vehicles as safe, secure, and dependable without disclosing or, indeed, deliberately withholding the threat posed by the Anti-Theft Security Defect, Defendants

committed deceptive activities in violation of the Arizona Consumer Fraud Act.

969.    Plaintiffs and Class Members reasonably relied on Defendants' representations about the safety, security, and security of the Class Vehicles.

970.    Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

###    3.    Arizona Count 3:  Fraudulent Concealment

971.    Arizona Plaintiffs incorporates all foregoing paragraphs as though fully set forth herein.

972.    Arizona Plaintiffs brins this cause of action as individuals and on behalf of the members of the Arizona Subclass.

973.    Defendants intentionally concealed from Plaintiff the existence of the Anti-Theft Security Defect in the Class Vehicles.

974.    The existence of the Anti-Theft Security Defect was a material fact to Plaintiff because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiff and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

975.    Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiff as set forth herein and based upon the following reasons:

(a)    Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)    Defendants were authoritative figures in the automotive industry and were trusted by Plaintiff and Class Members. Defendants abused that trust to induce a

211

false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiff's trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiff and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiff, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the

theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiff and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

976.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

977.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiff and Class Members into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiff and Class Members to underestimate the risk of theft and the need for additional security measures; (g) received continuous security

updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

978.   Plaintiff and Class Members could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

979.   Plaintiff and Class Members justifiably and reasonably relied upon Defendants' misleading statements and omissions.

980.   If Plaintiff and Class Members had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

981.   If the Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

982.   Defendants' omissions damaged Plaintiff and Class Members because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

983.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.   Arizona Count 4: Unjust Enrichment Against All Defendants

984.   Arizona Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

985.   Arizona Plaintiffs bring this count individually and on behalf of the other members of the Arkansas Class.

986.    For purposes of this count, the Arizona Class Members shall be referred to as "Class Members."

987.    Defendants were aware of the Anti-Theft Security Defect when they marketed and sold the Class Vehicles to Plaintiffs and Class Members.

988.    When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

989.    Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

990.    Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

991.    It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

992.    Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

993.    Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

994.    Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

## C.    California Counts:

### 1.    California Count 1: Breach of Implied Warranty of Merchantability (Cal. Com. Code §§ 2314 and 10212) Against Defendants.

995.    California Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

996.    California Plaintiffs bring this count individually and on behalf of the other members of the California Subclass.

997.    For purposes of this count, the California Subclass Members shall be referred to as "Class Members."

998.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

999.   Defendants are and were at all relevant times "merchants" of motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

1000.   Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

1001.   All Class Members who purchased Class Vehicles are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

1002.   All Class Members who leased Class Vehicles are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

1003.   The Class Vehicles were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

1004.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1005.   However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design

elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1006. Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1007. Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1008. Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable

amount of time after the Anti-Theft Security Defect became public. Additionally, on August 23, 2024, Class Members sent notice letters to them.

1009.   Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1010.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

> **2.      California Count 2: Violation of the California Song-Beverly Consumer Warranty Act for Breach of Implied Warranty, Cal. Civ. Code §§ 1791.1 and 1792**

1011.   California Plaintiffs, excluding Burton Way Investments LLC, incorporate all foregoing paragraphs as though fully set forth herein.

1012.   California Plaintiffs, excluding Burton Way Investments LLC, bring this cause of action as individuals and on behalf of the members of the California Subclass.

1013.   Defendants are "manufacturers" of the Class Vehicles under Cal. Civ. Code § 1791(j). Defendants are also "sellers" and "lessors" of motor vehicles under Cal. Civ. Code § 1791(l) and (i).

1014.   Plaintiffs and Class Members are "buyers" or "lessees" of Class Vehicles under Cal. Civ. Code § 1791(b) and (h).

1015. The Class Vehicles are "consumer goods" covered by the California Consumer Legal Remedies Act. Cal. Civ. Code. § 1791(a).

1016. It was implied by the Defendants that the Class Vehicles being sold or leased were "merchantable" conforming to the requirements of Cal. Civ. Code §§ 1791.1(a) and 1792.

1017. The implied warranty of merchantability signifies the Class Vehicles' compliance with all the features that: (1) are acceptable in commerce based on the contract description; (2) are intended for the ordinary uses for which goods of that nature are employed; (3) are appropriately boxed, packaged, and labeled; and (4) are consistent with any affirmations of fact made on the container or label, as detailed in Cal. Civ. Code § 1791.1(a).

1018. Due to the Anti-Theft Security Defect, the Class Vehicles would be met with objection in the automobile trade and, therefore, are not deemed merchantable or appropriate for the ordinary purposes for which vehicles are utilized.

1019. The Class Vehicles' labels do not adequately reveal the Anti-Theft Security Defect. The vehicles do not embody the safety, security, quality, and security promised by Defendants.

1020. As a direct and proximate cause of Defendants breaching the implied warranty of merchantability, both Plaintiffs and Class Members have encountered Class Vehicles that are fundamentally flawed, primarily due to the unabated Anti-Theft Security Defect.

### 3. California Count 3: Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, et seq.) Against All Defendants

1021. California Plaintiffs, excluding Burton Way Investments LLC, reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1022. California Plaintiffs, excluding Burton Way Investments LLC, bring this count individually and on behalf of the other members of the California Subclass.

1023.   For purposes of this count, the California Subclass Members shall be referred to as "Class Members."

1024.   The Class Vehicles are "goods" within the meaning of Cal. Civ. Code § 1761(a).

1025.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Cal. Civ. Code § 1761(c).

1026.   Plaintiffs and Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

1027.   The California Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770.

1028.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the CLRA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1029.   Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the CLRA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

> (a)   Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)     Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)     Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)     Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1030.   As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1031.   By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices as defined in Cal. Civ. Code § 1770(a):

(a)      representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(b)      representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

(c)      advertising the Class Vehicles with the intent not to sell or lease them as advertised; and

(d)      representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not. Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

1032.  Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1033.  Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1034.  Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations,

concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1035.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1036.   Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1037.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1038.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1039.   In accordance with § 1782(a) of the CLRA, Plaintiffs' counsel on behalf of Plaintiffs and the Class Members, served Defendants via Certified Mail on August 23, 2024 with notice of their alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiffs and Class Members and demanded that they correct or agree to correct the actions described therein within thirty (30) days of such notice. Because Defendants failed to

adequately remedy their unlawful conduct within the requisite time period, the Plaintiffs seek all damages and relief to which they and the Class Members are entitled.

1040.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs seek an order enjoining Defendants from engaging in the methods, acts, or practices alleged herein, including further concealment of the Anti-Theft Security Defect, and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the CLRA.

> **4.     California Count 4: Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.) Against All Defendants.**

1041.   California Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1042.   California Plaintiffs bring this count individually and on behalf of the other members of the California Subclass.

1043.   For purposes of this count, the California Subclass Members shall be referred to as "Class Members."

1044.   The California Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business acts or practices."

1045.   Defendants' knowing and intentional conduct described in this complaint constitutes unlawful, unfair, and fraudulent business acts and practices in violation of the UCL. Specifically, Defendants' conduct is unlawful, unfair, and fraudulent in at least the following ways:

(a)     By knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from the Anti-Theft Security Defect while obtaining money from Plaintiffs and Class Members;

(b)     By purposefully designing and manufacturing the Class Vehicles to contain the Anti-Theft Security Defect, concealing the Anti-Theft Security Defect from Plaintiffs and the Class Members, and failing to fix the Anti-Theft Security Defect free of charge; and

(c)     By marketing the Class Vehicles as safe, convenient, and defect-free, with cutting edge technology, all while knowing of the Anti-Theft Security Defect.

1046.   The Class Vehicles are defectively designed with the Anti-Theft Security Defect. Accordingly, the Class Vehicles do not contain starting systems with anti-theft features or design elements that would prevent forward self-mobility and steering when the key is removed from the starting system.

1047.   In intentionally deciding—uniquely among manufacturers selling vehicles in the United States—not to equip Class Vehicles with sufficient anti-theft design, Defendants committed an unlawful business act or practice in violation of § 17200.

1048.   Defendants also committed an unlawful business act or practice in violation of § 17200 by violating the California FAL, the CLRA, and other laws alleged herein.

1049.   Defendants' acts, omission, and conduct were also "unfair" because they offend public policy and constitute immoral, unethical, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members. The gravity of harm resulting from Defendants' conduct outweighs any potential benefits attributable to the conduct, and there were reasonably available alternatives to further Defendants' legitimate business interests.

1050.   Selling cars without anti-theft features or design elements sufficient to comply with FMVSS 114 is unfair to consumers because it exposes consumers to elevated risks of theft without fair warning or justification.

1051.   Defendants failed to provide notice that the Class Vehicles lacked any anti-theft feature or design element sufficient to provide an adequate theft deterrent or otherwise comply with FMVSS 114, and failed to give any notice as to the risks associated with operating or even owning a vehicle that does not comply with FMVSS 114.

1052.   Defendants intentionally failed to disclose and actively concealed the fact that the Class Vehicles were defective and also did not comply with FMVSS 114. In marketing materials, Defendants often advertised that higher-end trim packages came with a "push button start" feature rather than a traditional turn-key ignition. However, Defendants did not inform consumers that the Class Vehicles were being sold without adequate anti-theft protection to safeguard life and property. Defendants long have provided immobilizers as standard technology in select higher-end models and as a feature in higher-end trim packages on other models. Meanwhile, the less expensive trim packages of those same models were manufactured and sold without an immobilizer or any other anti-theft feature or design element that would prevent theft and satisfy FMVSS 114.

1053.   Defendants did not include features or design elements on the Class Vehicles that would bring those vehicles into compliance with the letter or intent of FMVSS 114. Thus, Defendants designed, developed, manufactured, marketed, and sold their vehicles in a dangerous and defective condition. This too was unfair to consumers and therefore violated the UCL.

1054.   Additionally, Defendants committed fraudulent acts or practices in violation of § 17200. Specifically, as alleged in detail above, Defendants designed, developed, manufactured, and/or knowingly and intentionally marketed and sold Class Vehicles with the Anti-Theft Security Defect while misrepresenting the safety, quality, and security of the Class Vehicles, and/or omitting, and failing to disclose material facts regarding the existence, nature, and scope of the

Anti-Theft Security Defect in the Class Vehicles from consumers, including Plaintiffs and Class Members.

1055.   Defendants had an ongoing duty to Plaintiffs and other Class Members to refrain from unfair or deceptive practices in the course of their business. Specifically, Defendants owed Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect because:

(a)   Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect, and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)   Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)   Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)   Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they

marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1056.   Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1057.   Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1058.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own. Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1059.   Accordingly, Plaintiffs and Class Members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment of and failure to disclose material information regarding the Anti-Theft Security Defect.

1060.   Defendants' violations present a continuing risk to Plaintiffs and Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1061.   Plaintiffs request that this Court enter an order enjoining Defendants from continuing their unfair, unlawful, and/or deceptive practices and restoring to Plaintiffs and Class Members any money Defendants acquired by unfair competition as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345, and for such other relief set forth below.

1062.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**5.      California Count 5: False Advertising Under the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, et seq.) Against All Defendants**

1063.   California Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI above as though fully set forth herein.

1064.   California Plaintiffs bring this count individually and on behalf of the other members of the California Subclass.

1065.   For purposes of this count, the California Subclass Members shall be referred to as "Class Members."

1066.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Cal. Bus. & Prof. Code § 17506.

1067.   The California False Advertising Law ("California FAL") prohibits false advertising. California Bus. & Prof. Code § 17500.

1068.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the California FAL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1069.   Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the California FAL in the course of their business. Specifically, they owed Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because:

(a)   Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)   Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)   Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

231

(d)     Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1070.   By misrepresenting the Class Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect to consumers, Defendants engaged in untrue and misleading advertising prohibited by California Bus. & Prof. Code § 17500.

1071.   Defendants made or caused to be made and disseminated throughout California advertising, marketing, labeling, and other publications containing numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care they should have been known to be untrue and misleading to consumers, including Plaintiffs and Class Members.

1072. Defendants' unfair or deceptive acts and practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles were safe, secure, and reliable, and that they did not contain the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members,

about the true safety, and security of Class Vehicles, the quality of the Class Vehicles and their brands, and the true value of the Class Vehicles.

1073.  Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations and omissions that the Class Vehicles were safe, secure, and reliable in deciding to purchase and lease those vehicles.

1074.  Plaintiffs and Class Members' reliance was reasonable, as they had no way of discerning that those representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1075.  Had Plaintiffs and Class Members known the truth about the Anti-Theft Security Defect, they would not have purchased or leased Class Vehicles, or would have paid significantly less for them.

1076.  Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1077.  Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. The unlawful acts and practices complained of herein affect the public interest.

1078.   Plaintiffs and Class Members seek an order enjoining Defendants' false advertising, any such orders or judgments as may be necessary to restore to Plaintiffs and Class Members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the false advertising provisions of the California FAL.

1079.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

### 6.      California Count 6: Fraudulent Concealment

1080.   California Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1081.   California Plaintiffs bring this cause of action as individuals and on behalf of the members of the California Subclass.

1082.   Defendants intentionally concealed from Plaintiffs the existence of the Anti-Theft Security Defect in the Class Vehicles.

1083.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiffs because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiffs and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1084.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs as set forth herein and based upon the following reasons:

(a)     Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)     Defendants were authoritative figures in the automotive industry and were trusted by Plaintiffs and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiffs' trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiffs and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft

Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiffs, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiffs and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1085.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1086.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiffs into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with

236

advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiffs to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1087.   Plaintiffs could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1088.   Plaintiffs justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1089.   If Plaintiffs had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1090.   If the Plaintiffs and Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1091.   Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1092.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 7. California Count 7: Unjust Enrichment Against All Defendants

1093. California Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1094. California Plaintiffs bring this count individually and on behalf of the other members of the California Subclass.

1095. For purposes of this count, the California Subclass Members shall be referred to as "Class Members."

1096. When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1097. Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1098. Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1099. It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1100. Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the

position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1101.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1102.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**D.     Colorado Counts**

> **1.     Colorado Count 1: Breach of Implied Warranty of Merchantability (Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212) Against Defendants**

1103.   Colorado Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1104.   Colorado Plaintiffs bring this count individually and on behalf of the other members of the Colorado Class.

1105.   For purposes of this count, the Colorado Class Members shall be referred to as "Class Members."

1106. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.

1107. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

1108. With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

1109. All Class Members who purchased Class Vehicles in Colorado are "buyers" within the meaning of Colo. Rev. Stat. § 4-2-103(1)(a).

1110. All Class Members who leased Class Vehicles in Colorado are "lessees" within the meaning of Colo. Rev. Stat. § 4-2.5-103(1)(p).

1111. The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

1112. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1113.  However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1114.  Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1115.  Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class

Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1116.   Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 23, 2024, Class Members sent notice letters to them.

1117.   Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1118.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

### 2.   Colorado Count 2: Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, et seq.) Against All Defendants

1119.   Colorado Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1120.   Colorado Plaintiffs bring this count individually and on behalf of the other members of the Colorado Class.

1121.   For purposes of this count, the Colorado Class Members shall be referred to as "Class Members."

1122.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

1123.   The Class Vehicles are "Motor vehicles" within the meaning of Colo. Rev. Stat. § 6-1-102(5.5).

1124.   The Colorado Consumer Protection Act ("Colorado CPA") prohibits unfair, unconscionable, and deceptive acts or practices in the course of the person's business, vocation, or occupation. Colo. Rev. Stat. § 6-1-105.

1125.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Colorado CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of the Class Vehicles, and the Anti-Theft Security Defect, as detailed above.

1126.   Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the Colorado DTPA in the course of their business. Specifically, Defendants owed Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

(a)   Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)   Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle

components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)      Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)      Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1127.   As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1128.   By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Colo. Rev. Stat. § 6-1-105:

(a)      knowingly or recklessly making a false representation as to the approval, or certification of the Class Vehicles;

244

(b)      knowingly or recklessly making a false representation as to the characteristics, uses, benefits, and false representations of the Class Vehicles;

(c)      representing that the Class Vehicles are of a particular standard, qualify, or grade when they are not;

(d)      Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

(e)      Engaging in the other unconscionable, false, misleading, or deceptive acts or practices pertaining to the Class Vehicles "actionable at common law or under other statutes of [Colorado]."

Colo. Rev. Stat. §§ 6-1-105(1)(b), (e), (g), (i), and (3).

1129.   Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1130.   Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1131.   Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as

Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1132.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1133.   Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1134.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1135.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1136.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs and the Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Colorado CPA.

### 3.      Colorado Count 3: Fraud by Omission and Concealment Against All Defendants

1137.   Colorado Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1138.   Colorado Plaintiffs bring this count individually and on behalf of the other members of the Colorado Class.

1139.   For purposes of this count, the Colorado Class Members shall be referred to as "Class Members."

1140.   Defendants intentionally concealed from Plaintiffs the existence of the Anti-Theft Security Defect in the Class Vehicles.

1141.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiffs because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiffs and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1142.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs as set forth herein and based upon the following reasons:

(a)      Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)      Defendants were authoritative figures in the automotive industry and were trusted by Plaintiffs and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public

concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiffs' trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiffs and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiffs, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiffs and Class Members were only

privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1143. The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1144. Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiffs into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiffs to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1145.   Plaintiffs could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1146.   Plaintiffs justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1147.   If Plaintiffs had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1148.   If the Plaintiffs and Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1149.   Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1150.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.      Colorado Count 4: Unjust Enrichment Against All Defendants

1151.   Colorado Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1152.   Colorado Plaintiffs bring this count individually and on behalf of the other members of the Colorado Class.

1153.   For purposes of this count, the Colorado Class Members shall be referred to as "Class Members."

1154.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1155.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1156.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1157.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1158.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1159.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class

Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1160. Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

## E.    Delaware Counts

### 1.    Delaware Count 1: Violation of the Delaware Consumer Fraud Act (6 Del. Code § 2511, et seq.) Against All Defendants

1161. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1162. Plaintiffs bring this count individually and on behalf of the other members of the Delaware Class.

1163. For purposes of this count, the Delaware Class Members shall be referred to as "Class Members."

1164. Defendants, Plaintiffs, and Class Members are "persons" within the meaning of 6 Del. Code § 2511(7) and § 2531(5).

1165. The Delaware Consumer Fraud Act ("Delaware CFA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

1166.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Delaware CFA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1167.   Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the CFA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

(a)    Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

(b)    Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own.

(c)    Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)    Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to

the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1168.    As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1169.    Defendants engaged in one or more of the following unlawful acts or practices prohibited by 6 Del. Code § 2513(a): using or employing deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of a material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1170.    Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1171.    Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1172.   Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1173.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1174.   Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1175.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1176.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1177.   Plaintiffs and Class Members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive or treble damages, and any other just and proper relief available under the Delaware CFA and DTPA (6 Del. Code §§ 2525).

**2.      Delaware Count 2: Violation of the Delaware Deceptive Trade Practices Act (6 Del. Code § 2531, et seq.) Against All Defendants**

1178.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1179.   Plaintiffs bring this count individually and on behalf of the other members of the Delaware Class.

1180.   For purposes of this count, the Delaware Class Members shall be referred to as "Class Members."

1181.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of 6 Del. Code § 2531(5).

1182.   The Delaware Deceptive Trade Practices Act ("Delaware DTPA") makes it unlawful to engage in a deceptive trade practice in the course of a business." 6 Del. Code § 2532(a).

1183.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Delaware DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1184.   Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the DTPA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

(a)    Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)    Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)    Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)    Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1185. As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1186.   By misrepresenting the Class Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants also engaged in one or more of the following deceptive trade practices enumerated by the Delaware Deceptive Trade Practices Act at 6 Del. Code § 2532:

      (a)     Causing likelihood of confusion or misunderstanding as to the approval or certification of the Class Vehicles;

      (b)     Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      (c)     Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

      (d)     Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

      (e)     engaging in any other conduct which created a likelihood of confusion or of misunderstanding.

1187.   6 Del. Code § 2532 (2), (5), (7), (9), and (12).

1188.   Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1189.   Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and

Class Members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1190. Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1191. Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1192. Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1193. Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1194. Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1195. Plaintiffs and Class Members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive or treble damages, and any other just and proper relief available under the Delaware CFA and DTPA (6 Del. Code § 2533).

3. **Delaware Count 3: Fraud by Omission and Concealment Against All Defendants**

1196. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1197. Plaintiffs bring this count individually and on behalf of the other members of the Delaware Class.

1198. For purposes of this count, the Delaware Class Members shall be referred to as "Class Members."

1199. Defendants were aware of the Anti-Theft Security Defect when they marketed and sold the Class Vehicles to Plaintiffs and Class Members.

1200. Having been aware of the Anti-Theft Security Defect within the Class Vehicles, and having known that Plaintiffs and Class Members could not have reasonably been expected to know of the Anti-Theft Security Defect, Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs and Class Members in connection with the sale of the Class Vehicles. Defendants further had a duty to disclose the Anti-Theft Security Defect because:

(a) Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b) Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle

components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)     Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)     Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1201.   In breach of their duties, Defendants failed to disclose the Anti-Theft Security Defect to Plaintiffs and Class Members in connection with the sale of the Class Vehicles.

1202.   For the reasons set forth above, the Anti-Theft Security Defect within the Class Vehicles is material to the sale of the Class Vehicles because a reasonable person would find it important in purchasing, leasing, or retaining a new or used motor vehicle and because it directly impacts the value of the Class Vehicles purchased or leased by the Plaintiffs and Class Members.

1203.   Defendants intended for the Plaintiffs and Class Members to rely on their omissions and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they

paid believing that their vehicles would not have an Anti-Theft Security Defect that would affect the quality, reliability, and safety of the Class Vehicles.

1204.   Plaintiffs and Class Members' reliance was reasonable, as they had no way of discerning that learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1205.   Defendants actively concealed and suppressed these material facts, in whole or in part, to maintain a market for the Class Vehicles, to protect profits, and to avoid costly recalls that would expose them to liability for those expenses and harm the commercial reputations of Defendants and their products. They did so at the expense of Plaintiffs and Class Members.

1206.   If Defendants had fully and adequately disclosed the Anti-Theft Security Defect to consumers, Plaintiffs and Class Members would have seen such a disclosure.

1207.   Through their omissions and concealment with respect to the Anti-Theft Security Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiffs and Class Members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

1208.   Had Plaintiffs and Class Members known of the Anti-Theft Security Defect within the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

1209.   As a direct and proximate result of Defendants' omissions, Plaintiffs and other Class Members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Anti-Theft Security Defect had been disclosed to them. Accordingly, Defendants are liable to Plaintiffs and Class Members for their damages in an amount to be proven at trial.

1210.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the Plaintiffs' and Class Members' rights and well-being; and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages, as permitted by law, in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### 4.      Delaware Count 4: Unjust Enrichment Against All Defendants

1211.   Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1212.   Plaintiffs bring this count individually and on behalf of the other members of the Delaware Class.

1213.   For purposes of this count, the Delaware Class Members shall be referred to as "Class Members."

1214.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1215.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1216.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1217.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1218.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1219.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1220.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**F.      Florida Counts:**

### 1.      Florida Count 1: Breach of Implied Warranty of Merchantability (Fla. Stat. §§ 672.314 and 680.212) Against Defendants

1221.   Florida Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1222.   Florida Plaintiffs bring this count individually and on behalf of the other members of the Florida Class.

264

1223.   For purposes of this count, the Florida Class Members shall be referred to as "Class Members."

1224.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Fla. Stat. §§ 672.314 and 680.212.

1225.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

1226.   Defendants are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

1227.   All Class Members who purchased Class Vehicles in Florida are "buyers" within the meaning of Fla. Stat. §§ 672.103(1)(a).

1228.   All Class Members who leased Class Vehicles in Florida are "lessees" within the meaning of Fla. Stat. § 680.1031(1)(n).

1229.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

1230.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an

abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1231.   However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1232.   Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1233.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek

alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1234. Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 23, 2024, Class Members sent notice letters to them.

1235. Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1236. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

### 2. Florida Count 2: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

1237. Florida Plaintiffs incorporates all foregoing paragraphs as though fully set forth herein.

1238. Florida Plaintiffs bring this cause of action as an individual and on behalf of the

members of the Florida Subclass.

1239. Plaintiff and Class Members are "consumers" under Fla. Stat. § 501.203(7).

1240. Defendants are engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8).

1241. The Florida Deceptive and Unfair Trade Practices Act prohibits unfair competition, as well as unconscionable, deceptive, or unfair acts in trade or commerce. Fla. Stat. § 501.204(1).

1242. Defendants violated the Florida Deceptive and Unfair Trade Practices Act by making false representations, concealing, omitting, or failing to disclose essential facts related to the Class Vehicles' security, safety, and the presence of the Anti-Theft Security Defect.

1243. Defendants owed a duty to disclose all material facts regarding the Anti-Theft Security Defect because of their exclusive knowledge of the issues, which were unknown to Plaintiff or Class Members, and their extent was not discoverable by reasonable means. The Class Vehicles sold by Defendants are technically complex and only Defendants are in a position to understand the safety implications and the effects of partial disclosures regarding vehicle safety—disclosures that misleadingly omitted information about the defects.

1244. Such actions by Defendants—including failing to disclose the Anti-Theft Security Defect while marketing the Class Vehicles as safe—constitute unfair and deceptive trade practices under Fla. Stat. § 501.204(1).

1245. Defendants designed their business practices to induce reliance on their representations, intending to mislead consumers about the adequacy of anti-theft measures and the nonexistence of the Anti-Theft Security Defect. The deceptive conduct materially influenced Plaintiff and Class Members' purchasing decisions, causing them to believe the vehicles were safe and free from defects.

1246.   The reliance of Plaintiffs and Class Members on Defendants' misrepresentations was reasonable and justified, as there was no way for them to fully detect the falsehood or discover the defects independently. Awareness of the truthful state of the Defect would have deterred Plaintiff and the Class from purchasing or would have significantly reduced the transaction price. Therefore, Plaintiff and Class Members suffered damages due to Defendants' breaches of the Florida Deceptive and Unfair Trade Practices Act.

### 3.   Florida Count 3: Fraudulent Concealment

1247.   Florida Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1248.   Florida Plaintiffs bring this cause of action as an individual and on behalf of the members of the Florida Subclass.

1249.   Defendants intentionally concealed from Plaintiff the existence of the Anti-Theft Security Defect in the Class Vehicles.

1250.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiff because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiff and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1251.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiff as set forth herein and based upon the following reasons:

> (a)   Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

> (b)   Defendants were authoritative figures in the automotive industry and were

269

trusted by Plaintiff and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiff's trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiff and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiff, or Class Members. These statistics, meticulously

collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiff and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1252. The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1253. Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiff and Class Members into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiff and Class Members to underestimate

the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1254.   Plaintiff and Class Members could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1255.   Plaintiff and Class Members justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1256.   If Plaintiff and Class Members had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1257.   If the Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1258.   Defendants' omissions damaged Plaintiff and Class Members because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1259.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.      Florida Count 4: Unjust Enrichment

1260.   Florida Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1261.   Florida Plaintiffs bring this count individually and on behalf of the other members of the Florida Class.

1262.   For purposes of this count, the Florida Class Members shall be referred to as "Class Members."

1263.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1264.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1265.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1266.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1267.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1268.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1269.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**G.      Georgia Counts:**

**1.      Georgia Count 1: Breach of Implied Warranty (Ga. Code. Ann. §§ 11-2-314 and 11-2A-212) Against Defendants**

1270.   Georgia Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1271.   Georgia Plaintiffs bring this cause of action as individuals and on behalf of the members of the Georgia Subclass.

1272.   Defendants were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

1273.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

1274.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

1275.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

1276.   Georgia law implies a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used.

1277.   Therefore, Defendants provided Plaintiffs and Georgia Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1278.   In violation of the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with secure, safe, and high-quality transportation. The Class Vehicles suffer from the Anti-Theft Security Defect, as alleged herein, and Defendants knew of its existence at the time the Class Vehicles were sold or leased.

1279.   The Class Vehicles' Anti-Theft Security Defect was present when the vehicles left Defendants' control. The Anti-Theft Security Defect results from Defendants' actions and decisions and was not created by subsequent events. Therefore, the Class Vehicles were not merchantable at the time of sale.

1280.   Plaintiffs and members of the Georgia Subclass have complied with all obligations under the warranty or have otherwise been excused from the performance of obligations because of Defendants' acts and omissions described herein.

1281.   Plaintiffs and members of the Georgia Subclass were not required to notify

Defendants of the breach because affording Defendants additional opportunities to cure its breach would be futile. Defendants are on notice of the Anti-Theft Security Defect from complaints and requests they have received from Class Members, and complaints and reports they have received through other channels, including their monitoring and subsequent investigations of stolen Class Vehicles.

1282.   Plaintiffs and the Georgia Subclass have suffered damages, and continue to suffer damages, resulting from the purchase of defective vehicles from Defendants as described herein.

> **2.      Georgia Count 2: Violation of the Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq.***

1283.   Georgia Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1284.   Georgia Plaintiffs bring this cause of action as an individual and on behalf of the members of the Georgia Subclass.

1285.   Plaintiffs, Class Members, and Defendants are all "persons" under the Georgia Uniform Deceptive Trade Practices Act.

1286.   The Georgia Uniform Deceptive Trade Practices Act prohibits businesses from engaging in deceptive conduct, including the misrepresentation of goods or services and actions that lead to consumer confusion or misunderstanding. *See* Ga. Code Ann. § 10-1-372(a).

1287.   Defendants breached the Georgia Uniform Deceptive Trade Practices Act through willful misrepresentation, nondisclosure, and concealment of crucial information concerning the quality, security, and safety of Class Vehicles.

1288.   Defendants bore the responsibility of full disclosure to Plaintiffs and Class Members due to their unique and advanced knowledge of the Anti-Theft Security Defect—a duty amplified by the Defect's concealed nature and technical complexity. Defendants willfully omitted

vital information regarding this Defect in their marketing, even though such facts were material to the Class Members' decisions to buy or lease the Class Vehicles, thereby violating their duty of disclosure.

1289.   As alleged herein, Defendants were well aware of the Anti-Theft Security Defect at the point of advertising and selling the Class Vehicles—a conscious strategy to prompt consumer purchases.

1290.   These deceptive acts were orchestrated to mislead, thereby forming a pattern of deceptive practices, creating and perpetuating misconceptions amongst consumers regarding the Class Vehicles' safety and defect-free nature. Defendants' actions materially influenced Plaintiffs' and Class Members' reliance on the misrepresented safety and security in their purchase and lease decisions.

1291.   Had the truth about the Anti-Theft Security Defect been disclosed, Plaintiffs and Class Members would have refrained from purchasing or leasing or would have negotiated a significantly reduced price for the Class Vehicles.

1292.   The reliance of Plaintiffs and Class Members on Defendants' misrepresentations was reasonable and justified, as there was no way for them to fully detect the falsehood or discover the defects independently. Awareness of the truthful state of the Defect would have deterred Plaintiff and the Class from purchasing or would have significantly reduced the transaction price. Therefore, Plaintiff and Class Members suffered damages due to Defendants' breaches of the Georgia Uniform Deceptive Trade Practices Act.

1293.   Pursuant to Ga. Code. Ann § 10-1-373, Plaintiff and the Georgia Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia UDTPA.

3.      **Georgia Count 3: Violation of the Georgia Fair Business Practices Act (Ga. Code Ann. § § 10-1-390, et seq.) Against All Defendants**

1294.   Georgia Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1295.   Georgia Plaintiffs bring this count individually and on behalf of the other members of the Georgia Subclass.

1296.   For purposes of this count, the Georgia Subclass Members shall be referred to as "Class Members."

1297.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code. Ann. § 10-1-393(a).

1298.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Georgia FBPA.

1299.   As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which were intended to induce consumers to purchase the Class Vehicles.

1300.   By misrepresenting the Class Vehicles as safe, reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices in violation of the Georgia UTPA:

(a)      Causing likelihood of confusion or misunderstanding as to the approval or certification of the Class Vehicles;

(b)      Representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

278

(c)     Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and

(d)     Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

Ga. Code. Ann. § 10-1-393(b).

1301.   Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1302.   Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did. in fact, deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1303.   Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1304.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1305.   Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1306.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1307.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1308.   On August 23, 2024, Class Members sent Defendants notice of the Anti-Theft Security Defect. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, internet videos, news reports, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct, Plaintiffs seek all damages and relief to which Class Members are entitled.

1309.   Alternatively, providing notice to Defendants and an opportunity to cure the breach prior to filing suit would have been futile. As alleged above, Defendants have long known that the

Class Vehicles contained the Anti-Theft Security Defect, however, did nothing to remedy the Anti-Theft Security Defect.

1310. Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiffs and the Georgia Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Georgia FBPA.

### 4. Georgia Count 4: Fraud by Omission and Concealment

1311. Georgia Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1312. Georgia Plaintiffs bring this cause of action as an individual and on behalf of the members of the Georgia Subclass.

1313. Defendants intentionally concealed from Plaintiff the existence of the Anti-Theft Security Defect in the Class Vehicles.

1314. The existence of the Anti-Theft Security Defect was a material fact to Plaintiff because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiff and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1315. Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiff as set forth herein and based upon the following reasons:

> (a) Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

> (b) Defendants were authoritative figures in the automotive industry and were trusted by Plaintiff and Class Members. Defendants abused that trust to induce a

281

false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiff's trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiff and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiff, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the

theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiff and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1316.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1317.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiff and Class Members into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiff and Class Members to underestimate the risk of theft and the need for additional security measures; (g) received continuous security

updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1318.   Plaintiff and Class Members could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1319.   Plaintiff and Class Members justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1320.   If Plaintiff and Class Members had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1321.   If the Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent theft.

1322.   Defendants' omissions damaged Plaintiff and Class Members because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1323.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 5.      Georgia Count 5: Unjust Enrichment Against All Defendants

1324.   Georgia Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1325.   Georgia Plaintiffs bring this count individually and on behalf of the other members of the Georgia Subclass.

1326.   For purposes of this count, the Georgia Subclass Members shall be referred to as "Class Members."

1327.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1328.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1329.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1330.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1331.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1332.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining

Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1333.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**H.     Illinois Counts:**

**1.     Illinois Count 1: Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A**

1334.   The Illinois Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1335.   Plaintiffs bring this cause of action as individuals and on behalf of the members of the Illinois Subclass.

1336.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("Illinois Consumer Fraud Act"), is to prohibit unfair or deceptive business practices that harm consumers. This prohibition includes "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

1337.   Defendants are "persons" as defined in 815 ILCS 505/1(c).

1338.   Illinois Plaintiffs and the Illinois Subclass are "consumers" as defined in 815 ILCS 505/1(e).

1339.   Defendants engaged in deceptive practices that violate the Illinois Consumer Fraud Act, as described throughout this complaint. Defendants failed to disclose the Anti-Theft Security Defect, concealed the Anti-Theft Security Defect, and marketed their vehicles as safe, secure, and of high quality.

1340.   Defendants engaged in unfair or deceptive practices prohibited by the Illinois Consumer Fraud Act by intentionally and systematically devaluing security and concealing the Anti-Theft Security Defect.

1341.   Defendants intended for Plaintiffs and members of the Illinois Subclass to rely on representations made by Defendants in their methods of competition and unfair, deceptive acts.

1342.   Defendants knew or should have known that the Class Vehicles suffered from defective security systems.

1343.   Defendants knew or should have known that their conduct violated the Illinois Consumer Fraud Act.

1344.   Defendants' deception happened in the course of trade or commerce as the deceptive practices described throughout this Complaint occurred in relation to the sale and marketing of Class Vehicles.

1345.   Had Illinois Plaintiffs and the Illinois Subclass members known about the seriousness of the Anti-Theft Security Defect in Class Vehicles, they would not have purchased or leased the vehicles or would have paid less for them. Plaintiffs did not receive the benefit of the bargain because of Defendants' actions. Defendants' deceptive practices damaged plaintiffs and the Illinois Subclass.

## 2. Illinois Count 2: Breach of Implied Warranty, 810 ILCS §§ 5/2-314 and 5/2A-212

1346. Illinois Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1347. Illinois Plaintiffs bring this cause of action as individuals and on behalf of the members of the Illinois Subclass.

1348. Defendants are "merchants" with respect to the Class Vehicles under 810 ILCS §§ 5/2-104(1) and 5/2A103(3) and "sellers" of Class Vehicles under § 5/2-103(1)(d).

1349. The Class Vehicles are, and were at all relevant times, "goods" under 810 ILCS §§ 5/2-105(1) and 5/2A-103(1)(h).

1350. Illinois law implies a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used.

1351. Therefore, Defendants provided Plaintiffs and Illinois Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1352. In violation of the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with secure, safe, and high-quality transportation. The Class Vehicles suffer from the Anti-Theft Security Defect, as alleged herein, and Defendants knew of its existence at the time the Class Vehicles were sold or leased.

1353. The Class Vehicles' Anti-Theft Security Defect was present when the vehicles left Defendants' control. The Anti-Theft Security Defect resulted from Defendants' actions and decisions and was not created by subsequent events. Therefore, the Class Vehicles were not merchantable at the time of sale.

1354.   Plaintiffs and members of the Illinois Subclass have complied with all obligations under the warranty or have otherwise been excused from the performance of obligations because of Defendants' acts and omissions described herein.

1355.   Plaintiffs and members of the Illinois Subclass were not required to notify Defendants of the breach because affording Defendants additional opportunities to cure its breach would be futile. Defendants are on notice of the Anti-Theft Security Defect from complaints and requests they have received from Class Members, and complaints and reports they have received through other channels, including their monitoring and subsequent investigations of stolen Class Vehicles.

1356.   Plaintiffs and the Illinois Subclass have suffered damages, and continue to suffer damages, resulting from the purchase of defective vehicles from Defendants as described herein.

### 3.      Illinois Count 3: Fraudulent Inducement

1357.   Illinois Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1358.   Illinois Plaintiffs bring this cause of action as individuals and on behalf of the members of the Illinois Subclass.

1359.   Defendants intentionally misrepresented the quality of Class Vehicles and concealed the Anti-Theft Security Defect that makes Class Vehicles easy to steal, unsafe, and worth less than they would be if they did not have the defect.

1360.   As explained herein, Defendants represented, through omissions and misrepresentations, that the Class Vehicles were free of significant defects, that the Class Vehicles were secure, and that the Class Vehicles would operate properly.

1361.   The Class Vehicles purchased by Plaintiffs and Class Members all have defective starting systems.

1362.   At all relevant times, the Defendants have held out the Class Vehicles to be free from defects. Defendants market the Class Vehicles as safe and high quality. At the same time, Defendants have failed to disclose critical information regarding the Anti-Theft Security Defect.

1363.   Defendants' misrepresentations and omissions about the Class Vehicles are material as they affect the value of each vehicle.

1364.   Defendants made these misrepresentations and omissions for the purpose of inducing reliance by consumers.

1365.   Defendants know and have known the falsity of their representations about the quality, dependability, safety, and security of the Class Vehicles. The full depth of information about the Anti-Theft Security Defect in Class Vehicles is only within the possession and control of Defendants. Plaintiffs do not have access to these facts and Defendants have concealed this information from Class Members.

1366.   Plaintiffs and Class Members did reasonably rely on Defendants' representations and omissions. Defendants are best positioned to explain the quality, dependability, safety, and security of the vehicles they sell.

1367.   Defendants' misrepresentations and omissions damaged Plaintiffs because they purchased cars with defective security systems that were defective, unsafe, easily stolen, and diminished in value.

1368.   Defendants committed this fraud intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.      Illinois Count 4: Fraudulent Concealment

1369.   Illinois Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1370.   Illinois Plaintiffs bring this cause of action as individuals and on behalf of the members of the Illinois Subclass.

1371.   Defendants intentionally concealed from Plaintiffs the existence of the Anti-Theft Security Defect in the Class Vehicles.

1372.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiffs because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiffs and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1373.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs as set forth herein and based upon the following reasons:

(a)     Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)     Defendants were authoritative figures in the automotive industry and were trusted by Plaintiffs and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiffs' trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiffs and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiffs, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiffs and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1374.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1375.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiffs into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiffs to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1376.   Plaintiffs could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1377.   Plaintiffs justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1378.   If Plaintiffs had known of the Anti-Theft Security Defect at the time they purchased

or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1379. If the Plaintiffs whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1380. Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1381. Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 5.      Illinois Count 5: Unjust Enrichment Against All Defendants

1382. Illinois Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1383. Illinois Plaintiffs bring this count individually and on behalf of the other members of the Arkansas Class.

1384. For purposes of this count, the Illinois Class Members shall be referred to as "Class Members."

1385. Defendants were aware of the Anti-Theft Security Defect when they marketed and sold the Class Vehicles to Plaintiffs and Class Members.

1386. When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1387. Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at

the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1388.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1389.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1390.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1391.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1392.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal

remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

## I.      Indiana Counts:

### 1.      Indiana Count 1: Breach of the Indiana Implied Warranty of Merchantability Code §§ 26-1-2-314 and 26-1-2.1-212, *et seq.*

1393.   Indiana Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1394.   Indiana Plaintiffs bring this cause of action as individuals and on behalf of the members of the Indiana Subclass.

1395.   Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1396.   Defendants are "merchants" with respect to the Class Vehicles under Ind. Code §§ 26-1-2.1-103(3) and 26-1-2-104(1), and are "sellers" of motor vehicles under § 26-1-2-103(1)(d)

1397.   The Class Vehicles are, and were at all relevant times, "goods" under 810 ILCS §§ 5/2-105(1) and 5/2A-103(1)(h).

1398.   Indiana law implies a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used.

1399.   Therefore, Defendants provided Plaintiffs and Indiana Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1400.   In violation of the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with secure, safe, and high-quality transportation. The Class Vehicles suffer from the Anti-Theft Security Defect, as alleged herein, and Defendants knew of its existence at the time the Class Vehicles were sold or leased.

1401.   The Class Vehicles' safety defects were present when the vehicles left Defendants' control. The defects result from Defendants' actions and decisions and were not created by subsequent events. Therefore, the Class Vehicles were not merchantable at the time of sale.

1402.   Plaintiffs and members of the Indiana Subclass have complied with all obligations under the warranty or have otherwise been excused from the performance of obligations because of Defendants' acts and omissions described herein.

1403.   Plaintiffs and members of the Indiana Subclass were not required to notify Defendants of the breach because affording Defendants additional opportunities to cure its breach would be futile. Defendants are on notice of the Anti-Theft Security Defect from complaints and requests they have received from Class Members, and complaints and reports they have received through other channels, including their monitoring and subsequent investigations of stolen Class Vehicles.

1404.   Plaintiffs and the Indiana Subclass have suffered damages, and continue to suffer damages, resulting from the purchase of defective vehicles from Defendants as described herein.

### 2.      Indiana Count 2: Violation of the Indiana Deceptive Consumer Sales Act (Ind. Code § 24-5-0.5-1, et seq.) Against All Defendants

1405.   Indiana Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1406.   Plaintiffs bring this count individually and on behalf of the other members of the Indiana Class.

1407.   For purposes of this count, the Indiana Class Members shall be referred to as "Class Members."

1408.   Defendants are "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

1409.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of

Ind. Code § 24-5-0.5-2(a)(2).

1410. Defendants were and are engaged in "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

1411. The Class Vehicles were the "subject of a consumer transaction" within the meaning of Ind. Code §24-5-0.5-2(a)(4).

1412. The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a supplier from committing an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a).

1413. In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Indiana DCSA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1414. Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the Indiana DCSA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

(a)     Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)     Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)      Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)      Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1415.   As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1416.   By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose and actively concealing the dangers and risks posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Ind. Code § 24-5-0.5-3:

(a)      Representing that the Class Vehicles have approval, performance, characteristics, accessories, uses, or benefits that they do not have;

(b)      Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and

(c)     Advertising the Class Vehicles can be purchased as advertised if the supplier does not intend to sell them as advertised.

Ind. Code §§ 24-5-0.5-3(b)(1), (2), and (11).

1417.   Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1418.   Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1419.   Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1420.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class

Members did not, and could not, unravel Defendants' deception on their own.

1421.   Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1422.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1423.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1424.   On August 23, 2024, Class Members sent Defendants notice of the Anti-Theft Security Defect. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, internet videos, news reports, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct, Plaintiffs seek all damages and relief to which Class Members are entitled.

1425.   Alternatively, providing notice to Defendants and an opportunity to cure the breach prior to filing suit would have been futile. As alleged above, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect, however, did nothing to remedy the Anti-Theft Security Defect.

1426.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs and Class Members seek an order

enjoining Defendants' unfair or deceptive acts or practices and awarding damages, treble damages, and any other just and proper relief available under the Indiana DCSA.

### 3.     Indiana Count 2: Constructive Fraud

1427.   Indiana Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1428.   Indiana Plaintiffs bring this cause of action as individuals and on behalf of the members of the Indiana Subclass.

1429.   Defendants intentionally concealed from Plaintiffs the existence of the Anti-Theft Security Defect in the Class Vehicles.

1430.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiffs because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiffs and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1431.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs as set forth herein and based upon the following reasons:

(a)     Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)     Defendants were authoritative figures in the automotive industry and were trusted by Plaintiffs and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants'

manipulation of Plaintiffs' trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)      Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)      The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiffs and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)      Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiffs, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiffs and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle

thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1432.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1433.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiffs into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiffs to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1434.   Plaintiffs could not have discovered the Anti-Theft Security Defect through

reasonable inquiry or inspection due to its technical nature.

1435.   Plaintiffs justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1436.   If Plaintiffs had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1437.   If the Plaintiffs and Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1438.   Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1439.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

**4.       Indiana Count 4: Unjust Enrichment Against All Defendants**

1440.   Indiana Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1441.   Plaintiffs bring this count individually and on behalf of the other members of the Indiana Class.

1442.   For purposes of this count, the Indiana Class Members shall be referred to as "Class Members."

1443.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1444.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1445.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1446.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1447.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1448.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**J.     Maryland Counts:**

      **1.     Maryland Count 1: Breach of Implied Warranty of Merchantability (Md. Code Com. Law §§ 2-314 and 2A-212) Against Defendants**

1449.   Maryland Plaintiffs reallege and incorporate by reference all preceding allegations

as though fully set forth herein.

1450.   Maryland Plaintiffs bring this count individually and on behalf of the other members of the  Maryland Class.

1451.   For purposes of this count, the Maryland Class Members shall be referred to as "Class Members."

1452.   For purposes of this count, Defendants together shall be referred to as "Defendants."

1453.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles Md. Code Com. Law §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

1454.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Md. Code. Com. Law § 2A-103(1)(p).

1455.   All Class Members who purchased Class Vehicles in Maryland are "buyers" within the meaning of Md. Code. Com. Law § 2-103(1)(a).

1456.   All Class Members who leased Class Vehicles in Maryland are "lessees" within the meaning of Md. Code. Com. Law § 2A-103(1)(n).

1457.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code. Com. Law §§ 2-105(1) and 2A-103(1)(h).

1458.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Md. Code Com. Law §§ 2-314 and 2A-212.

1459.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with

an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1460. However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1461. Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed

between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1462.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1463.   Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 23, 2024, Class Members sent notice letters to them.

1464.   Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1465.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

    **2.**    **Maryland Count 2: Violation of the Maryland Consumer Protection Act, Md. Code, Com. Law § 13-101, *et seq*.**

1466.   Maryland Plaintiff Garrett Pfeifer incorporates all foregoing paragraphs as though fully set forth herein.

1467.   Maryland Plaintiff brings this cause of action as an individual and on behalf of the members of the Maryland Subclass.

1468.   Plaintiff is a "consumer" as defined by Md. Code, Com. Law, § 13-101(c).

1469.   Class Vehicles are "merchandise" as defined by Md. Code, Com. Law, § 13-101(f).

1470.   Plaintiff, Defendants, and Class Members constitute "persons" as defined by Md. Code, Com. Law, § 13-101(h).

1471.   The Maryland Consumer Protection Act, provides that "[a] person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division." Md. Code, Com. Law, § 13-303.

1472.   Section 13-301 defines "unfair, abusive or deceptive trade practices." Id. at § 13-301.

1473.   Defendants breached the Maryland Consumer Protection Act through willful misrepresentation, nondisclosure, and concealment of material information concerning the quality, security, and safety of Class Vehicles.

1474.   Defendants had the duty of full disclosure to Plaintiffs and Class Members due to their unique and advanced knowledge of the Anti-Theft Security Defect—a duty amplified by the Defect's concealed nature and technical complexity. Defendants willfully omitted vital information regarding this Defect in their marketing, even though such facts were material to the Class Members' decisions to buy or lease the Class Vehicles, thereby violating their duty of disclosure.

1475.   As alleged herein, Defendants were well aware of the Anti-Theft Security Defect at the point of advertising and selling the Class Vehicles—a conscious strategy to prompt consumer purchases.

1476.   These deceptive acts were orchestrated to mislead, thereby forming a pattern of deceptive practices, creating and perpetuating misconceptions amongst consumers regarding the Class Vehicles' safety and defect-free nature. Defendants' actions materially influenced Plaintiffs' and Class Members' reliance on the misrepresented safety and security in their purchase and lease decisions.

1477.   Had the truth about the Anti-Theft Security Defect been disclosed, Plaintiffs and Class Members would have refrained from purchasing or leasing or would have negotiated a significantly reduced price for the Class Vehicles.

1478.   The reliance of Plaintiffs and Class Members on Defendants' misrepresentations was reasonable and justified, as there was no way for them to fully detect the falsehood or discover the defects independently. Awareness of the truthful state of the Defect would have deterred Plaintiff and the Class from purchasing or would have significantly reduced the transaction price. Therefore, Plaintiff and Class Members suffered damages due to Defendants' breaches of the Maryland Consumer Protection Act.

### 3.   Maryland Count 3: Fraudulent Concealment

1479.   Maryland Plaintiff Garrett Pfeifer incorporates all foregoing paragraphs as though fully set forth herein.

1480.   Maryland Plaintiff brings this cause of action as an individual and on behalf of the members of the Maryland Subclass.

1481.   Defendants intentionally concealed from Plaintiff the existence of the Anti-Theft Security Defect in the Class Vehicles.

1482.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiff because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiff and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1483.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiff as set forth herein and based upon the following reasons:

(a)      Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)      Defendants were authoritative figures in the automotive industry and were trusted by Plaintiff and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiff's trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)      Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiff and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiff, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiff and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1484.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing

the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1485.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiff and Class Members into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiff and Class Members to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1486.   Plaintiff and Class Members could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1487.   Plaintiff and Class Members justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1488.   If Plaintiff and Class Members had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1489.   If the Class Members whose vehicles were stolen had been aware of the Anti-Theft

Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1490. Defendants' omissions damaged Plaintiff and Class Members because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1491. Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.    Maryland Count 4: Unjust Enrichment Against All Defendants

1492. Maryland Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1493. Maryland Plaintiffs bring this count individually and on behalf of the other members of the Maryland Class.

1494. For purposes of this count, the Maryland Class Members shall be referred to as "Class Members."

1495. When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1496. Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1497. Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew

of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1498.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1499.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1500.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**K.   Michigan Counts:**

### 1.   Michigan Count 1: Breach of Implied Warranty of Merchantability (Mich. Comp. Laws §§ 440.2314 and 440.2862) Against Defendants

1501.   Michigan Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1502.   Michigan Plaintiffs bring this count individually and on behalf of the other members of the  Michigan Class.

1503.   For purposes of this count, the Michigan Class Members shall be referred to as "Class Members."

1504.   For   purposes   of   this   count,   Defendants   together   shall   be   referred   to   as

316

"Defendants."

1505. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

1506. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and 440.2803(3), and "sellers" of motor vehicles under § 440.2103(1)(c).

1507. Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

1508. All Class Members who purchased Class Vehicles in Michigan are "buyers" within the meaning of Mich. Comp. Laws § 440.2103(1)(a).

1509. All Class Members who leased Class Vehicles in Michigan are "lessees" within the meaning of Mich. Comp. Laws § 440.2803(1)(n).

1510. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 4400.2803(1)(h).

1511. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1512.   However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1513.   Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1514.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use

the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

### 2.    Michigan Count 2: Silent Fraud

1515.   Michigan Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1516.   Michigan Plaintiffs bring this cause of action as individuals and on behalf of the members of the Michigan Subclass.

1517.   Defendants intentionally concealed from Plaintiffs the existence of the Anti-Theft Security Defect in the Class Vehicles.

1518.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiffs because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiffs and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1519.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs as set forth herein and based upon the following reasons:

(a)    Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)    Defendants were authoritative figures in the automotive industry and were trusted by Plaintiffs and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiffs' trust. By emphasizing their commitment to the security

319

of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiffs and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiffs, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiffs and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such

320

snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1520. The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1521. Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiffs into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiffs to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1522. Plaintiffs could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1523. Plaintiffs justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1524. If Plaintiffs had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1525. If the Plaintiffs and Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1526. Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1527. Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 3. Michigan Count 3: Unjust Enrichment Against All Defendants

1528. Michigan Plaintiffs reallege and incorporate by reference all allegations in Sections I-IV as if fully set forth herein.

1529. Plaintiffs bring this count individually and on behalf of the other members of the Michigan Class.

1530. For purposes of this count, the Michigan Class Members shall be referred to as "Class Members."

1531. When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1532. Plaintiffs and Class Members would not have purchased or leased their Class

Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1533.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1534.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1535.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1536.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**L.    Missouri Counts:**

**1.    Missouri Count 1: Breach of Implied Warranty of Merchantability (Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212) Against Defendants**

1537.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1538.   Plaintiffs bring this count individually and on behalf of the other members of the Missouri Class.

1539.   For purposes of this count, the Missouri Class Members shall be referred to as "Class Members."

1540.   For purposes of this count, Defendants shall be referred to as "Defendants."

1541.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212.

1542.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Rev. Stat. §§ 400.2-104(1) and 400.2A-103(3), and "sellers" of motor vehicles under § 400.2-103(1)(d).

1543.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

1544.   Class Members who purchased Class Vehicles in Missouri are "buyers" within the meaning of Mo. Rev. Stat. § 400.2-103(1)(a).

1545.   Class Members who leased Class Vehicles in Missouri are "lessees" within the meaning of Mo. Rev. Stat. § 400.2A-103(1)(n).

1546.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. §§ 400.2-105(1) and 400.2A-103(1)(h).

1547.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other

things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1548. However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1549. Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1550.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies.  Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1551.   Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 24, 2024, Class Members sent notice letters to them.

1552.   Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1553.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

     **2.**     **Missouri Count 2: Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, et seq.) Against All Defendants**

1554.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

fully set forth herein.

1555.  Plaintiffs bring this count individually and on behalf of the other members of the Missouri Class.

1556.  For purposes of this count, the Missouri Class Members shall be referred to as "Class Members."

1557.  Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1558.  Defendants were and are engaged in "trade or commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

1559.  The Class Vehicles are "merchandise" within the meaning of Mo. Rev. Stat. § 407.010(4). The sale or lease of the Class Vehicles is a "sale" within the meaning of Mo. Rev. Stat. § 407.010(6).

1560.  The Missouri Merchandising Practices Act ("Missouri MPA") states that "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice." Mo. Rev. Stat. § 407.020(1).

1561.  In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Missouri MPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1562.  Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the Missouri MPA in the course of their business. Specifically,

Defendants owed Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

    (a)    Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

    (b)    Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

    (c)    Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

    (d)    Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1563.    As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was

intended to induce consumers to purchase the Class Vehicles.

1564.  By misrepresenting the Class Vehicles as safe and reliable and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Mo. Rev. Stat. § 407.020(1): using or employing deception, fraud, false pretense, false promise or misrepresentation, unfair practice or the concealment, suppression or omission of a material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of the Class Vehicles in trade or commerce.

1565.  Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1566.  Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and State Class Members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1567.  Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants'

misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1568.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1569.   Had Class Members known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them. Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1570.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1571.   Pursuant to Mo. Rev. Stat. § 407.025, Plaintiffs and Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages, punitive damages and any other just and proper relief available under the Missouri MPA.

### 3.      Missouri Count 3: Fraud by Omission and Concealment Against All Defendants

1572.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1573.   Plaintiffs bring this count individually and on behalf of the other members of the Missouri Class.

1574. For purposes of this count, the Missouri Class Members shall be referred to as "Class Members."

1575. Defendants were aware of the Anti-Theft Security Defect when they marketed and sold the Class Vehicles to Plaintiffs and Class Members.

1576. Having been aware of the Anti-Theft Security Defect within the Class Vehicles, and having known that Plaintiffs and Class Members could not have reasonably been expected to know of the Anti-Theft Security Defect, Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs and Class Members in connection with the sale of the Class Vehicles. Defendants further had a duty to disclose the Anti-Theft Security Defect because:

> (a) Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

> (b) Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

> (c) Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

> (d) Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class

Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1577.   In breach of their duties, Defendants failed to disclose the Anti-Theft Security Defect to Plaintiffs and Class Members in connection with the sale of the Class Vehicles.

1578.   For the reasons set forth above, the Anti-Theft Security Defect within the Class Vehicles is material to the sale of the Class Vehicles because a reasonable person would find it important in purchasing, leasing, or retaining a new or used motor vehicle and because it directly impacts the value of the Class Vehicles purchased or leased by the Plaintiffs and Class Members.

1579.   Defendants intended for the Plaintiffs and Class Members to rely on their omissions and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would not have an Anti-Theft Security Defect that would affect the quality, reliability, and safety of the Class Vehicles.

1580.   Plaintiffs and Class Members' reliance was reasonable, as they had no way of discerning that learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1581.   Defendants actively concealed and suppressed these material facts, in whole or in part, to maintain a market for the Class Vehicles, to protect profits, and to avoid costly recalls that would expose them to liability for those expenses and harm the commercial reputations of Defendants and their products. They did so at the expense of Plaintiffs and Class Members.

1582.   If Defendants had fully and adequately disclosed the Anti-Theft Security Defect to

consumers, Plaintiffs and Class Members would have seen such a disclosure.

1583.  Through their omissions and concealment with respect to the Anti-Theft Security Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiffs and Class Members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

1584.  Had Plaintiffs and Class Members known of the Anti-Theft Security Defect within the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

1585.  As a direct and proximate result of Defendants' omissions, Plaintiffs and other Class Members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Anti-Theft Security Defect had been disclosed to them. Accordingly, Defendants are liable to Plaintiffs and Class Members for their damages in an amount to be proven at trial.

1586.  Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the Plaintiffs' and Class Members' rights and well-being; and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages, as permitted by law, in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### 4.      Missouri Count 4: Unjust Enrichment Against All Defendants

1587.  Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1588.  Plaintiffs bring this count individually and on behalf of the other members of the Missouri Class.

1589.  For purposes of this count, the Missouri Class Members shall be referred to as

"Class Members."

1590.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1591.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1592.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1593.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1594.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1595.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class

Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1596.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**M.     Nevada Counts:**

**1.     Nevada Count 1: Nevada Count 1: Breach of Implied Warranty of Merchantability (Nev. Rev. Stat. §§ 104.2314 and 104A.2212)**

1597.   Nevada Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1598.   Nevada Plaintiffs bring this cause of action as individuals and on behalf of the members of the Nevada Subclass.

1599.   Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1600.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

1601.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Nev. Rev. Stat. §§ 104.2104(1) and 104A.2103(3), and "sellers" of motor vehicles under § 104.2103(1)(c).

1602.   With respect to leases, Defendants were and are at all relevant times "lessors" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

1603.   Class Members who purchased Class Vehicles in Nevada are "buyers" within the

meaning of Nev. Rev. Stat. § 104.2103(1)(a).

1604.   Class Members who leased Class Vehicles in Nevada are "lessees" within the meaning of Nev. Rev. Stat. § 104A.2103(1)(n).

1605.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

1606.   Therefore, Defendants provided Plaintiffs and Nevada Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1607.   In violation of the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with secure, safe, and high-quality transportation. The Class Vehicles suffer from the Anti-Theft Security Defect, as alleged herein, and Defendants knew of its existence at the time the Class Vehicles were sold or leased.

1608.   The Class Vehicles' safety defects were present when the vehicles left Defendants' control. The defects result from Defendants' actions and decisions and were not created by subsequent events. Therefore, the Class Vehicles were not merchantable at the time of sale.

1609.   Plaintiffs and members of the Nevada Subclass have complied with all obligations under the warranty or have otherwise been excused from the performance of obligations because of Defendants' acts and omissions described herein.

1610.   Plaintiffs and members of the Nevada Subclass were not required to notify Defendants of the breach because affording Defendants additional opportunities to cure its breach would be futile. Defendants are on notice of the Anti-Theft Security Defect from complaints and requests they have received from Class Members, and complaints and reports they have received

through other channels, including their monitoring and subsequent investigations of stolen Class Vehicles.

1611.   Plaintiffs and the Nevada Subclass have suffered damages, and continue to suffer damages, resulting from the purchase of defective vehicles from Defendants as described herein.

### 2.     Nevada Count 2: Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. § 598.0903, et seq.)

1612.   Nevada Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1613.   Nevada Plaintiffs bring this count individually and on behalf of the other members of the Nevada Class.

1614.   For purposes of this count, the Nevada Class Members shall be referred to as "Class Members."

1615.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, et. seq. prohibits the use of deceptive trade practices in the course of business and occupation.

1616.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Nevada DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of the Class Vehicles and the Immobilizer Anti-Theft Security Defect, as detailed above.

1617.   Defendants had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the Nevada DTPA in the course of their business. Specifically, Defendants owed Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the Anti-Theft Security Defect from Plaintiffs and Class Members,

and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1618.   Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Nev. Rev. Stat. §§ 598.0915, 598.0923, and 598.0925:

(a)   Representing that the Class Vehicles have certifications which they do not have;

(b)   Representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(c)   Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

(d)   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

(e)   Failing to disclose the Anti-Theft Security Defect in connection with the sale of the Toyota Class Vehicles; and

(f)   Making an assertion of scientific fact in an advertisement which would cause a reasonable person to believe that the assertion is true.

Nev. Rev. Stat. §§ 598.0915(5), (7), (9), (15), 598.0923(2), and 598.0925.

1619.   Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1620.   Defendants' unfair or deceptive acts or practices were designed to mislead and had

a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1621. Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1622. Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1623. Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1624. Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1625.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1626.   Pursuant to Nev. Rev. Stat. §§ 41.600, Plaintiffs and Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Nevada DTPA.

### 3.   Nevada Count 3: Fraud by Omission and Concealment Against All Defendants

1627.   Nevada Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1628.   Nevada Plaintiffs bring this count individually and on behalf of the other members of the Nevada Class.

1629.   For purposes of this count, the Nevada Class Members shall be referred to as "Class Members." Defendants intentionally concealed from Plaintiffs the existence of the Anti-Theft Security Defect in the Class Vehicles.

1630.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiffs because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiffs and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1631.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs as set forth herein and based upon the following reasons:

(a)   Due to Defendants' exclusive, specific, and superior knowledge of the Anti-

Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)      Defendants were authoritative figures in the automotive industry and were trusted by Plaintiffs and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiffs' trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)      Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)      The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiffs and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)      Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiffs, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiffs and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1632.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1633.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiffs into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e)

underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiffs to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1634.   Plaintiffs could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1635.   Plaintiffs justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1636.   If Plaintiffs had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1637.   If the Plaintiffs and Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1638.   Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1639.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.     Nevada Count 4: Unjust Enrichment Against All Defendants

1640.   Nevada Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1641.   Nevada Plaintiffs bring this count individually and on behalf of the other members of the Nevada Class.

1642.   For purposes of this count, the Nevada Class Members shall be referred to as "Class Members."

1643.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1644.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1645.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1646.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1647.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1648.   Plaintiffs and Class Members are also entitled to injunctive relief compelling

Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1649.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

N.   **New Jersey Counts:**

    1.   **New Jersey Count 1: Breach of Implied Warranty of Merchantability (N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212) Against Defendants**

1650.   New Jersey Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1651.   New Jersey Plaintiffs bring this count individually and on behalf of the other members of the New Jersey Class.

1652.   For purposes of this count, the New Jersey Class Members shall be referred to as "Class Members."

1653.   For purposes of this count, Defendants shall be referred to as "Defendants."

1654.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212.

1655.   Defendants were and are at all relevant times "merchants" with respect to motor

vehicles under N.J. Stat. Ann. §§ 12A:2-104(1) and 12A:2A-103(3), and "sellers" of motor vehicles under § 12A:2-103(1)(d).

1656.   With respect to leases, Defendants were and are at all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

1657.   Class Members who purchased Class Vehicles in New Jersey are "buyers" within the meaning of N.J. Stat. Ann. § 12A:2-103(1)(a).

1658.   Class Members who leased Class Vehicles in New Jersey are "lessees" within the meaning of N.J. Stat. Ann. § 12A:2A-103(1)(n).

1659.   Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1660.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1661.   However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design

elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1662. Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1663. Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1664. Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 23,

2024, Class Members sent notice letters to them.

1665.  Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1666.  As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

## 2. New Jersey Count 2: Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, et seq.) Against All Defendants

1667.  New Jersey Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1668.  New Jersey Plaintiffs bring this count individually and on behalf of the other members of the New Jersey Class.

1669.  For purposes of this count, the New Jersey Class Members shall be referred to as "Class Members."

1670.  Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

1671.  The Class Vehicles are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

1672.  The New Jersey Consumer Fraud Act ("New Jersey CFA") prohibits unlawful practices. N.J. Stat. Ann. § 56:8-2.

1673.  In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the New Jersey CFA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1674.  Defendants had an ongoing duty to the Plaintiffs and Class Members to refrain from unfair or deceptive practices under the New Jersey CFA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

>    (a)     Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

>    (b)     Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

>    (c)     Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

>    (d)     Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known

safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1675.   As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1676.   By misrepresenting the Class Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1677.   Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1678. Defendants' unlawful acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles

had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including the Plaintiffs and Class Members, about the true safety and security of the Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1679.   Defendants' misrepresentations, concealments, omissions, and suppressions of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1680.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning that Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1681.   Had the Class Members known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1682.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1683.   Defendants' violations present a continuing risk to the Plaintiffs and Class

351

Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Additionally, their unlawful acts and practices complained of herein affect the public interest.

1684. Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and Class Members seek an order enjoining Defendants' unlawful acts or practices and awarding damages and any other just and proper relief available under the New Jersey CFA.

### 3. New Jersey Count 3: Fraudulent Concealment

1685. New Jersey Plaintiff Joyce Jones incorporates all foregoing paragraphs as though fully set forth herein.

1686. New Jersey Plaintiff Joyce Jones brings this cause of action as an individual and on behalf of the members of the New Jersey Subclass.

1687. Defendants intentionally concealed from Plaintiff the existence of the Anti-Theft Security Defect in the Class Vehicles.

1688. The existence of the Anti-Theft Security Defect was a material fact to Plaintiff because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiff and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1689. Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiff as set forth herein and based upon the following reasons:

(a) Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b) Defendants were authoritative figures in the automotive industry and were

trusted by Plaintiff and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiff's trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiff and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiff, or Class Members. These statistics, meticulously

collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiff and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1690. The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1691. Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiff and Class Members into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiff and Class Members to underestimate

the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1692.  Plaintiff and Class Members could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1693.  Plaintiff and Class Members justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1694.  If Plaintiff and Class Members had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1695.  If the Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1696.  Defendants' omissions damaged Plaintiff and Class Members because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1697.  Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.      New Jersey Count 4: Unjust Enrichment Against All Defendants

1698.  New Jersey Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1699.  New Jersey Plaintiffs bring this count individually and on behalf of the other

355

members of the New Jersey Class.

1700.   For purposes of this count, the New Jersey Class Members shall be referred to as "Class Members."

1701.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1702.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1703.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1704.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1705.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1706.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect

356

affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1707.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

## O.   Oregon Class

### 1.   Oregon Count 1: Breach of Implied Warranty (Or. Rev. Stat. § 72.3140 and 72A.2120) Against Defendants

1708.   Oregon Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1709.   Oregon Plaintiffs bring this count individually and on behalf of the other members of the Oregon Class.

1710.   For purposes of this count, the Oregon Class Members shall be referred to as "Class Members."

1711.   For purposes of this count, Defendants shall be referred to as "Defendants."

1712.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

1713.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

1714.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

1715.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

1716.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1717.   However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1718.   Any attempt by Defendants to disclaim or limit the implied warranty of

358

merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1719.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1720.   Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 23, 2024, Class Members sent notice letters to them.

1721.   Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an

adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1722.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

### 2.    Oregon Count 2: Violation of the Oregon Unlawful Trade Practices Act (Or. Rev. Stat. §§ 646.605, et seq.) Against All Defendants

1723.    Oregon Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1724.    Oregon Plaintiffs bring this count individually and on behalf of the other members of the Oregon Class.

1725.    For purposes of this count, the Oregon Class Members shall be referred to as "Class Members."

1726.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

1727.    Defendants are engaged in "trade" and "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

1728.    The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits unlawful practice in the course of business. Or. Rev. Stat. § 646.608(1).

1729.    In the course of their business, Defendants through their agents, employees, and/or subsidiaries, violated the Oregon UTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of

the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1730.   Defendants had an ongoing duty to the Plaintiffs and Class Members to refrain from unfair or deceptive practices under the Oregon UTPA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Anti-Theft Security Defect in the Class Vehicles because, as detailed above:

(a)   Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)   Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)   Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)   Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to

disclose the whole truth.

1731. As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1732. By misrepresenting the Class Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Or. Rev. Stat. § 646.608(1):

> (a) Causing likelihood of confusion or misunderstanding as to the approval or certification of the Class Vehicles;
>
> (b) Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> (c) Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and/or
>
> (d) Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

Or. Rev. Stat. § 646.608(1)(b), (e), (g), (i),

1733. Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1734. Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the

Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1735.   Defendants' misrepresentations, omissions, and concealment of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1736.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1737.   Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1738.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1739.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft

Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1740.   Pursuant to Or. Re. Stat. § 646.638, Plaintiffs and Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Oregon UTPA.

### 3.      Oregon Count 3: Fraudulent Concealment

1741.   Oregon Plaintiffs incorporate all foregoing paragraphs as though fully set forth herein.

1742.   Oregon Plaintiffs bring this cause of action as an individual and on behalf of the members of the Oregon Subclass.

1743.   Defendants intentionally concealed from Plaintiff the existence of the Anti-Theft Security Defect in the Class Vehicles.

1744.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiff because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiff and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1745.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiff as set forth herein and based upon the following reasons:

(a)      Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)      Defendants were authoritative figures in the automotive industry and were trusted by Plaintiff and Class Members. Defendants abused that trust to induce a

false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiff's trust. By emphasizing their commitment to the security of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiff and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiff, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the

theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiff and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1746. The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1747. Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiff and Class Members into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiff and Class Members to underestimate the risk of theft and the need for additional security measures; (g) received continuous security

updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1748.   Plaintiff and Class Members could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1749.   Plaintiff and Class Members justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1750.   If Plaintiff and Class Members had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1751.   If the Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1752.   Defendants' omissions damaged Plaintiff and Class Members because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1753.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.     Oregon Count 4: Unjust Enrichment Against All Defendants

1754.   Oregon Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1755.   Oregon Plaintiffs bring this count individually and on behalf of the other members of the Oregon Class.

1756.   For purposes of this count, the Oregon Class Members shall be referred to as "Class Members."

1757.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1758.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1759.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1760.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1761.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1762.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining

Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1763.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**P.   Texas Counts:**

### 1.   Texas Count 1: Breach of Implied Warranty of Merchantability (Tex. Bus. & Com. Code Ann. §§ 2.314 and 2A.212) Against Defendants

1764.   Texas Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1765.   Texas Plaintiffs bring this count individually and on behalf of the other members of the Texas Class.

1766.   For purposes of this count, the Texas Class Members shall be referred to as "Class Members."

1767.   For purposes of this count, Defendants shall be referred to as "Defendants."

1768.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Tex. Bus. & Com. Code Ann. §§ 2.314 and 2A.212.

1769.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code Ann. §§ 2.104(a) and 2A.103(c), and "sellers" of motor vehicles under § 2.103(a)(4).

1770.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code Ann. § 2A.103(a)(16).

1771.   All Class Members who purchased Class Vehicles in Texas are "buyers" within the meaning of Tex. Bus. & Com. Code Ann. § 2.103(a)).

1772.   All Class Members who leased Class Vehicles in Texas are "lessees" within the meaning of Tex. Bus. & Com. Code Ann. § 2A.103(a)(14).

1773.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code Ann. §§ 2.105(a) and 2A.103(a)(8).

1774.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1775.   However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable

to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1776.   Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1777.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1778.   Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 23, 2024, Class Members sent notice letters to them.

1779.   Alternatively, Plaintiffs and the Class Members were excused from providing

Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1780.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

2.      **Texas Count 2: Violation of the Deceptive Trade Practices- Consumer Protection Act (Tex. Bus. & Com. Code Ann. § 17.41, et seq.) Against All Defendants**

1781.   Texas Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1782.   Texas Plaintiffs bring this count individually and on behalf of the other members of the Texas Class.

1783.   For purposes of this count, the Texas Class Members shall be referred to as "Class Members."

1784.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(3).

1785.   The Plaintiffs and Class Members are "consumers" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(4).

1786.   The Class Vehicles are "goods" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(1).

1787.   Defendants were and are engaged in "trade" or "commerce" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(6). 28

1788.   The Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce[,]" Tex. Bus. & Com. Code Ann. § 17.46(a), and an "unconscionable action or course of action[,]" Tex. Bus. & Com. Code Ann. §§ 17.45(5) and 17.50(a)(3).

1789.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Texas DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, security, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1790.   Defendants had an ongoing duty to the Plaintiffs and Class Members to refrain from unfair or deceptive practices under the Texas DTPA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Immobilizer Security Defect in the Class Vehicles because as detailed above:

> (a)   Defendants had exclusive access to and far superior knowledge about facts regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

> (b)   Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

> (c)   Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security

Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)     Defendants made incomplete representations about the safety and security of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1791.   As detailed above, the information concerning the Anti-Theft Security Defect was known to Defendants at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

1792.   By misrepresenting the Class Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Anti-Theft Security Defect, Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Tex. Bus. & Com. Code Ann. §§ 17.46:

(a)     Representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(b)     Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and

(c)     Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

Tex. Bus. & Com. Code Ann. §§ 17.46(5), (7), and (9).

1793.   Defendants intended for Plaintiffs and Class Members to rely on them to provide adequately designed Class Vehicles, and to honestly and accurately reveal the safety hazards described above.

1794.   Defendants' unfair and deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including the Plaintiffs and Class Members, about the true safety and security of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1795.   Defendant's misrepresentations, concealments, omissions, and suppressions of material facts regarding the Anti-Theft Security Defect and true characteristics of the Class Vehicles were material to the decisions of the Plaintiffs and Class Members to purchase and lease those vehicles, as intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1796.   Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning that Defendants' representations were false and misleading, or otherwise learning that the Class Vehicles contained the Anti-Theft Security Defect, as alleged above. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1797.   Had they known the truth about the Anti-Theft Security Defect, Plaintiffs and Class

Members would not have purchased or leased Class Vehicles, or would have paid significantly less for them.

1798.   Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1799.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1800.   On August 23, 2024, Class Members sent Defendants notice of the Anti-Theft Security Defect. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, internet videos, news reports, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Class Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek all damages and relief to which Class Members are entitled.

1801.   Alternatively, any requirement to give notice to the Defendants under Tex. Bus. & Com. Code Ann. § 17.505(a) is excused because, inter alia, notice was impracticable due to the necessity of filing suit in order to prevent the expiration of the statute of limitations on certain Plaintiffs and Class Members' claims.

1802.   Pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Plaintiffs and Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Texas DTPA.

### 3. Texas Count 3: Fraud by Omission and Concealment Against All Defendants

1803.   Texas Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1804.   Texas Plaintiffs bring this count individually and on behalf of the other members of the Texas Class.

1805.   For purposes of this count, the Texas Class Members shall be referred to as "Class Members."

1806.   The existence of the Anti-Theft Security Defect was a material fact to Plaintiffs because it directly impacted the quality, dependability, safety, and security of the Class Vehicles, which are critical considerations for any vehicle owner. By concealing this defect, Defendants prevented Plaintiffs and Class Members from making informed decisions regarding the purchase or lease of these vehicles, substantially affecting their personal safety and financial interests.

1807.   Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs as set forth herein and based upon the following reasons:

(a)   Due to Defendants' exclusive, specific, and superior knowledge of the Anti-Theft Security Defect and technical procedures for adding transponder keys to SKIS, Defendants were required to disclose this defect to Class Members.

(b)   Defendants were authoritative figures in the automotive industry and were trusted by Plaintiffs and Class Members. Defendants abused that trust to induce a false sense of security regarding the safety of their vehicles. The Dodge Brand Chief Executive Officer's public assurance, which was intended to address public concerns over the increasing theft of Class Vehicles, exemplifies Defendants' manipulation of Plaintiffs' trust. By emphasizing their commitment to the security

of their products and their customers, Defendants fostered a special relationship of reliance, which misled Class Members into believing that potential vulnerabilities had been promptly and effectively addressed.

(c)     Defendants had a clear and continuing statutory obligation to inform vehicle owners, lessees, and potential consumers about any safety defects or non-conformances to Federal Motor Vehicle Safety Standards. See 49 CFR 577.5(a); 49 U.S. Code § 30118(c).

(d)     The inherent safety risks associated with the Anti-Theft Security Defect necessitated that Defendants disclose such defects to Plaintiffs and Class Members. The documented incidents involving stolen vehicles—ranging from their use in violent crimes to fatal high-speed crashes—demonstrate the dangerous nature of the Anti-Theft Security Defect. Furthermore, the direct threats to Class Members, including violent thefts and tragic instances of harm while attempting to recover stolen vehicles, unequivocally illustrate the danger posed by the Anti-Theft Security Defect.

(e)     Defendants had exclusive access to comprehensive and proprietary theft statistics related to the Class Vehicles, which is information that was not made available to the public, Plaintiffs, or Class Members. These statistics, meticulously collected and analyzed by Defendants, provided a detailed understanding of the theft rates, methods, and vulnerabilities specifically associated with the Anti-Theft Security Defect in the Class Vehicles. Plaintiffs and Class Members were only privy to fragmented and superficial snippets of information regarding vehicle thefts, without the benefit of the comprehensive data held by Defendants. Such

378

snippets were often disseminated through limited press releases, generalized statements, or partial disclosures that failed to convey the true magnitude and specific nature of the theft risk posed by the Anti-Theft Security Defect.

1808.   The media and law enforcement made inquiries upon Defendants to address the increasing theft rate of Class Vehicles. Defendants responded with half-truth statements and initiated a campaign of perfunctory software updates designed to conceal the full extent of the Anti-Theft Security Defect as alleged herein. These actions were ostensibly aimed at addressing the rising theft rates but were actually designed to conceal the full extent of the Anti-Theft Security Defect by distracting Class Members, the public, media, law enforcement, and others who may have uncovered the true nature of the Anti-Theft Security Defect.

1809.   Defendants concealed the existence of the Anti-Theft Security Defect with the intent and purpose to mislead Plaintiffs into believing that Class Vehicles: (a) had starting systems that complied with industry standards and federal regulations; (b) required an authorized key to start the vehicle; (c) had theft rates consistent with competing vehicles; (d) were equipped with advanced anti-theft technology capable of deterring unauthorized access and operation; (e) underwent rigorous security testing to identify and rectify potential vulnerabilities before reaching the market; (f) provided a level of security that would protect against theft more effectively than what was actually the case, leading Plaintiffs to underestimate the risk of theft and the need for additional security measures; (g) received continuous security updates and enhancements that effectively addressed known vulnerabilities, suggesting an ongoing commitment to vehicle security that was not reflected in the actions taken to mitigate the Anti-Theft Security Defect.

1810.   Plaintiffs could not have discovered the Anti-Theft Security Defect through reasonable inquiry or inspection due to its technical nature.

1811.   Plaintiffs justifiably and reasonably relied upon Defendants' misleading statements and omissions.

1812.   If Plaintiffs had known of the Anti-Theft Security Defect at the time they purchased or leased their Class Vehicles, then they would have paid less or acquired a non-defective vehicle from a competing manufacturer.

1813.   If the Plaintiffs and Class Members whose vehicles were stolen had been aware of the Anti-Theft Security Defect, then they would have purchased aftermarket security systems, avoided parking in public areas, or taken other measures to prevent the theft.

1814.   Defendants' omissions damaged Plaintiffs because they purchased cars with security systems that were defective, substandard, unsafe, easily stolen, and diminished in value.

1815.   Defendants committed this fraudulent omission intentionally, maliciously, deliberately, and recklessly in such a way that warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

### 4.   Texas Count 4: Unjust Enrichment Against All Defendants

1816.   Texas Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1817.   Texas Plaintiffs bring this count individually and on behalf of the other members of the Texas Class.

1818.   For purposes of this count, the Texas Class Members shall be referred to as "Class Members."

1819.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1820.   Plaintiffs and Class Members would not have purchased or leased their Class

Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1821.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1822.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1823.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1824.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1825.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal

remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

**Q.    Wisconsin Counts**

**1.    Wisconsin Count 1: Breach of Implied Warranty of Merchantability (Wis. Stat. §§ 402.314 and 411.212) Against Defendants**

1826.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1827.   Plaintiffs bring this count individually and on behalf of the other members of the Wisconsin Class.

1828.   For purposes of this count, the Wisconsin Class Members shall be referred to as "Class Members."

1829.   For purposes of this count, Defendants shall be referred to as "Defendants."

1830.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

1831.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1832.   With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1833.   All Class Members who purchased Class Vehicles in Wisconsin are "buyers" within the meaning of Wis. Stat. § 402.103(1)(a).

1834.   All Class Members who leased Class Vehicles in Wisconsin are "lessees" within the meaning of Wis. Stat. § 411.103(1)(n).

1835.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and sold by Defendants, were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state laws and regulations, including FMVSS 114.

1836.   However, the Class Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Anti-Theft Security Defect, lacking any anti-theft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a substantial safety hazard because the Anti-Theft Security Defect renders Class Vehicles vulnerable to theft, making them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

1837.   Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Class Vehicles without informing consumers about the Anti-Theft Security Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things,

Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and other Class Members. Additionally, Defendants knew of the Anti-Theft Security Defect at the time of sale.

1838.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that the Plaintiffs and Class Members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Class Members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present risk of them being stolen.

1839.   Plaintiffs and Class Members have provided Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Class Members within a reasonable amount of time after the Anti-Theft Security Defect became public. Additionally, on August 24, 2024, Class Members sent notice letters to them.

1840.   Alternatively, Plaintiffs and the Class Members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Class Vehicles contained the Anti-Theft Security Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Class Vehicles. As such, Plaintiffs and Class Members had no reason to believe that Defendants would have adequately repaired the Anti-Theft Security Defect if they presented their Class Vehicles to them for repair.

1841.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs' and Class Members' Class Vehicles were and are defective, and the

Anti-Theft Security Defect in their Class Vehicles has not been remedied. Therefore, Plaintiffs and Class Members have been damaged, in an amount to be proven at trial.

> **2.      Wisconsin Count 2: Violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18, et seq.) Against All Defendants**

1842.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1843.   Plaintiffs bring this count individually and on behalf of the other members of the Wisconsin Class.

1844.   For purposes of this count, the Wisconsin Class Members shall be referred to as "Class Members."

1845.   Defendants are "person[s], firm[s], corporation[s], or association[s]" within the meaning of Wis. Stat. § 100.18(1).

1846.   Plaintiffs and Class are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

1847.   The Class Vehicles are "merchandise" within the meaning of Wis. Stat. § 100.18(1).

1848.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits any "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

1849.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Wisconsin DTPA by knowingly and intentionally misrepresenting material facts regarding the quality, reliability, and safety of the Class Vehicles and the Anti-Theft Security Defect, as detailed above.

1850.   By misrepresenting the Class Vehicles as safe and reliable and free from defects,

Defendants violated the Wisconsin DTPA by making assertions, representations and statements of fact which are untrue, deceptive or misleading, as prohibited by Wis. Stat. § 100.18(1).

1851. Defendants' unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had adequate anti-theft protection, and that the Class Vehicles were not affected by the Anti-Theft Security Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1852. Defendants' misrepresentations of material facts regarding the Anti-Theft Security Defect the Class Vehicles were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiffs and Class Members were exposed to those misrepresentations of material facts, and relied on Defendants' misrepresentations that the Class Vehicles were safe and reliable in deciding to purchase and lease Class Vehicles.

1853. Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning that Defendants' representations were false and misleading. Plaintiffs and Class Members did not, and could not, unravel Defendants deception on their own.

1854. Had Plaintiffs and Class Members known the truth about the Anti-Theft Security Defect, Plaintiffs and Class Members would not have purchased or leased Class Vehicles, or would have paid significantly less for them.

1855. Plaintiffs and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

disclose material information.

1856.   Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Anti-Theft Security Defect. Defendants' unlawful acts and practices complained of herein affect the public interest.

1857.   Pursuant to Wis. Stat. § 100.18(11)(b)(2), Plaintiffs and Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Wisconsin DTPA.

**3.     Wisconsin Count 3: Fraud by Omission and Concealment Against All Defendants**

1858.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1859.   Plaintiffs bring this count individually and on behalf of the other members of the Wisconsin Class.

1860.   For purposes of this count, the Wisconsin Class Members shall be referred to as "Class Members."

1861.   Defendants were aware of the Anti-Theft Security Defect when they marketed and sold the Class Vehicles to Plaintiffs and Class Members.

1862.   Having been aware of the Anti-Theft Security Defect within the Class Vehicles, and having known that Plaintiffs and Class Members could not have reasonably been expected to know of the Anti-Theft Security Defect, Defendants had a duty to disclose the Anti-Theft Security Defect to Plaintiffs and Class Members in connection with the sale of the Class Vehicles. Defendants further had a duty to disclose the Anti-Theft Security Defect because:

(a)     Defendants had exclusive access to and far superior knowledge about facts

387

regarding the Anti-Theft Security Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members;

(b)     Given the Anti-Theft Security Defect's hidden and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle components that would be necessary to discover the Anti-Theft Security Defect on their own;

(c)     Defendants knew that the Anti-Theft Security Defect gave rise to safety concerns for the consumers who use the Class Vehicles, and the Anti-Theft Security Defect would have been a material fact to the Class Members' decisions to buy or lease Class Vehicles; and

(d)     Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to the consumers that the Class Vehicles contained the Anti-Theft Security Defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, Defendants had the duty to disclose the whole truth.

1863.   In breach of their duties, Defendants failed to disclose the Anti-Theft Security Defect to Plaintiffs and Class Members in connection with the sale of the Class Vehicles.

1864.   For the reasons set forth above, the Anti-Theft Security Defect within the Class Vehicles is material to the sale of the Class Vehicles because a reasonable person would find it important in purchasing, leasing, or retaining a new or used motor vehicle and because it directly

impacts the value of the Class Vehicles purchased or leased by the Plaintiffs and Class Members.

1865.   Defendants intended for the Plaintiffs and Class Members to rely on their omissions and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would not have an Anti-Theft Security Defect that would affect the quality, reliability, and safety of the Class Vehicles.

1866.   Plaintiffs and Class Members' reliance was reasonable, as they had no way of discerning that learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own.

1867.   Defendants actively concealed and suppressed these material facts, in whole or in part, to maintain a market for the Class Vehicles, to protect profits, and to avoid costly recalls that would expose them to liability for those expenses and harm the commercial reputations of Defendants and their products. They did so at the expense of Plaintiffs and Class Members.

1868.   If Defendants had fully and adequately disclosed the Anti-Theft Security Defect to consumers, Plaintiffs and Class Members would have seen such a disclosure.

1869.   Through their omissions and concealment with respect to the Anti-Theft Security Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiffs and Class Members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

1870.   Had Plaintiffs and Class Members known of the Anti-Theft Security Defect within the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

1871.   As a direct and proximate result of Defendants' omissions, Plaintiffs and other Class Members either overpaid for the Class Vehicles or would not have purchased the Class

Vehicles at all if the Anti-Theft Security Defect had been disclosed to them. Accordingly, Defendants are liable to Plaintiffs and Class Members for their damages in an amount to be proven at trial.

1872.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the Plaintiffs' and Class Members' rights and well-being; and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages, as permitted by law, in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### 4.      Wisconsin Count 4: Unjust Enrichment Against All Defendants

1873.   Plaintiffs reallege and incorporate by reference all allegations in Sections I-VI as if fully set forth herein.

1874.   Plaintiffs bring this count individually and on behalf of the other members of the Wisconsin Class.

1875.   For purposes of this count, the Wisconsin Class Members shall be referred to as "Class Members."

1876.   When they purchased and leased the Class Vehicles, Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

1877.   Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Anti-Theft Security Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

1878.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew

of these benefits because they were aware of the Anti-Theft Security Defect, yet they failed to disclose this knowledge and misled the Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

1879.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

1880.   Plaintiffs and Class Members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

1881.   Plaintiffs and Class Members are also entitled to injunctive relief compelling Defendants to offer, at no additional cost, remediation solutions for the Anti-Theft Security Defect affecting Class Vehicles. Plaintiffs also seek injunctive relief in the form of an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles and enjoining Defendants from selling the Class Vehicles with misleading information concerning the Defect.

1882.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs would have no adequate legal remedy. Plaintiffs also do not have an adequate remedy at law because monetary damages will not provide the prospective injunctive relief Plaintiffs demand.

## VIII.   PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and on behalf of the proposed Classes, respectfully request that this Court:

a.   Enter an order certifying the Classes under Rule 23 of the Federal Rules of Civil

Procedure;

b.  Designate Plaintiffs as the representatives of the Classes and appoint Plaintiffs' counsel as counsel for the Classes;

c.  Enter a judgment against Defendants for the causes of action alleged herein, award Plaintiffs damages, reasonable attorneys' fees, expenses, and costs;

d.  Grant permanent injunctive relief, enjoining the Defendants from selling vehicles with the Anti-Theft Security Defect and ordering Defendants to fix or replace Class Vehicles;

e.  Award other compensatory, punitive, exemplary, or other recoverable damages as appropriate;

f.  Award pre- and post-judgment interest;

g.  Grant such other relief as the Court deems just and equitable under the circumstances.

## IX.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable. Fed. R. Civ. P. 38.

Dated: September 6, 2024                    Respectfully submitted,

Anthony G. Simon (53455)
Jeremiah W. Nixon*                    By:_____
*Pending Application for Admission           Anthony G. Simon
to Eastern District of Michigan*
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, Missouri 63101
Ph: 314.241.2929
Fax: 314.241.2029
asimon@simonlawpc.com
jnixon@simonlawpc.com

Mark M. Berardi*
Daniel A. Hawkins*
*Pending Application for Admission
to Eastern District of Michigan
BERARDI AND ASSOCIATES LLC
14919 Founders Crossing
Homer Glen, IL 60491
Ph: 708.942.8030
Fax: 815.205.3546
Mark@berardilawoffice.com
Daniel@berardilawoffice.com

Don M. Downing
Gretchen Garrison
Jack A. Downing
GRAY RITTER GRAHAM
701 Market Street, Suite 800
St. Louis, MO 63101
Ph: 314.241.5620
ddowning@grgpc.com
ggarrison@grgpc.com
jdowning@grgpc.com

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Jonathan D. Lindenfeld
FEGAN SCOTT LLC
305 Broadway, 7th Floor
New York, NY  10007
Ph: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

OLSMAN MACKENZIE & PEACOCK

Emily M. Peacock (P64410)
Attorneys for Plaintiff
2684 West Eleven Mile Road
Berkley, MI 48072
248-591-2300 / (248) 591-2304 [fax]
epeacock@olsmanlaw.com

Dated:  September 6, 2024